## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

K.H., INDIVIDUALLY                                     )
AND ON BEHALF OF MINOR K.J.,                           )
                                                       )
and                                                    )
                                                       )
M.M., INDIVIDUALLY                                     )
AND ON BEHALF OF MINOR L.E.,                           )
                                                       )
                                                       )
and                                                    )
                                                       )
L.C., INDIVIDUALLY                                     )
AND ON BEHALF OF MINOR T.C.,                           )
                                                       )
                                                       )
      D.C. KinCare Alliance                       )
      1101 Connecticut Avenue NW, Suite 450       )
      Washington, D.C. 20036                      )
                                                       )
          Plaintiffs                      )        Civil Action No.
                                                       )
       v.                                    )        JURY TRIAL DEMANDED
                                                       )
                                                       )
THE DISTRICT OF COLUMBIA.                              )
      One Judiciary Square                        )
      441 Fourth Street, NW                       )
      Washington, D.C. 20001                      )
                                                       )
      SERVE:                                      )
                                                       )
      MURIEL BOWSER,                              )
      Mayor of the District of Columbia           )
      1350 Pennsylvania Avenue, NW, 4th Fl.       )
      Washington, D.C. 20004                      )
                                                       )
      KARL RACINE                                 )
      Attorney General for DC                     )
      441 4th Street NW, Suite 630 South          )
      Washington, DC. 20001,                      )
                                                       )

1

and                                               )
                                                  )
DC CHILD AND FAMILY SERVICES AGENCY )
    BRENDA DONALD, Director            )
    200 I Street, SE                   )
    Washington, DC 20003               )
                                                  )
        Defendants            )
                                                  )

## COMPLAINT

## I. PRELIMINARY STATEMENT

1.  The District of Columbia ("DC") is obligated under federal and DC law to safeguard children's health and well-being, and, in particular, to take necessary and appropriate steps to ensure that abused or neglected children who cannot be protected from harm in the home are placed in a safe environment and provided assistance, including financial support. Specifically, if DC, through its agency the DC Child and Family Services Agency ("CFSA") (collectively the "Defendants"), determines that a child has been neglected or abused and is in imminent danger in their current home, CFSA is required to immediately remove the child from the unsafe home and place the child with a licensed foster parent. Following this emergency removal, CFSA must petition the DC Superior Court to initiate a neglect case and formally seek legal custody of the child.

2.  CFSA must consider giving preference to an adult relative over a non-related caregiver when placing a child in foster care. When CFSA places a child with a relative, which is known as kinship placement or kinship foster care, CFSA is required to license the relative as a foster parent. Once the child has been placed with a licensed foster parent, the child is entitled to a number of services that help to ensure his or her continued health and safety, including continued court and

CFSA supervision. Additionally, the foster parent is entitled to foster care maintenance payments to help alleviate the financial burden of caring for the child.

3.      Despite these requirements, Defendants, for at least the last 10 years, have adopted the custom and practice of kinship diversion, where Defendants remove children from the custody of their parents and informally place them in the care of a family member or relative caregiver, rather than a placement in kinship foster care with that same relative caregiver. Because these children are diverted to live with a relative caregiver informally rather than formally placed with a licensed foster parent, Defendants take the position that neither the child nor relative caregiver is entitled to services or foster care maintenance payments. Accordingly, by ignoring the legally-required removal and placement procedures, Defendants avoid their legal and financial responsibilities to support these children and their relative caregivers. Indeed, on information and belief, Defendants have adopted this custom and practice of kinship diversions to relative caregivers, and now utilize it routinely, ***precisely in order to avoid those responsibilities***. The use of kinship diversion rather than kinship placement deprives both child and caregiver of their rights to assistance, in violation of the United States Constitution, and state and federal law.

4.      Plaintiff K.J. (hereinafter "K.J.")[1] is a five-year-old girl whose parents are unable to provide her with necessary and adequate care due to her parents' mental and developmental health issues and housing instability. K.J.'s parents have neglected and abused K.J. As a result, Defendants removed K.J. from her mother's home and informally and illegally placed K.J. via

---

[1] Pursuant to Rule 5.2(a) of the Federal Rules of Civil Procedure and Rule 5.4(f) of the Local Rules of the U.S. District Court for the District of Columbia, all minor Plaintiffs are identified by their initials. Plaintiffs have filed a motion and accompanying memorandum requesting leave of the Court for all adult Plaintiffs and minor Plaintiff's biological parents to be identified anonymously and for all Plaintiffs' residential addresses to be substituted with the address of their counsel, DC KinCare Alliance.

kinship diversion to the care of her maternal aunt, Plaintiff K.H. (hereinafter "K.H."). K.H. has continued to care for K.J. on a daily basis since Defendants effected the kinship diversion on October 18, 2018. During this time, K.H. has submitted numerous requests to CFSA to license her as a foster parent and to provide financial support. Defendants have refused each of K.H.'s requests for licensure as a foster parent and for financial assistance. To date, these failures have resulted in withheld foster care support services and financial losses of approximately $13,680 in withheld foster care payments and other amounts to be determined at trial.

5.      Plaintiff L.E. (hereinafter "L.E.") is an eight-month-old girl whose parents are unable to provide her with necessary and adequate care because of, *inter alia*, her parents' substance use and mental health issues, domestic violence, and housing instability. L.E.'s parents have neglected and physically abused L.E. As a result, Defendants removed L.E. from her mother's care and informally and illegally placed her via kinship diversion to the care of her maternal grand-aunt, Plaintiff M.M. (hereinafter "M.M."). M.M. has continued to care for L.E. on a daily basis since Defendants effected the kinship diversion on February 20, 2019. During this time, M.M. submitted a written request to CFSA to license her as L.E.'s foster parent. Defendants denied M.M.'s request for licensure as a foster parent. To date, these failures have resulted in withheld foster care support services and financial losses of approximately $9,082 in withheld foster care payments and other amounts to be determined at trial.

6.      Plaintiff T.C. (hereinafter "T.C.") is a fourteen-year-old boy whose parents are unable to provide him with necessary and adequate care because of, *inter alia*, his parents' substance use and mental health issues and housing instability. T.C.'s parents have neglected and physically abused T.C. As a result, Defendants removed T.C. and four of his siblings from their mother's home and informally and illegally placed them via kinship diversion to the care of their paternal

grandmother, Plaintiff L.C. (hereinafter "L.C."). L.C. cared for T.C.'s siblings from March 6, 2019 until June 22, 2019 and has continued to care for T.C. on a daily basis since Defendants effected the kinship diversion in March. During this time, L.C. submitted a written request to CFSA to license her as a foster parent. Defendants denied L.C.'s request for licensure as a foster parent. To date, these failures have resulted in withheld foster care support services and financial losses of approximately $25,118 in withheld foster care payments and other amounts to be determined at trial.

7.      As a direct consequence of Defendants' conduct, K.J., K.H., L.E., M.M., T.C. and L.C. (together, the "Plaintiffs") have been and continue to be denied the full services, economic benefits and other rights to which they are entitled under federal and DC law.

8.      Moreover, Defendants have violated federal and DC law by discriminating against Plaintiffs and other "kinship families" (*i.e.,* families in which children who were abused and/or neglected and are now being raised by relatives who could be licensed as foster parents but are not, due to Defendants' custom and practice). Defendants do so by treating kinship families differently and less supportively than Defendants treat children in licensed foster care and their foster parents.

9.      This action seeks declaratory and injunctive relief, as well as damages, to redress the violations of federal and DC law.

## II. JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and 42 U.S.C. § 1983 because this action arises under the Constitution and the laws of the United States. Specifically, this action arises under Title IV-E of the Social Security Act, 42 U.S.C. §§

670-679c ("Social Security Act"), and the Fifth and Fourteenth Amendments to the United States Constitution.

11.     Plaintiffs' claims for declaratory relief and damages are authorized by 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 1983, and by the inherent powers of this court in law and in equity.

12.     This Court also has supplemental jurisdiction over Plaintiffs' pendant state law claims under 28 U.S.C. § 1367.

13.     Venue is proper under 28 U.S.C. §1391(b)(2) because all of the events and omissions giving rise to Plaintiffs' claims occurred in the District of Columbia.

### III. PARTIES

14.     Plaintiff K.J. is a minor child who was removed from the custody of her biological parents and placed via kinship diversion in the care of her maternal aunt, K.H. As the legal custodian of K.J., Plaintiff K.H. brings this action on her own behalf and on behalf of K.J. Plaintiffs are citizens of the United States and have been DC residents at all relevant times.

15.     Plaintiff L.E. is a minor child who was removed from the custody of her biological mother and placed via kinship diversion in the care of her maternal great-aunt, M.M. As the legal custodian of L.E., Plaintiff M.M. brings this action on her own behalf and on behalf of L.E. Plaintiffs are citizens of the United States and have been DC residents at all relevant times.

16.     Plaintiff T.C. is a minor child who was removed from the custody of his biological mother and placed via kinship diversion in the care of his paternal grandmother, L.C. As the legal custodian of T.C., Plaintiff L.C. brings this action on her own behalf and on behalf of T.C. Plaintiffs are citizens of the United States and have been DC residents at all relevant times.

17.     Defendant District of Columbia is the government of the District of Columbia. Defendant District of Columbia operates and has oversight over Defendant CFSA.

18.     Defendant CFSA is a cabinet-level agency of the District of Columbia charged with administering the child welfare support system and ensuring the safety and well-being of children residing within the District of Columbia. CFSA is responsible both for responding to and investigating reports of child abuse and neglect and for removing and placing neglected or abused children who cannot be protected with services in their own home.

## IV. FEDERAL AND DC LAW GOVERNING DC'S OBLIGATIONS TO ABUSED AND NEGLECTED CHILDREN AND THEIR CAREGIVERS

19.     By acting through CFSA to effectuate kinship diversions without following the legally required procedures, Defendant District of Columbia has violated and continues to violate the Social Security Act, DC's Prevention of Child Abuse and Neglect Act of 1977 ("Child Abuse and Neglect Act"), the District of Columbia Human Rights Act of 1977 ("DC Human Rights Act"), and the Fifth and Fourteenth Amendment rights of the Plaintiffs.

20.     By effectuating kinship diversions without following the legally required procedures, Defendant CFSA has violated and continues to violate the Social Security Act, the Child Abuse and Neglect Act, the DC Human Rights Act, and the Fifth and Fourteenth Amendments of the United States Constitution.

**A.      Obligations Under The Federal Social Security Act**

21.     Title IV-E of the Social Security Act establishes a federal-state grant program that is designed to ensure that abused and neglected children who cannot be protected from harm in their homes are placed in a safe and stable environment until those children are able to safely return home or are placed in another permanent living arrangement.

22.     The Social Security Act requires any "State"[2] that opts to receive Title IV funds to have a

state plan approved by the Secretary of the U.S. Department of Health and Human Services which,

in pertinent part –

   (a) requires that foster care maintenance payments be made on behalf of a child in foster

       care, if "the child while in the home, would have met the [TANF][3] eligibility

       requirement . . . .";

   (b) requires that reasonable efforts be made to preserve and reunify families by seeking to

       prevent or eliminate the need for removing the child from his or her home prior to

       placement in foster care and to make it possible for the child to safely return to his or

       her home;

   (c) requires that in making such reasonable efforts, "the child's health and safety shall be

       the paramount concern";

   (d) requires that due diligence be exercised to identify and provide notice to adult relatives

       within 30 days of effecting a removal, and specifically requires that such notice, among

       other things, explain the options the relative has under federal and state law to participate

       in the care and placement of the child and describe the requirements to become a kinship

       foster parent as well as the additional services and support available to foster children;

   (e) requires the State to consider giving preference to an adult relative over a non-related

       caregiver when determining a placement for a child;

---

[2] Under the Act, the term "State" includes DC. 42 U.S.C. § 603(b)(7).
[3] TANF, which stands for Temporary Assistance for Needy Families, is a federal program that
provides assistance to families with children when the parents or other responsible relatives cannot
provide for the family's basic needs.

(f) requires that children in foster care receive quality services to protect their health and safety;

(g) provides for the development of a "case plan" for each child in foster care and the establishment of a "case review system" with respect to such child; and

(h) requires that, if the family cannot safely be reunified, steps be taken to finalize a permanent placement for the child.

42 U.S.C. §§ 671 and 672.

23.     Pursuant to the Social Security Act, the State is required to make foster care maintenance payments on behalf of a child in foster care, which "cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." § 675(4)(A).

24.     Additionally, each child in foster care is entitled to a written "case plan," that (i) describes the type of placement, including the safety and appropriateness of the placement; (ii) sets forth a plan to ensure that the child receives safe and proper care and that "services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care"; (iii) includes the child's health and education records and ensures the educational stability of the child; and (iv) includes the steps the agency has taken to achieve permanency for a child whose plan is adoption or placement in another permanent home. §§ 671(a)(16) and 675(1). Each case plan must be reviewed under the State's "case review system" which ensures the child's case plan and status is reviewed by a court or administrative body at

least every six months to assess the child's safety, the continuing need for and appropriateness of the placement, compliance with the case plan, progress toward alleviating or mitigating the causes necessitating placement in foster care, and the likely date by which the child may be safely returned to his or her home or placed for adoption or legal guardianship. §§ 671(a)(16) and 675(5).

**B.      Obligation Under DC's Prevention of Child Abuse and Neglect Act of 1977 and Related Statutory Provisions**

25.      The District of Columbia Prevention of Child Abuse and Neglect Act of 1977 provides that CFSA shall, among other things: (i) receive and respond to reports of child abuse and neglect[4]; (ii) when necessary, remove children from their homes; (iii) ensure that children who have been abused or neglected are protected from further experiences and conditions detrimental to their healthy growth and development; (iv) obtain substitute care for a child whose parents are unable to meet the child's minimum needs; (v) provide services and resources to abused and neglected children and their families, including services aimed at safely reuniting the family as quickly as possible; and (vi) ensure timely permanent placement of the child where reunification is not possible. D.C. Code § 4-1303.01a. *See also* § 4-1303.03 *et seq*.

26.      Pursuant to its responsibility to receive and respond to reports of child abuse and neglect, CFSA is required to "conduct a thorough investigation of a report of suspected child abuse or neglect to protect the health and safety of the child or children when . . . [CFSA] suspects a child is at imminent risk of or has experienced abuse or neglect that [CFSA] determines to be severe."

---

[4] Under the Act, child abuse is defined to include the infliction of physical or mental injury upon a child, sexual abuse or exploitation of a child, and the negligent treatment or maltreatment of a child. D.C. Code § 16-2301(23)(A). A neglected child is, *inter alia*, a child who is without proper parental care or control, subsistence, education or other care necessary for his or her physical, mental, or emotional health, and a child whose parent, guardian, or custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity. § 16-2301 (9)(A)(ii) and (iii).

§ 4-1301.04(a)(1). Such investigation must commence "immediately upon receiving a report . . . indicating that the child's safety or health is in immediate danger." § 4-1301.04(b)(1). The initial phase of the investigation must be completed within 24 hours of its commencement and must include, among other things, seeing the child, conducting interviews of the child's caretakers, assessing the safety of the home where the child lives, deciding on the safety of the child in the household, and making a finding of whether the report of abuse or neglect is substantiated, inconclusive, or unfounded. § 4-1301.04(c). The full investigation, which must be completed no later than 30 days after receipt of the report, must determine "the nature, extent, and cause of the abuse or neglect, if any." § 4-1301.06(a)-(b)(1).[5] Further, if the suspected abuse or neglect is substantiated, the investigation shall determine whether there is any child in the home whose health, safety, or welfare is at risk and whether any child who is at risk should be removed from the home or can be protected by the provision of resources. § 4-1301.06(b)(3).

27.     Under the statute, CFSA's determinations during the investigation dictate the next steps that CFSA is required to take. At all times during this process, CFSA must ensure the safety of the child. To do so, "[i]n cases in which a child is alleged to be a neglected, but not an abused, child [CFSA] shall determine whether the child should be removed from the home or can be protected by the provision of services or resources."  § 4-1301.07(a). When CFSA determines that a child has been abused or neglected and should be removed from their home, CFSA's Director is authorized to petition the DC Superior Court for a finding of abuse or neglect and seek legal custody of the child, which, if granted, will provide CFSA with legal custody of the child who will then be placed with a licensed foster parent. § 4-1303.04(c)(2).

_____

[5] While the Agency is permitted 30 days, oftentimes the abuse or neglect is readily apparent and is effectively substantiated when the social worker arrives at the scene.

28.     If there is an immediate safety issue or risk of danger to the child and "in the opinion of [CFSA] . . . there is insufficient time to petition for removal, the [CFSA] shall request the police to remove the child . . . ." § 4-1301.07(a). Further, "A child may be taken into custody ... by any employee of [CFSA] authorized to do so, or a law enforcement officer, when he or she has reasonable grounds to believe that the child is in immediate danger from his or her surroundings and that the removal of the child from his or her surroundings is necessary . . . ." § 16-2309(a)(3).

29.     For each child who is removed to foster care, DC must provide monetary benefits to the foster parent on behalf of the child if the child is eligible for TANF and certain other criteria are satisfied. § 4-217.01.

30.     In addition, CFSA must prepare a case plan for the child and family and must take such steps (including, but not limited to, providing or arranging for appropriate services to the child and family) as are needed for the protection of the child and the preservation, rehabilitation and, when safe and appropriate, reunification of the family. § 4-1301.09(b). *See also* § 4-1301.02(3) (defining "case plan").

31.     CFSA must ensure that the status of each child in foster care is reviewed periodically. § 4-1301.09(d). This review shall determine the safety of the child, the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, the extent of progress towards alleviating or mitigating the causes necessitating foster care, and a projected date for returning the child safely to the home or placing the child for adoption or other permanent placement. § 4-1301.09(e)(1).

32.     CFSA is required to make reasonable efforts to make it possible for a child in foster care to return safely to his or her home. § 4-1301.09a(b). In making such reasonable efforts, "the child's safety and health shall be the paramount concern." § 4-1301.09a(a). If such reasonable efforts "are

determined to be inconsistent with the child's permanency plan, [CFSA] shall make reasonable efforts to place the child in accordance with the child's permanency plan and to complete whatever steps are necessary to finalize the child's permanent placement."

§ 4-1301.09a(c).

C.    **Obligations Under DC's Human Rights Act of 1977**

33.    The DC Human Rights Act states that it is "an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived: race, color, . . . sex, . . . familial status,[6] . . . or place of residence." § 2-1402.73. "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." § 2-1402.68.

34.    Pursuant to the DC Human Rights Act, the CFSA may not unlawfully discriminate against relative caregivers by refusing to provide foster care benefits and services to those relative caregivers and the children under their care on the basis of familial status. Instead, the CFSA must provide relative caregivers with the opportunity to become licensed foster parents or provide further services or support to either the child or relative so that the relative caregivers can receive the same services and support provided to licensed foster parents caring for children who experienced a similar type and severity of mistreatment.

35.    Additionally, pursuant to the DC Human Rights Act, Defendants' customs and practices may not, in effect, discriminate against certain protected classes. Specifically, Defendants'

---

[6] The term 'familial status' is defined as "one or more individuals under 18 years of age being domiciled with: (1) a parent or other person having legal custody of the individual; or (2) the designee, with written authorization of the parent, or other persons having legal custody of individuals under 18 years of age. The protection afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or in the process of securing legal custody of any individual under 18 years of age." § 2-1401.02(11A).

informal placement of abused and neglected children with relatives may not have a disparate impact on the basis of status in a protected class, such as race, sex, or place of residence. Plaintiffs may demonstrate a prima facie case of disparate treatment based on statistics. *Nat'l Fair Hous. All. v. Travelers Indem. Co.,* 261 F. Supp. 3d 20, 34 (D.D.C. 2017).

## V. CUSTOM AND PRACTICE OF REMOVAL AND INFORMAL PLACEMENT VIA KINSHIP DIVERSION

36.     Because Defendants receive money under Title IV of the Social Security Act, Defendants must operate the DC child welfare program in accordance with the requirements under the Act, as well as the requirements under the DC Child Abuse and Neglect Act. Although receipt of these funds requires such compliance, Defendants' custom and practice of effecting kinship diversions is in blatant violation of those statutes.

37.     As discussed above, when a report of child abuse or neglect is substantiated and CFSA determines the child cannot be "adequately protected" in the home through the provision of services, CFSA is required to remove the child to foster care. §§ 4-1301.09a, 4-1303.04(c). To effect such removal, CFSA must (i) obtain the consent of the parent; (ii) petition the Family Division of the Superior Court of DC for a finding of abuse or neglect and the removal of the child; or (iii) request the police to remove the child if there is insufficient time for CFSA to petition for removal. § 4-1303.04(c). Per the statute, these are the only actions CFSA can take upon making a determination that a neglected or abused child must be removed from their home and transferred to the care of a third party.

38.     Once the child has been removed from his or her home, the child must be placed in a licensed foster home. CFSA has established a formal procedure for removing a child from his or her home and placing the child with a relative, which is referred to as a ***kinship placement***. Prior to effecting a kinship placement, CFSA is required to issue the relative with whom the child is

being placed a license (or a temporary license) to operate a foster home. D.C. Mun. Reg. § 6027.1.

Even though the foster parent is a relative of the child, such licensure is necessary, "to assure that

each child in [CFSA's] care and custody has a placement that meets their needs for safety,

permanence, and well-being." CFSA, *Temporary Licensing of Foster Homes for Kin Policy*,

(effective Sept. 20, 2011). This also ensures "the same level of protection for all children who are

placed in out-of-home care" and entitles both the foster parent and foster child to the same services

and benefits afforded to other foster parents and children who are not related. *Id.*

39.     Despite the fact that there are legally-established procedures and requirements for effecting

a kinship placement, CFSA has a longstanding custom and practice of informally and illegally

placing abused and neglected children with relatives through ***kinship diversion***, without issuing

licenses to the caretaker relatives. Specifically, after CFSA has substantiated[7] a report of child

abuse or neglect and determined the child cannot be protected in his or her home through the

provision of services, CFSA will initiate contact with a relative to see if they are willing to care

for the child. If CFSA identifies a willing relative that is available to care for the child, CFSA will

informally and illegally place the child with the relative through kinship diversion, rather than

commencing court removal proceedings and formally placing the child with a relative who has

been licensed as a foster parent, as required by applicable law.

40.     CFSA's use of kinship diversion constitutes a <u>flouting</u> of DC law as it subverts the formally

established procedures for effecting kinship placements and denies children and parents in kinship

diversion arrangements the same benefits, services, and protections as other foster children and

---

[7] When CFSA engages in kinship diversion, it does not always accurately record the allegation against the parent as substantiated in its records, presumably because that would trigger the legal requirement for removal and placement of a child in licensed foster care if the child cannot remain safely at home.

foster parents. For example, prior to placing a child in foster care, CFSA is required to, among other things, perform a health and safety assessment of the foster parent's home and require the foster parent to meet conditions related to the child's sleeping arrangement, health care, and education. However, when CFSA effects a kinship diversion, CFSA does not routinely conduct a home study to ensure that the relative caregiver's residence is safe, collect basic information about the relative caregiver and others living in the home, or ensure the relative caregiver has the means to care for the child.

41.     Furthermore, once the child has been informally placed in a kinship diversion arrangement, CFSA does not monitor diverted children on an ongoing basis or provide even minimal post-diversion services or support to the child, birth parent, or relative caregiver. Without CFSA oversight and accountability, the urgent needs of the child (*e.g.,* mental health, medical, and educational services), the birth parent (*e.g.,* mental health or substance abuse treatment, parent education classes), and the relative caregiver (*e.g.,* child care, peer support groups, respite) can go unmet, and there is no process for safely reunifying the child with his or her parents.[8] Moreover, neither the diverted children nor the relatives responsible for their care are eligible for financial support, such as foster care maintenance payments and vouchers for camps, enrichment programs, or other programs available only to foster children.

42.     Upon information and belief, senior management of CFSA has long acquiesced to and/or endorsed this custom and practice, which allows CFSA to appear to meet certain self-imposed statistical targets for reducing the number of DC's abused and neglected children in foster care.

---

[8] The Supreme Court has recognized that parents have a fundamental Constitutional liberty interests in "the care, custody, and control of their children." *Troxell v Granville*, 530 U.S. 57 (2000). Accordingly, when CFSA decides that a child should be removed from the parental home and cared for by relatives without a court order, it also violates the parents' constitutional rights.

These targets are not only arbitrary but provide CFSA with a perverse incentive to use kinship diversion rather than attempting to license caregivers as foster parents. The custom and practice of kinship diversion has saved DC millions of dollars over at least the past 10 years.

## VI. DEFENDANTS' KINSHIP DIVERSION OF CHILDREN VIOLATES FEDERAL AND DC LAW

43.     CFSA engaged in kinship diversion when it removed the Plaintiff children K.J., L.E. and T.C. from their homes and informally and illegally placed them in the care of their relatives, plaintiffs K.H., M.M. and L.C., respectively.

### A.     PLAINTIFFS K.J. AND K.H.

44.     K.J. is the biological daughter of K.D., her father, a Maryland resident, and O.J., her mother, a DC resident. In November 2016, O.J. obtained sole legal and physical custody of K.J. pursuant to a Permanent Custody Order issued by the DC Family Court. Under the Permanent Custody Order, K.J.'s father was granted visitation as agreed between the parties but was not permitted overnight visits without O.J.'s consent.

45.     Despite the fact that O.J. was granted sole custody of K.J., O.J. has had a long history of serious mental health issues, including paranoia, that have impacted her parenting and have prevented her from providing K.J. with adequate care. CFSA has received numerous reports alleging O.J. neglected or abused K.J., including, *inter alia*, that O.J. failed to obtain adequate medical care for K.J., failed to enroll K.J. in school, allowed K.J. to dance for money on a street corner, kept K.J. out all night with male strangers, and left K.J. alone in the home. CFSA also received reports that K.J. ingested O.J.'s medication, that K.J. was unclean and hungry, and that there was general filth in the home. As a result of these reports, CFSA has been heavily involved with O.J. and K.J. for many years.

46.     In October 2018, CFSA was involved with the family due to allegations regarding O.J.'s mental illness and failure to enroll K.J. in school. On October 17, 2018, a CFSA in-home social worker, Zakia Joyner-Kennedy, and a CFSA investigative social worker, Claire Hoffman, visited O.J. and K.J. in their home. Hoffman reported that, during the meeting, O.J. wore no clothing other than a cardigan, appeared dirty, and needed reminders to keep covered up. Hoffman also reported that O.J. had difficulty understanding that CFSA had opened a case against her and often stopped and stared off during conversation. Following the meeting, Hoffman reached out to Community Connections, a CFSA-contracted mental health agency involved in O.J.'s case, and stated that O.J.'s hygiene and paranoia appeared to be getting worse and that she was concerned that O.J. could become dangerous to herself or others.

47.     On the evening of October 17, 2018, Community Connections staff visited O.J.'s home and determined that O.J. needed an emergency admission to the hospital for mental health evaluation. Accordingly, Community Connections staff completed DC Department of Behavioral Health Form FD12, which authorizes immediate detention if the writer has reason to believe that the person is mentally ill and likely to injure self or others because of mental illness. Pursuant to this action, the DC Metropolitan Police Department arrived at O.J.'s house and transported her to the Comprehensive Psychiatric Emergency Program ("CPEP"), where she was admitted and stayed overnight.

48.     K.H. received a call from O.J. that she had been admitted to CPEP and asked K.H. to go to her home to pick up K.J. On her way over, K.H. called the CFSA child protection hotline. K.H. arrived at O.J.'s home around the same time as K.D. The Metropolitan Police Department released K.J. to K.D.'s care. CFSA did not arrive at the scene or take custody of K.J. that evening.

49.     The next morning, K.H. picked up K.J. and took her to school to begin the kindergarten

enrollment process as O.J. had not enrolled or taken K.J. to school at all during the 2018-2019 school year.

50.     In the early afternoon on October 18, 2018, Hoffman was notified that O.J. would likely be discharged from CPEP later that day. As a result, Hoffman contacted K.H., and instructed her to file for emergency custody of K.J. Because K.H. was not able to file for emergency custody until the following day, Hoffman asked Community Connections whether it would be possible for O.J. to be held longer at CPEP. This action is effectively a determination by CFSA that K.J. was in immediate danger and that immediate removal from her home was necessary. Despite making this determination, Hoffman did not follow the legally required removal procedures but instead made K.H. responsible for effecting the removal of K.J. Moreover, Hoffman did not inform K.H. of all her options to participate in K.J.'s care, including that K.H. could be licensed as a foster parent for K.J., despite the fact that such notice is required by law.

51.     Pursuant to Hoffman's instruction, on October 19, 2018, K.H. filed a Motion for Emergency Custody of K.J. The Family Court granted K.H. emergency sole physical custody and joint legal custody with O.J., with a full hearing scheduled for November 8, 2018.

52.     Sometime between October 18 and 31, 2018, Hoffman told K.H. that, if the judge did not grant her custody at the hearing on November 8, 2018, CFSA would have to remove K.J. and place her in foster care. Because K.H. had not been informed that *she* could be licensed by CFSA as K.J.'s foster parent, K.H. understood Hoffman to be saying that, if she did not obtain custody of K.J., CFSA would be required to place K.J. in foster care with a stranger.

53.     On October 31, 2018, K.H. met with Joyner-Kennedy, the CFSA in-home social worker. Prior to this date, K.H. had learned of the option to become a foster parent from a source other than CFSA, and during the meeting she requested that CFSA license her as a foster parent for K.J.

In response to K.H.'s request, Joyner-Kennedy suggested that K.H. did not want to care for K.J. K.H. explained she did want to care for K.J. but wanted to do so as a foster parent so that there would be a safe way for K.J. to return home to her mother. K.H. expressed concern that K.J. previously had been informally placed with relatives via kinship diversion arrangements without safe reunification of the child with her mother, and also expressed concern that O.J. blamed K.H. for "taking away" K.J. K.H. also stated she did not want the burden of bringing legal action against her sister in court to obtain custody of K.J.

54.     Joyner-Kennedy then told K.H. that getting custody through a custody case is the same as a neglect case and removal to foster care because the same services would be provided. However, unlike a custody case, in a neglect case CFSA takes legal custody of the child and is legally responsible for the care and well-being of the child. CFSA also assigns a social worker to the family, prepares a case plan and provides financial assistance and services to the family.

55.     On November 13, 2018, the Court issued an order granting K.H. temporary sole physical and legal custody of K.J., which grant of custody continues in full force and effect as of the date hereof. Both parents continue to seek custody of K.J., and a trial in the custody case is scheduled for January 2020.

56.     K.H. has continuously cared for K.J. since October 18, 2018. During this time, CFSA has failed to provide any services to K.J. CFSA failed to develop a case plan for K.J. and has not provided her with any mental health, medical, or educational services.

57.     Further, CFSA has not provided any support or financial assistance to K.H. On several occasions in November 2018, K.H. requested CFSA license her as a foster parent for K.J., and each time CFSA refused to do so despite the fact that K.H. has satisfied the requirements necessary to become a licensed foster parent. Moreover, at all relevant times, K.J. has been eligible to receive

benefits under the TANF program and, accordingly, K.H. has been entitled to receive foster care maintenance payments on K.J.'s behalf, which for 2018 and 2019 amounts to $1,140 per 30-day period. K.H. has not received any foster care maintenance payments on behalf of K.J. because Defendants took K.J. out of her mother's unsafe home without a court removal proceeding and informally and illegally placed her in the care of her aunt K.H. through kinship diversion, without licensing K.H. as a foster parent.

58.     Additionally, while CFSA is required to assist foster parents in obtaining personal records for foster children, CFSA did not make any effort to help K.H. obtain K.J.'s immunization records, birth certificate, social security card, or health insurance card. *See* CFSA, *Relationship with Resource Parents Policy*, (effective Aug. 7, 2004). Without these documents, K.H. could not obtain any public benefits for K.J. K.H. only started to receive TANF and Supplemental Nutrition Assistance Program (SNAP) benefits as of April 1, 2019.

59.     Since October 18, 2018, K.H. has effectively shouldered the financial costs of caring for K.J. The increased costs of raising K.J. have resulted in a substantial financial burden for K.H. who is having difficulty paying for rent, utilities, food, and other necessities.

60.     As described above, CFSA's failure to remove K.J. to foster care or license K.H. as a foster parent have resulted in injury to Plaintiffs including, but not limited to, housing and food instability, emotional distress, and a lack of permanency for K.J.

61.     On April 15, 2019, K.H., for herself and on behalf of K.J., submitted a Notice of Claim against DC to the DC Office of Risk Management. By letter dated April 24, 2019, the DC Office of Risk Management acknowledged receipt of the Notice of Claim.

B.      **PLAINTIFFS L.E. AND M.M.**

62.     Child L.E. is the biological daughter of her father N.F. ("N.F."), and her mother K.E. ("K.E."). N.F. is 31 years old and a Maryland resident. K.E. is a minor and a DC resident.

63.     N.F. has a history of violence against women. In 2014, N.F. assaulted an ex-girlfriend and was charged in Prince George's County, Maryland for attempted first and second degree murder; first and second degree assault; wear, carry, and transport a handgun and knife with intent to injure; use of a firearm in the commission of a crime; and wear and carry a knife with intent to injure a person. N.F. was convicted of second-degree assault and sentenced to 10 years in prison, with all but one year suspended.

64.     K.E. has suffered from serious and untreated mental health and substance use issues for many years and has been admitted for acute inpatient psychiatric hospital treatment for suicidal ideations. K.E., herself a minor child, is currently in foster care and is the subject of ongoing juvenile and Person In Need Of Supervision (PINS) cases in DC Superior Court. K.E. was only 16 years old when L.E. was conceived. During K.E.'s pregnancy, K.E. told M.M. that N.F. had kicked her in the stomach.

65.     When L.E. was born in January 2019, she was medically fragile and was in the Neonatal Intensive Care Unit (NICU) for three days. During this time, K.E. never left her room to visit L.E. in the NICU. Because of K.E.'s lack of interest in L.E. and K.E.'s young age, hospital social workers only permitted K.E. to take L.E. home because she would be living with L.E.'s great-aunt, M.M.

66.     Once living in M.M.'s home, K.E. never cared for L.E. and would leave every day to hang out with her friends. K.E. would only come home to sleep at night.

67.    On February 20, 2019, K.E. engaged in a physical altercation with her own mother who was visiting M.M.'s home. While the grandmother was holding L.E., K.E. punched the grandmother numerous times leaving bruises and then tried to forcibly take L.E. from the grandmother's arms by yanking L.E.'s leg. The police were called and K.E. was arrested. K.E. was released to CFSA, but she ran away from the CFSA offices.

68.    The next day, February 21, 2019, Ms. Reid, a CFSA social worker, came to M.M.'s home and told M.M. that she needed to file for emergency custody that day or CFSA would take L.E. and place her in foster care with an unrelated person. This action is effectively a determination by CFSA that L.E. was in immediate danger and that immediate removal from her mother's care was necessary. Despite making this determination, Reid did not follow the legally required removal procedures but instead made M.M. responsible for effecting the removal of L.E. Moreover, Reid did not inform M.M. of all her options to participate in L.E.'s care, despite the fact that such notice is required by law. In fact, even though M.M. told Reid that she had been licensed as a foster parent, Reid still insisted that M.M. had to file for custody or CFSA would take the child away. Reid never explained to M.M. that L.E. could be placed into foster care with M.M. as her foster parent.

69.    Pursuant to Reid's request, M.M. went to the courthouse to file for custody of L.E. However, when she arrived, the court was already closed. M.M. notified Reid that she was unable to file the custody papers that day, and would file them first thing the next morning. Reid instructed M.M. not to allow K.E. into her home because of concerns for the safety of L.E. in K.E.'s presence. At that time, M.M. had no legal authority to keep L.E., so K.E. could conceivably have come to the home and taken the child.

70.     On February 22, 2019, M.M. filed a Motion for Emergency Custody of L.E. and was granted temporary custody of the child. In the custody case, K.E. seeks joint legal custody of L.E. and visitation with the child, and N.F. seeks custody of L.E. As of the date of this filing, the court has continued to grant M.M. sole legal and physical custody of L.E. A trial in the custody case is scheduled for January 2020.

71.     Sometime in June, M.M. learned of the option to become a licensed foster parent from a source other than CFSA. Accordingly, on June 9, 2019, M.M. submitted to CFSA a written request to be licensed as a foster parent for L.E. On June 24, 2019, CFSA denied M.M.'s request to be licensed as a foster parent for L.E.

72.     In the early morning hours of July 20, 2019, M.M. received text messages from K.E. asking M.M. to call the police because N.F. had just beat her up and she could not breathe.

73.     On August 2, 2019, M.M. received a call from K.E. that N.F. had thrown bleach on her and asked M.M. to pick her up and take her to the Emergency Room. When M.M. picked up K.E., she told M.M. that N.F. had thrown the bleach on her two days prior. She then showed M.M. burns on her thighs. At the hospital, when M.M. helped K.E. take off her clothes to put on a hospital gown, M.M. saw burns on K.E.'s back and buttocks. Burn specialists were called in to treat K.E. When the doctors lifted K.E.'s gown to look at her wounds, M.M. heard them state that K.E. also had burns in her vaginal area.

74.     On August 27, 2019, N.F. was charged with first- and second- degree assault and reckless endangerment for pouring bleach on K.E., causing first and second degree burns on her back, buttocks, and genitals. N.F. is incarcerated and awaiting trial on the charges. Upon information and belief, K.E. is sympathetic to N.F. and is reluctant to testify against him at trial.

75.     M.M. has continuously cared for L.E. since February 20, 2019. During this time, CFSA has failed to provide any services to L.E. CFSA failed to develop a case plan for L.E. and has not provided her with any services.

76.     Further, CFSA has not provided any support or financial assistance to M.M. CFSA denied M.M.'s request to be licensed as a foster parent despite the fact that M.M. has satisfied the necessary requirements. Moreover, at all relevant times, L.E. has been eligible to receive benefits under the TANF program and, accordingly, M.M. has been entitled to receive foster care maintenance payments on L.E.'s behalf, which for 2019 amounts to $1,140 per 30-day period. M.M. has not received any foster care maintenance payments on behalf of L.E. because Defendants removed L.E. from her mother's care without a formal removal proceeding and informally and illegally placed her in the care of her great-aunt M.M. through kinship diversion, without licensing M.M. as a foster parent.

77.     Since February 20, 2019, M.M. has shouldered the financial costs of caring for L.E. The increased costs to M.M. of raising L.E. have resulted in a substantial financial burden for M.M. who is having difficulty paying for rent, utilities, food, and other necessities.

78.     As described above, CFSA's failure to remove L.E. to foster care with M.M. has resulted in injury to Plaintiffs including, but not limited to, housing and food instability, emotional distress, and a lack of permanency for L.E.

79.     On July 23, 2019, M.M., for herself and on behalf of L.E., submitted a written Notice of Claim against DC to the DC Office of Risk Management. By letter dated July 29, 2019, the DC Office of Risk Management acknowledged receipt of the Notice of Claim.

## C.     PLAINTIFFS T.C. AND L.C.

80.     T.C. and his siblings are the biological children of their father T.H. ("T.H.") and their mother L.K. ("L.K."), both of whom are DC residents.

81.     L.K. has suffered from serious and untreated mental health and substance use issues for many years. T.H. has struggled with homelessness.

82.     CFSA has been involved with this family for years, and has informally and illegally placed the children with T.H.'s mother, L.C., through kinship diversion arrangements two times prior to the current incident that is the basis for this claim.

83.     On March 6, 2019, T.C.'s oldest sibling reported to L.C. that L.K. put bug repellant in the children's food, spit in their drinks, poured Mumbo sauce on their school clothes, and woke them up by pouring hot water on them. L.C. called the assigned CFSA in-home social worker, Mr. Narendra Date, to report the incident.

84.     After receiving the call from L.C., Date removed T.C. and his siblings from L.K.'s home and transported the children to L.C.'s home. Even though L.C. lives in a unit that does not permit any additional individuals to live in the home, CFSA informally and illegally placed five children in L.C.'s home. This action is effectively a determination by CFSA that T.C. and his sibling were in immediate danger and that immediate removal from their home was necessary. Despite making this determination, Date did not follow the required removal procedures but instead made L.C. responsible for effecting the removal of T.C. and his siblings. Moreover, Date did not inform L.C. of all her options to participate in T.C. and his siblings' care, including that T.C. could be licensed as a foster parent, despite the fact that such notice is required by law.

85.     On March 13, 2019, L.C. filed a Motion for Emergency Custody of T.C. and his siblings and a same-day emergency hearing was held. At the hearing, L.C. relayed the information from

the text message she received that led to T.C. and his siblings to come into her care, and also alleged that L.K. has a substance use problem and regularly neglects the children. L.C. further represented that T.H. did not want to care for the children. CFSA General Counsel, Mr. Paul Kratchman, appeared at the custody hearing by phone and confirmed all of L.C.'s representations. The Court granted L.C. temporary custody of T.C. and his siblings. L.C. did not agree to take custody of T.C.'s youngest sibling and as a result, CFSA initiated court proceedings and the child was formally removed from L.K.'s home and placed in a foster care home with an unrelated person.

86.     CFSA never informed L.C. of her option to become a foster parent for T.C. or his siblings, despite the fact that such notice is required by law. L.C., however, had learned of the option to become a foster parent from a source other than CFSA, and on June 9, 2019, L.C. submitted a written request to CFSA to be licensed as a foster parent for T.C. and his siblings. Despite the fact that L.C. satisfied the requirements necessary to become a licensed foster parent, CFSA denied L.C.'s request to be licensed as a foster parent.

87.     T.C. and his siblings suffer from trauma and have behavioral issues that were exacerbated by the small quarters of L.C.'s home. It became increasingly difficult for L.C. to manage all of the children. On June 22, 2019, after one of T.C.'s siblings was involved in a physical altercation with L.C.'s granddaughter in her home, L.C. returned T.C.'s siblings to L.K.'s home.

88.     T.C., however, remained with L.C. and on September 20, 2019, L.C., T.H. and L.K. agreed to a custody order approved by the court that permits T.C. to remain in the custody of L.C. The order, however, is revocable at will by either parent.

89.     L.C. has continuously cared for T.C. since March 6, 2019. During this time, CFSA has failed to provide any services to T.C. CFSA failed to develop a case plan for T.C. and has not provided him with any mental health, medical, or educational services.

90.     Further, CFSA has not provided any support or financial assistance to L.C. CFSA denied L.C.'s request to be licensed as a foster parent despite the fact that L.C. has satisfied the necessary requirements. Moreover, at all relevant times, T.C. has been eligible to receive benefits under the TANF program and, accordingly, L.C. has been entitled to receive foster care maintenance payments on T.C.'s behalf, which for 2019 amounts to $1,140 per 30-day period. Further, T.C.'s siblings are also eligible to receive benefits under the TANF program and L.C. is entitled to receive foster care maintenance payments on their behalf for the three months in which they were under her care. L.C. has not received any foster care maintenance payments on behalf of T.C. or his siblings because Defendants removed T.C. and his siblings from their mother's unsafe home without a formal removal proceeding and informally and illegally placed them in the care of their grandmother L.C. through kinship diversion, without licensing L.C. as a foster parent.

91.     Additionally, while CFSA is required to assist foster parents in obtaining personal records for foster children, CFSA did not make any effort to help L.C. obtain the immunization records, social security cards, or Medicaid cards for T.C. or his siblings. As a result, L.C. was delayed in receiving public benefits.

92.     The increased costs to L.C. of raising T.C. and his siblings have resulted in a substantial financial burden for L.C. who is having difficulty paying for rent, utilities, food, and other necessities.

93.     As described above, CFSA's failure to remove T.C. or his siblings to foster care or license

L.C. as a foster parent have resulted in injury to Plaintiffs including, but not limited to, housing

and food instability, emotional distress, and a lack of permanency for T.C. and his siblings.

94.     On August 20, 2019, L.C., for herself and on behalf of T.C., submitted a written Notice of

Claim against DC to the DC Office of Risk Management. By letter dated September 3, 2019, the

DC Office of Risk Management acknowledged receipt of the Notice of Claim.

## VII. CLAIMS

### COUNT 1:  VIOLATION OF TITLE IV-E OF THE
### SOCIAL SECURITY ACT, 42 U.S.C. §§ 670-679c

95.     Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs of this

complaint.

96.     Plaintiffs' claim for violation of the Social Security Act is brought pursuant to 42 U.S.C. §

1983, which affords Plaintiffs a private right of action.

97.     Through its custom and practice of kinship diversion, Defendants have failed to operate

the DC child welfare program in accordance with the requirements of the Social Security Act.

Specifically, Defendants failed to: (i) remove K.J., L.E. and T.C. and his siblings to foster care

after substantiating a report of abuse and/or neglect and determining that the children could not be

adequately protected in their home; (ii) conduct formal removal proceedings through the Family

Division of the Superior Court of DC; (iii) inform K.H., M.M. and L.C. of their options for

becoming licensed foster parents; (iv) license K.H., M.M. and L.C. as foster parents; (v) provide

foster care maintenance payments to K.H., M.M. and L.C.; (vi) provide any services to protect the

safety and health of K.J., L.E. and T.C. and his siblings during their diversion; and (vii) establish

a case plan for K.J., L.E. and T.C. and his siblings, or provide a periodic review of their status. 42

U.S.C. §§ 671, 672, 675. By failing to take these actions, Defendants have deprived the Plaintiffs

of rights which they are guaranteed under Title IV-E of the Social Security Act, and accordingly Defendants have violated such Act.

**COUNT 2: VIOLATION OF THE EQUAL PROTECTION CLAUSE
OF THE FOURTEENTH AMENDMENT AS APPLIED TO DC
THROUGH THE DUE PROCESS CLAUSE OF THE FIFTH
AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES**

98.     Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs of this complaint.

99.     Plaintiffs' claim for violation of the Equal Protection Clause of the Fourteenth Amendment is brought pursuant to 42 U.S.C. § 1983, which affords Plaintiffs a private right of action.

100.    Through its custom and practice of kinship diversion, Defendants have deprived K.J., L.E., T.C. and his siblings, and other abused and neglected children in kinship diversion arrangements of their rights by failing to provide them the same services and support as Defendants provide to children placed in licensed foster care. Defendants' discriminatory treatment is not rationally related to advancing any legitimate governmental interest and therefore violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution as applied to DC through the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

101.    Through its custom and practice of kinship diversion, Defendants also have deprived K.H., M.M. and L.C. and other similarly situated relative caregivers of their rights by failing to provide them with the opportunity to become licensed foster parents and thereby receive the same services and support as Defendants provide to licensed foster parents caring for children who experienced a similar type and severity of mistreatment. Defendants' discriminatory treatment is not rationally related to advancing any legitimate governmental interest and therefore violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution as applied to DC through the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

**COUNT 3:  VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH
AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES**

102.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs of this
complaint.

103.    Plaintiffs' claim for violation of the Due Process Clause of the Fifth Amendment is brought
pursuant to 42 U.S.C. § 1983, which affords Plaintiffs a private right of action.

104.    Through Defendants' custom and practice of kinship diversion, Defendants have deprived
Plaintiffs of the protected property interests that the Social Security Act and the Child Abuse and
Neglect Act confer on abused and neglected children and their caregivers (including, but not
limited to, the right to receive foster care maintenance payments and other economic benefits,
quality services for the family, and a written case plan). Moreover, through its custom and practice
of kinship diversion, Defendants have deprived K.J., L.E. and T.C. of their right to familial
integrity and have done so without providing sufficient procedural safeguards.

105.    By depriving Plaintiffs of their protected property interests, Defendants have violated the
Plaintiffs' rights under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

**COUNT 4:  VIOLATION OF DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF
1977- DISCRIMINATORY INTENT AND DISPARATE IMPACT BASED ON
FAMILIAL STATUS, RACE, SEX, AND PLACE OF RESIDENCE**

106.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs of this
complaint.

107.    Under the DC Human Rights Act, it is "an unlawful discriminatory practice for a District
government agency or office to limit or refuse to provide any facility, service, program, or benefit
to any individual on the basis of an individual's actual or perceived: race, color, . . . sex, . . . familial

status,[9] . . . or place of residence." D.C. Code § 2-1402.73. "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." § 2-1402.68.

108.    CFSA's kinship diversion policy is an unlawful discriminatory practice because it refuses to provide foster care benefits and services to relative caregivers and the children under their care on the basis of familial status. After CFSA has effected a kinship diversion, CFSA does not provide relative caregivers with the opportunity to become licensed foster parents or provide further services or support to either the child or relative. Accordingly, relative caregivers are not able to receive the same services and support provided to licensed foster parents caring for children who experienced a similar type and severity of mistreatment. CFSA's decision to deny these relative caregivers the opportunity to receive these services and support is based solely on familial status.

109.    Defendants unlawfully discriminated against Plaintiffs by refusing to provide them with a program or benefit on the basis of familial status. Specifically, by depriving K.H., M.M. and L.C. of the ability to apply for licensure as a foster parent and receive foster care maintenance payments on the children's behalf, Defendants discriminated against the Plaintiffs based on the sole fact that K.H., M.M. and L.C. had obtained legal custody of the children, an action CFSA directed K.H. and M.M. to take. Had K.H., M.M. and L.C. not obtained legal custody of the children, CFSA would have initiated a legal proceeding to remove K.J., L.E. and T.C. from their homes, and K.H., M.M. and L.C. would have been permitted to apply to become licensed foster parents and to

---

[9] The term 'familial status' is defined as "one or more individuals under 18 years of age being domiciled with: (1) a parent or other person having legal custody of the individual; or (2) the designee, with written authorization of the parent, or other persons having legal custody of individuals under 18 years of age. The protection afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or in the process of securing legal custody of any individual under 18 years of age." D.C. Code § 2-1401.02(11A).

receive foster care maintenance payments. Accordingly, Defendants discriminated against Plaintiffs by denying them the tangible benefit of foster care maintenance payments based on the Plaintiffs' status in a protected class.

110.    In addition, while the intent may not have been to discriminate, Defendants' custom and practice of informally and illegally placing abused and neglected children who cannot be protected in their homes to live with relatives via kinship diversion and excluding those relative caregivers who satisfy the requirements to be foster parents from access to foster care maintenance payments has a disproportionate impact on the African-American community, women, and residents of DC's Wards 7 and 8.

111.    CFSA has identified DC Wards 7 and 8 as having "a greater number of families either currently involved with the District's child welfare system or at risk of entry into the system."[10] Further, as of 2017, 63% of CFSA investigations that were substantiated for abuse and/or neglect involved children living in Wards 7 and 8,[11] with 22% of the cases substantiated by CFSA in Ward 7 and 41% in Ward 8.[12]

---

[10] Annual Public Report FY 2018, CHILD AND FAMILY SERVICES AGENCY (Jan. 2019) https://cfsa.dc.gov/sites/default/files/dc/sites/cfsa/publication/attachments/FY18%20CFSA%20Annual%20Public%20Report%20FINAL%203-7-19.pdf
[11] The Annie E. Casey Foundation Kids Count Data Center, "Substantiated investigations of child neglect and abuse by ward in District of Columbia," https://datacenter.kidscount.org/data/tables/9384-substantiated-investigations-of-child-neglect-and-abuse-by-ward?loc=10&loct=3#detailed/21/1852-1859/false/870,573,869,36,868,867,133/any/18507. (last visited Oct. 15, 2019)
[12] Id.

112.    Wards 7 and 8 are predominantly African American: Ward 7 is 93.8% African American; Ward 8 is 90.9% African American.[13] By way of comparison, as of 2016, African Americans constituted 48.3% of the population of the District of Columbia as a whole.[14]

113.    The vast majority of relative caregivers are women. In 2018, for 90% of the families participating in CFSA's Grandparent Caregivers Program, the caregiver was a grandmother.[15] For an additional 4% of participating families, the caregiver was a great-aunt.[16]

114.    Upon information and belief, CFSA's custom and practice of kinship diversion has a negative disparate impact on African Americans who live in DC, on residents of Wards 7 and 8, and on women. There is no independent justification or nondiscriminatory reason for this disparate impact. Accordingly, Defendants' custom and practice of informing placing children via kinship diversion violates the DC Human Rights Act as such conduct, in effect, discriminates against certain protected classes.

---

[13] *Id.*

[14] The Annie E. Casey Foundation Kids Count Data Center, "Race/Ethnicity of total population by ward in District of Columbia," https://datacenter.kidscount.org/data/tables/8875-race-ethnicity-of-total-population-by-ward?loc=10&loct=21#detailed/3/any/false/870,573, 869,36,868,867,133,11/3498,2161,2159,2157,2663,3499,3307,2160/17763,17764   (last   visited Oct. 15, 2019).

[15] Grandparent Caregivers Program: Annual Status Report, CY 2018, CHILD AND FAMILY SERVICES AGENCY, (Feb. 28, 2019) https://cfsa.dc.gov/sites/default/files/dc/sites/cfsa/publication/attachments/CFSA_Grandparent%20Caregivers%20Program%20Annual%20Report%202018_%202-28-19%20%28FINAL%29.pdf.

[16] *Id.*

## COUNT 5: NEGLIGENCE

115.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs of this complaint.

116.    The Child Abuse and Neglect Act creates a special relationship between Defendants and DC's abused and neglected children. D.C. Code § 4-1303.01a. Defendants breached that special duty when CFSA received reports that K.J., L.E. and T.C. were being abused and/or neglected and failed to take the steps prescribed by the Child Abuse and Neglect Act for the protection of these children. Instead of complying with its obligations, Defendants removed K.J., L.E. and T.C. from their homes and informally and illegally placed them via kinship diversion to the care of K.H., M.M. and L.C., respectively, without following the legally required procedures for removal and placement with a licensed foster parent.

117.    Defendants' breach of duty proximately caused injury to Plaintiffs.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

(a) Issuance of a declaratory judgment that Defendants' custom and practice of kinship diversion, and in particular the informal removal and placement via kinship diversion of K.J., L.E. and T.C. to K.H., M.M. and L.C., respectively, violates Title IV-E of the Social Security Act, 42 U.S.C. §§ 670–679c, the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clause of the Fifth Amendment to the U.S. Constitution, and the DC Child Abuse and Neglect Act, and DC Human Rights Act;

(b) Entry of a permanent injunction preventing Defendants from retaliating against K.H., M.M. and L.C. for seeking licensure as a foster parent and foster care maintenance payments;

(c) Entry of a permanent injunction preventing Defendants from continuing the custom and practice of kinship diversion;

(d) Award Plaintiffs compensatory damages in an amount equal to the total foster care maintenance payments that Plaintiffs would have received since the kinship diversion was effectuated, applying the current payment rate of $1,140 per 30-day period, plus interest, and other damages attributable to Defendants' violation of federal and DC law;

(e) Issuance of an order that, for so long as K.J., L.E. and T.C., remain in the sole or primary physical custody of K.H., M.M. and L.C., respectively, Defendants continue to pay to Plaintiffs an amount equal to foster care maintenance payments and other damages attributable to Defendants' violation of federal and DC law;

(f) Award costs, and expenses for this action, including attorneys' fees; and

(g) Award such further relief as this Court deems necessary, proper, and just.

A JURY TRIAL IS HEREBY DEMANDED.

Respectfully submitted,

Samantha Badlam
D.C. Bar No. 977190
202-508-4734
samantha.badlam@ropesgray.com

Peter Brody
D.C. Bar No. 398717
202-508-4612
peter.brody@ropesgray.com

Scott McKeown
D.C. Bar No. 314459
202-508-4740
scott.mckeown@ropesgray.com

Ropes & Gray LLP
2099 Pennsylvania Avenue, NW

Washington, DC 20006

Marla Spindel
D.C. Bar No. 443306
202-360-7106
marla@dckincare.org

Stephanie McClellan
D.C. Bar No. 485658
202 550-4014
stephanie@dckincare.org

DC KinCare Alliance
1101 Connecticut Avenue, NW, Suite 450
Dated: October 17, 2019          Washington, DC 20006

*Attorneys for Plaintiffs*