UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| K.H., *et al.*,<br><br>             *Plaintiffs*,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>             *Defendants*. | Civil Action No. 19-3124 (TFH) |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

INTRODUCTION

Plaintiffs' Amended Complaint relies on a faulty understanding of the role and authority of the District of Columbia Child and Family Services Agency (CFSA).[1] Plaintiffs allege that the plaintiff children[2] were "removed from the custody" of their parents and "informally" put in the care of a relative—a process known as "kinship diversion." But this process, even if described accurately by plaintiffs, is not prohibited by District of Columbia or federal law and is not administered in a way that violates plaintiffs' equal protection or due process rights. Instead, kinship diversion represents one of CFSA's options for ensuring that children are provided with necessary care and assistance, ideally while remaining in the care of relatives, rather than placed in a foster home. In addition, plaintiffs fail to state claims under

---

[1]     Defendants are CFSA and the District of Columbia (collectively, the District).

[2]     Plaintiffs are three children and their respective adult relative caregivers.

the Social Security Act and the D.C. Human Rights Act and cannot plausibly assert claims for violations of District of Columbia common law based on alleged misrepresentations made by CFSA employees. As such, the Amended Complaint should be dismissed with prejudice.

## BACKGROUND

### I.   Legal Framework

#### A.   The Social Security Act

The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670, *et seq.* (AACWA), is part of the Social Security Act and "is a grant of federal funding for expenses associated with operating a foster care system." *Conner B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 61 (1st Cir. 2014). "In order to obtain the funding, the state must submit a plan for the operation of its foster care system and receive approval from the Secretary of the [U.S. Department of Health and Human Services (HHS)]." *Id.*

"Congress passed the Act under its Spending Clause power, U.S. Const. art. I, § 8, and like other federal-state cooperative programs, states are given the choice of complying with the Act's conditions or forgoing federal funding." *D.O. v. Glisson*, 847 F.3d 374, 376 (6th Cir. 2017). As such, HHS is directed to take corrective actions if a state substantially fails to conform to the requirements of its plan and may require a state to implement a corrective action plan or, if necessary, withhold federal funds. *Midwest Foster Care and Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1194 (8th Cir. 2013); *see also Connor B.*, 774 F.3d at 61 (citing *Sam M. ex rel. Elliott v. Chafee*, 800

F. Supp. 2d 363, 388 (D.R.I. 2011)) ("The AACWA is also enforced by [HHS], [which] is empowered to withhold federal funding if the state fails to comply substantially with the statutory requirements and fails to implement a corrective plan.").

Particularly relevant here, the AACWA requires a state to make "foster care maintenance payments" to certain foster parents or foster homes to support the care of children placed in foster care. 42 U.S.C. §§ 671(a)(1), 672(a)(1), 675(4). "A state can receive federal matching funds—at a rate equal to its Medicaid matching rate—only for those foster care maintenance payments meeting the [ ] requirements of § 672." *Kincade*, 712 F.3d at 1195. To qualify for maintenance payments, the removal must be under a "voluntary placement agreement" or a "judicial determination," § 672(a)(2)(A), and the child's "placement and care" must be the responsibility of the state. *Id.* § 672(a)(2)(B). In addition, 42 U.S.C. § 671(a)(16) requires a state to provide "for the development of a case plan … for each child receiving foster care maintenance payments under the State plan and [ ] for a case review system …."

B.   <u>District of Columbia Law</u>

CFSA's legal obligation to "conduct a thorough investigation" is triggered when it receives a report of "suspected child abuse or neglect[.]" D.C. Code § 4-1301.04(a)(1).[3] If CFSA substantiates the suspected abuse or neglect, it must determine whether any children at risk "should be removed from the home or can be protected by the provision of resources, such as those listed in §§ 4-1303.03 and 4-

---

[3]   The Prevention of Child Abuse and Neglect Act (Abuse and Neglect Act) is codified, as amended, at D.C. Code §§ 4-1301.01, *et seq.*

1303a." *Id.* § 4-1301.06(b)(3). That list of resources is broad and coextensive with the authority of the Director of CFSA,[4] and includes "services for families of neglected and abused children including services designed to help children, where safe and appropriate, to return to families from which they have been removed" and "services to families with children, child protective services, foster care, and adoption." *Id.* §§ 4-1303.03(a)(3), (a)(7).

If an abused or neglected child cannot be adequately protected by the services provided by the agency, CFSA is authorized to, among other things, "[r]emove the child with the consent of the parent[.]" *Id.* § 4-1303.04(c)(1).[5] CFSA may also place a child with a relative in kinship diversion. *Id.* § 4-1303.03(a)(7); *see In re D.S.*, 88 A.3d 678, n.19 (D.C. 2014) (A "parent's choice of a fit custodian for the child must be given *weighty consideration* which can be overcome only by … clear and convincing

---

[4]      D.C. Code § 4-1303.03 is entitled "Duties and powers of the Director." Those duties include operation of "a program of treatment of services designed to promote the safety of children, reunification of families, and timely permanent placements"; "rehabilitative services to the child's family in an effort to reunify the family when a child has been adjudicated a neglected child and placed in foster care"; the power to "develop and test innovative models of practice" and "issue grants to community and neighborhood-based groups for programs that deliver prevention and intervention service"; and "[t]o provide other programs and services that are consistent with the purposes of this subchapter[.]" *Id.* §§ 4-1303.03(a)(11), (a)(14), (a-1)(2), (a-1)(3), (a-1)(3A)(A), and (a-1)(6).

[5]      The use of the phrase "is authorized to" (as opposed to the term "shall") prior to listing the three options in D.C. Code § 4-1301.04(c), suggests that these are simply examples, not an exclusive list of the actions CFSA *must* take. *Cf., e.g., Murphy v. Smith*, 138 S. Ct. 784, 787 (2018) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' … normally creates an obligation impervious to judicial discretion.")).

evidence[.]") (quoting *In re T.W.M.*, 964 A.2d 595, 602 (D.C. 2009) (emphasis in original)).

In addition, CFSA is directed to make "reasonable efforts … to preserve and reunify the family …." *Id.* § 4-1301.09a(b)(1); *see also id.* § 4-1301.09a(b)(3) ("Reasonable efforts shall be made to make it possible for the child to return safely to the child's home."). "Reasonable efforts to place a child for adoption, with an *approved kinship caregiver*, with a legal custodian or guardian, or in another permanent placement may be made concurrently with the reasonable efforts required by subsection (b) of this section." *Id.* § 4-1301.09a(f) (emphasis added).

Finally, and relevant to plaintiffs' claims, "custody" is a legal term and cannot be granted or revoked by CFSA. *See* D.C. Code § 16-2301(21) ("The term 'legal custody' means a legal status created by [a Family Division of the Superior Court of the District of Columbia] order which vests in a custodian the responsibility for the custody of a minor[.]"); *cf.* Amended Complaint (Compl.) (ECF No. 13) ¶¶ 53 (plaintiff K.H. granted custody of K.J.); 68 (plaintiff M.M. granted custody of L.E.); 88 (plaintiff L.C. granted custody of T.C.).[6]

## II.  <u>Plaintiffs' Allegations</u>

Plaintiffs challenge CFSA's informal practice of placing suspected abused or neglected children in the care of a relative caregiver rather than formally placing

---

[6]     *See also* D.C. Code § 16-2320(a)(3) (for children found to be neglected, the Court may transfer legal custody to CFSA; an authorized private organization; or "a relative or other individual who is found by [the Court] to be qualified to receive and care for the child[.]").

them with a foster parent or in a group setting. Compl. ¶ 3.[7] Plaintiffs contend that if a charge of abuse or neglect is substantiated, a child removed from a home *must* be placed in foster care. *Id.* ¶ 35.

Plaintiffs allege that, as a result of kinship diversion, children are not provided foster care maintenance payments and other services that are available to children placed in formal foster care. *Id.* ¶ 35. In particular, plaintiffs allege that under District law, CFSA may only take particular actions upon a report of "child abuse or neglect," Compl. ¶ 35, and that it must follow formal procedures for placing a child in foster care with a relative. *Id.* ¶ 36. Plaintiffs claim that CFSA will informally:

> [C]ontact a relative to see if they are willing to care for the child. If CFSA identifies a willing relative that is available to care for the child, CFSA deliberately ignores its responsibility to inform the relative of their option to become [ ] licensed as a foster parent, and typically directs or pressures the relative to file [ ] an emergency motion for legal and physical custody, including by threatening to place the child in foster care with a stranger if the relative does not agree to do so.

*Id.* ¶ 37. Plaintiffs allege this policy results in CFSA failing to take a number of steps that apply to formal foster care, such as a health and safety assessment of the foster

---

[7]     Plaintiffs' counsel, DC KinCare Alliance (KinCare Alliance), has challenged this practice in *LaShawn A. v. Bowser*, Civil Action No. 89-1754 (TFH), although the Court has not found—as argued by KinCare Alliance—that the children "diverted" by the practice are members of the plaintiff class there, nor has the Court taken other action requested by KinCare Alliance. *See id.*, ECF Nos. 1180-1, 1187, 1197; *see also id.* ECF No. 1192 (Letter from Court Monitor dated Nov. 30, 2018 "re: Update on consultation between the Monitor, KinCare Alliance, and CFSA"); *cf.* ECF No. 1197 ("[W]e respectfully request that the Court order CFSA to immediately cease its practice of utilizing informal kinship diversion as a substitute for kinship foster care.").

parent's home, *id.* ¶ 38, financial support, *id.* ¶ 39, and ongoing monitoring and services. *Id.*

Plaintiff K.J. is a six-year-old child who is cared for by her maternal aunt, plaintiff K.H. Compl. ¶ 4. Plaintiff L.E. is a one-year-old child who has been informally placed in the care of her maternal great-aunt, plaintiff M.M. *Id.* ¶ 5. Plaintiff T.C. is a fifteen-year-old who was cared for by his paternal grandmother, plaintiff L.C., until January 13, 2020. *Id.* ¶ 6. In the case of both K.J. and L.E., K.H. and M.M. have obtained temporary custody; a trial as to K.J.'s custody was held on January 21 and 22, 2020, and the case is under advisement, *id.* ¶ 55; as for L.E., a trial in the custody case is continued pending the outcome of other legal proceedings. *Id.* ¶ 73. As to T.C., he remained in L.C.'s custody until January 13, 2020, when a custody order granted custody to his father. *Id.* ¶ 89.

Plaintiffs allege that each of the relative caregivers (K.H., M.M. and L.C.) has requested to be licensed as a foster parent but that CFSA has refused to do so. *Id.* ¶¶ 4–6, 51, 69, 86. In addition, plaintiffs allege that each of the caregivers was instructed by CFSA to file for emergency custody. *Id.* ¶¶ 49, 66, 68, 84. They also allege CFSA failed to instruct them of the option to be licensed as foster parents and instead encouraged them to pursue custody. *Id.* ¶¶ 48, 50-51, 66, 84, 86. To that end, plaintiffs allege that CFSA has failed to provide them with financial support or other services. *Id.* ¶¶ 54–55, 74–75, 89–90.

III.    <u>Plaintiffs' Claims</u>

In the Amended Complaint (Complaint), plaintiffs allege the District has violated several provisions of AACWA (Count I). *See id.* ¶¶ 23–24. In addition, plaintiffs allege violations of the Equal Protection Clause (Count II), *id.* ¶¶ 100–106; the Due Process Clause (Count III), *id.* ¶¶ 107–113; the D.C. Human Rights Act (Count IV), *id.* ¶¶ 114–119; common law negligence (Count V), *id.* ¶¶ 120–124; fraudulent misrepresentation (Count VI), *id.* ¶¶ 125–129; and negligent misrepresentation (Count VII), *id.* ¶¶ 130–132.

Based on those claims, plaintiffs seek declaratory and injunctive relief that CFSA's policy of kinship diversion is unlawful, Compl. at 40–41, as well as compensatory damages in the amount of foster care maintenance payments they would have been entitled to, and attorney's fees and costs. *Id.* at 41.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. "[A] complaint [does not] suffice if it

tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678

(quoting *Twombly*, 550 U.S. at 557).

In evaluating a motion under Rule 12(b)(6), the Court "may consider … the

facts alleged in the complaint, any documents either attached to or incorporated in

the complaint, and matters of which [the Court] may take judicial notice." *EEOC v.*

*St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v.*

*Holder*, 923 F.Supp.2d 204, 209 (D.D.C. 2013).

## ARGUMENT

I.   <u>Plaintiffs' Allegations Fail to Establish That the District Has Violated
     Provisions of the Social Security Act, if Those Provisions Are Privately
     Enforceable (Count I).</u>

Plaintiffs seek to enforce a variety of provisions of the AACWA; specifically, 42

U.S.C. §§ 671, 672, and 675. Compl. ¶¶ 96–97. Plaintiffs allege that those statutory

provisions require the District to: (1) remove children "from their home pursuant to

a voluntary placement agreement or judicial determination that continuation in the

home would be contrary to the welfare of the child"; (2) place children in a foster home

that has been licensed or approved; (3) inform children's relatives of their options to

participate in the care and placement of the child" and "the requirements to become

a foster family home and the additional services and support that are available for

children placed in such a home"; (4) provide foster care maintenance payments; (5)

provide quality "services to protect the child's safety and health"; and (6) establish a

written case plan and case review system that meets various requirements. *Id.*

As discussed below, plaintiffs cannot enforce the provisions that they claim the District has violated. But even if plaintiffs can, their allegations do not establish that the District has failed to comply with the referenced federal provisions.

A.    The Social Security Act Does Not Prohibit Kinship Diversion.

In general, plaintiffs' arguments in Paragraphs 96(a)–(c) and 97(a)–(b) of the Complaint boil down to their belief that federal law prohibits kinship diversion; in other words, the District *must* formally place neglected or abused children in foster care, conduct formal removal proceedings in Superior Court, inform certain individuals of their option to become licensed foster parents and license them (and had to take those steps with respect to the plaintiffs here). *Id.* But federal law does not contain such requirements.

1.    Plaintiffs Cannot Privately Enforce the Provisions They Believe Prohibit Kinship Diversion.

Plaintiffs are attempting to enforce 42 U.S.C. §§ 671(a)(10), 671(a)(22), 671(a)(29), 672(a)(2), and 672(c). None permits private enforcement.

"Congress creates federal causes of action" but "[i]f the text of a statute does not provide a cause of action, there ordinarily is no cause of action." *Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1097 (D.C. Cir. 2017). On "rare occasions, [however,] the Supreme Court has recognized implied causes of action" that may be enforced through 42 U.S.C. § 1983 (Section 1983). *Id.* A plaintiff alleging that a constitutional or statutory provision creates an implied right of action of action must show "Congress's intent—notwithstanding the lack of an express cause of action—to

create a 'private right' and a 'private remedy.'" *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).

"A statute creates a right enforceable under Section 1983 if (1) 'Congress ... intended that the provision in question benefit the plaintiff,' (2) 'the plaintiff ... demonstrate[s] that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence,' and (3) 'the statute ... unambiguously impose[s] a binding obligation on the States' using 'mandatory, rather than precatory, terms.'" *DuBerry v. District of Columbia*, 824 F.3d 1046, 1051 (D.C. Cir. 2016) (citing *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)). Although "Section 1983 provides a remedy for the deprivation of federal constitutional and statutory rights by any person under color of state law," "[t]he deprivations for which it provides a remedy, however, are only those of 'rights, privileges, or immunities secured by the Constitution and laws of the United States, ... not the broader or vaguer benefits or interests.'") *Id.* (citation omitted).

The Supreme Court has clarified the first prong of that analysis, finding that a statute must provide for an "unambiguously conferred right to support a cause of action." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). In other words, the focus is on whether the "text and structure" indicates that "Congress intends to create new individual rights." *Id.* at 286. That analysis looks to whether: (1) the statute contains "'rights-creating' language," *id.* at 287 (quoting *Sandoval*, 532 U.S. at 288); (2) the statute has an "aggregate focus" instead of being "concerned with whether the needs of any particular person have been satisfied," *id.* (quotation omitted); and (3)

11

Congress created a mechanism for federal review. *Id.* at 289–90. Indeed, "if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action." *Id.* at 290; *see also Sandoval*, 532 U.S. at 286-88 (statutory intent is "determinative," and a court should look for "rights-creating language").

Even if a statute meets that standard, the presumption of enforceability may be rebutted by a showing that Congress either explicitly prohibited a private remedy or implicitly did so "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement." *Blessing*, 520 U.S. at 341.

Although not relied on by plaintiffs, the Supreme Court has already held that 42 U.S.C. § 671(a)(15)[8] does not support a private cause of action. *Suter v. Artist M.*, 503 U.S. 347 (1992); *see also Melton v. District of Columbia*, 85 F. Supp. 3d 183, 191 (D.D.C. 2015) ("A private individual has no cause of action under the [AACWA] itself or through an action under 42 U.S.C. § 1983.").[9]

---

[8]    Section 671(a)(15) sets forth the steps that a state agency should take to ensure that it:  (1) makes the child's health and safety the "paramount" concern in removal; (2) takes reasonable efforts to reunify families and keep a child in his or her home; and (3) permanently places a child if he or she cannot be kept in the home.

[9]    Admittedly, and as the Second Circuit noted, in 1994 Congress overrode the reasoning in *Suter* to enable certain provisions of the AACWA to give rise to private enforcement. *N.Y. State Citizen's Coalition for Children v. Poole*, 922 F.3d 69, 83 n.7 (2d. Cir. 2019) (citing 42 U.S.C. § 1320a-2). In doing so, however, Congress explicitly did not "intend[] to alter the holding in [*Suter*] that section 671(a)(15) … is not enforceable in a private right of action." 42 U.S.C. § 1320a-2.

As with that statute, which requires a state agency to take certain generalized actions to ensure a child's health and safety, 42 U.S.C. §§ 671(a)(10),[10] 671(a)(22),[11] 671(a)(29),[12] 672(a)(2),[13] and 672(c)[14] similarly do not permit private enforcement. *See Estate of Place v. Anderson*, 398 F. Supp. 3d 816, 843 (D. Col. 2019) (analysis of whether AACWA provisions confer enforceable rights "requires attention to the specific provisions to have been violated"). As an initial matter, the first three provisions appear as part of Section 671, which sets out the requirement that, to receive federal funds under the AACWA, a state must have a plan approved by HHS. 42 U.S.C. § 671(a). As such, the statutory provisions plaintiffs rely on relate to what

---

[10]    Section 671(a)(10) requires that a state plan: (1) provide "for the establishment or designation" of a state authority responsible for "establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations"; (2) apply those standards to institutions and homes receiving funds; and (3) include policies as to liability.

[11]    Section 671(a)(22) provides that "the State shall develop and implement standards to ensure that children in foster care placements in public or private agencies are provided quality services that protect the safety and health of the children."

[12]    Section 671(a)(29) requires a state to develop a plan to provide notice to a child's family members and relatives regarding the placement of the child and the options for the family members or relatives to become a licensed foster home.

[13]    Section 672(a)(2) provides that, for purposes of eligibility for foster care maintenance payments, "[t]he removal and foster care placement of a child" must be through a "voluntary placement agreement" or "a judicial determination," the child is the responsibility of a state or public agency, and the child has been placed in a foster home or other institution.

[14]    Section 672(c) defines the terms "foster family home" and "child-care institution" for purposes of eligibility for foster care maintenance payments.

a state must include in a plan approved by HHS, rather than substantive obligations on a state's conduct.

Moreover, Section 671(a)(10) sets out how a state agency should establish and enforce standards for foster homes and childcare institutions; it does not, however, set out those standards with any specificity or with the detail required to confer an enforceable right. It is therefore not worded in sufficiently mandatory terms to meet the standard set out in *Gonzaga*. This is because "[w]here a statute merely gives individuals a general benefit or enhances their interest in having the state meet its statutory responsibilities, plaintiffs seeking to force compliance with the funding conditions must utilize 'the typical remedy' of pursuing 'action by the Federal Government to terminate funds to the State.'" *Kincade*, 712 F.3d at 1195 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)).

So too, Section 671(a)(22) provides that "the State shall develop and implement standards to ensure that children in foster care placements in public or private agencies are provided quality services that protect the safety and health of the children." By its very terms, that provision requires a state to take further, generalized actions (*i.e.*, providing "quality" services), not the specific types of mandatory actions necessary to meet the standard set out in *Gonzaga*. *See, e.g.*, *Yvonne L. ex rel. Lewis v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 889 (10th Cir. 1992) (finding that Section 671(a)(10) was not privately enforceable because it concerned standards of national organizations concerned with foster home criteria); *see also Gonzaga*, 536 U.S. at 288 (statute with "aggregate" focus "cannot

14

give rise to individual rights"). And Section 671(a)(29) requires a state to develop a plan to provide notice to a child's family members and relatives regarding the placement of the child and the options for the family members or relatives to become a licensed foster home.

In addition, Section 672(a)(2) appears part of a statutory scheme that establishes when a child is eligible to receive foster care maintenance payments; the particular subsection cited by plaintiffs describes the specific placement requirements that make a child eligible to receive payments. The subsection does not, however, *require* that children be placed in foster care. *See* 42 U.S.C. § 672(a)(2); *see also Estate of Place*, 398 F. Supp. 3d at 841 ("Congress clearly intended the AACWA to benefit children in state foster care ... [t]he more difficult question is whether the right assertedly protected ... is too vague and amorphous for judicial enforcement."). And Section 672(a)(c) just sets out the definition to be used for two terms that are in the Section. A definitional section cannot confer enforceable rights. *31 Foster Children v. Bush*, 329 F.2d 1255, 1271 (11th Cir. 2003) (where provisions "are definitional in nature, they alone cannot and do not supply a basis for conferring rights enforceable under § 1983").

### 2. Plaintiffs Cannot Point to a Violation of Section 671, Nor Do They Allege That HHS Has Failed to Approve CFSA's Plan.

Even if the statutory provisions plaintiffs rely on were enforceable, they fail to point to a violation of 42 U.S.C. §§ 671(a) or 672—they do not allege that the District has failed to comply with the terms of federal law by not putting into place a "plan" approved by HHS. Instead, plaintiffs allege that the District has not *operated* its

"child welfare program" as required by federal law, Compl. ¶ 98, not that HHS has failed to approve the District's plan. In any event, the responsibility for enforcing that requirement would fall on HHS, not plaintiffs here. *See* 42 U.S.C. § 671(b).

**B.** **Plaintiffs Cannot Privately Enforce the Requirement That the District Make Foster Care Maintenance Payments; Even if They Could, the District Has Not Violated the Statutory Requirement.**

Plaintiffs claim the District has violated 42 U.S.C. §§ 671(a)(1), 672(a)(1), and 675(4)(A) by failing to provide them with foster care maintenance payments when the children were placed into kinship diversion. Compl. ¶¶ 96–97. Even if plaintiffs can enforce those provisions, however, they have established no statutory violation because the plain text of Section 672(a) only makes payments applicable to children placed through specific paths.

**1.** **Sections 671(a)(1) and 672(a)(1) Do Not Confer Enforceable Rights.**

The text and structure of Sections 671(a)(1) and 672(a)(1) demonstrate that neither provision confers an enforceable right.[15] First, Section 671(a)(1) speaks to the requirement that a state plan provide for payment of foster care maintenance payments. *See Kincade*, 712 F.3d at 1198 ("the overwhelming focus is upon the conditions precedent that trigger" the requirement states "remit foster care maintenance payments"). Section 671(a)(1) does not set out the content of those

---

[15]     To the extent plaintiffs seek to enforce 42 U.S.C. § 675(4), which provides a definition of foster care maintenance payments, that provision does not confer an enforceable right. *31 Foster Children*, 329 F.2d at 1271; *see also Kincade*, 712 F.3d at 1198 (finding Section 675(4)(A) was enacted by Congress to clarify "general confusion about what can be called a foster care maintenance payment") (citing S. Rep. 96-336 (1980)).

payments, or describe to whom the payments benefit; instead, it simply sets out the requirement that a state plan include certain services and instructs HHS to not approve plans lacking those requirements and to take action if a state fails to meet its obligations. Those requirements are not consistent with the Supreme Court's stringent test of enforceability. *See Gonzaga*, 536 U.S. at 287 ("'rights-creating' language").

Section 672(a) also does not speak in the mandatory language needed to confer an enforceable right for Spending Clause legislation. While Section 672(a) does provide that a state "shall make foster care maintenance payments" on behalf of specified children, as the court noted in *Kincade*, that direction must be looked at in the context of Sections 672(a) and 675(4)(A), which "speak to the states as regulated participants in the [AACWA] and enumerate limitations on when the states' expenditures will be matched with federal dollars; they do not speak directly to the interests of the Providers." *Kincade*, 712 F.3d 1190. Rather than conferring a private right, "[t]he function of § 672(a)(1) is to serve as a roadmap for the conditions a state must fulfill in order for its expenditure to be eligible for federal matching funds; otherwise, the state bears the full cost of these payments." *Id.* at 1198. Said differently:

> The title of § 671(a)(1), 'Eligibility,' is thus an apt descriptor of the subsection's focus—it sets forth limitations on when a foster care maintenance payment is eligible for partial federal reimbursement … [t]he asserted provisions inescapably serve to establish restrictions on the state foster care expenditures that will be eligible for federal matching.

*Id.* at 1199. As such, "the failure to meet the requirements of § 672(a) 'triggers a funding prohibition,' and the asserted right is only mentioned in the context of these funding prohibitions." *Id.* at 1202; *see also N.Y. State Citizens' Coalition for Children v. Poole*, 935 F.3d 56, 59 (2d. Cir. 2019) (Livingston, J., dissenting from denial of rehearing *en banc*) (the AACWA "does not come close to satisfying [the] demanding standard for recognizing a privately enforceable right under § 1983 to foster care maintenance payments").[16] In addition, the conference report accompanying the passage of the AACWA clarified that Congress referred to the provision regarding maintenance payments as "Federal Matching Provisions for Foster Care," H. Rep. 96-900, at 50 (Apr. 23, 1980), further supporting the court's conclusion in *Kincade* that "when a statute links funding to substantial compliance with its conditions—including forming and adhering to a state plan with specified features—this counsels against the creation of individual enforceable rights." 712 F.3d at 1200; *see also id.* at 1202 ("the asserted right is only mentioned in the context of these funding prohibitions … further evidence of an aggregate focus.").

This conclusion is consistent with the Supreme Court's recent articulation in *Armstrong v. Exceptional Child Center, Inc.*, where the Court, in evaluating whether providers could sue under certain Medicaid provisions of the Social Security Act, explained that "[o]ur precedents establish that a private right of action under federal law is not created by mere implication, but must be 'unambiguously conferred.'" 135

---

[16]    Some courts have come to the opposite conclusion as to Section 672(a)(1). *See Poole*, 922 F.3d at 82-83; *Glisson*, 847 F.3d at 381.

S. Ct. 1378, 1387 (2015). Indeed, the Court expressed skepticism that any Spending Clause legislation may confer an enforceable right given that it "is phrased as a directive to the federal agency charged with approving state [ ] plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate ...." *Id.*

### 2.   Plaintiffs Do Not Allege They Were Entitled to Maintenance Payments.

And regardless, plaintiffs' claim is essentially dependent on a finding that federal law prohibits kinship diversion (and, as demonstrated above, the provisions that plaintiffs rely on for this claim are not enforceable and have not been violated by the District). This is because Section 672(a)(1)(A) states that maintenance payments must only be made if the removal and foster care placement meet the definition of Section 672(a)(2)(A). That provision, in turn, requires the "removal and foster care placement" to be made "in accordance" with "a voluntary placement agreement," or "a judicial determination to the effect that continuation in the home from which removed would be contrary to the welfare of the child and that reasonable efforts of the type described in section 671(a)(15) ... have been made." 42 U.S.C. § 672(a)(2)(A). The child's placement must also be the responsibility of the state, 42 U.S.C. § 672(a)(2)(B), and the child must be placed "in a foster family home." 42 U.S.C. § 672(a)(2)(C).

Plaintiffs do not allege that their kinship diversions meet those requirements. In fact, plaintiffs make clear that K.J., L.E. and T.C. were not placed in formal foster care. Compl. ¶¶ 48, 50, 53, 66, 68, 84–85. And plaintiffs also make clear that K.H.,

M.M. and L.C. were not licensed as foster parents (despite their alleged attempts to do so) or that the children were otherwise placed in a foster family home meeting the definition in 42 U.S.C. § 672(c).[17] *Id.* ¶¶ 51, 69, 86. So too, plaintiffs do not indicate that CFSA undertook any other activities that would constitute indicia of licensure as a foster home. *Cf. Glisson*, 847 F.3d at 383–84 (finding placement constituted an approved foster home where the state agency conducted a home evaluation and background check). Similarly, plaintiffs provide no allegations that CFSA placed plaintiffs through a "voluntary placement agreement," 42 U.S.C. § 672(a)(2)(A)(i), or that the diversion of the plaintiff children otherwise satisfies the requirements of that section.

As such, plaintiffs have failed to allege that they meet the requirements of the AACWA to receive foster care maintenance payments. *See Johnson v. N.Y. State Office of Child and Family Servs.*, Civil Action No. 16-1331, 2017 WL 6459516, at *8 (N.D.N.Y. Dec. 18, 2017) (citing *Maher v. White*, Civil Action No. 90-4674, 1992 WL 122912, at *3 (E.D. Pa. June 2, 1992)) (an individual who is not a foster child or foster parent has no claim under the AACWA, as the provisions' benefits "'are only available to maintain the child while in foster care'"). Instead, plaintiffs' claim seems to be that CFSA was required to treat K.H., M.M. and L.C. as licensed foster parents. But the plain text of 42 U.S.C. § 672(a) refutes that assertion; regardless of whether other

---

[17]     42 U.S.C. § 672(c) defines a "foster family home" as a "foster family home for children which is licensed by the State … or has been approved by the agency of such State having responsibility for licensing homes of this type, as meeting the standards established for such licensing." 42 U.S.C. § 672(c).

provisions require the action plaintiffs seek, this provision of the AACWA provides for payments in specified circumstances. *See Glisson*, 847 F.3d at 381 ("Section 672(a) restricts the class of children entitled to benefits in two relevant ways."). It does not act as a predicate to satisfying those circumstances.

C.   **Plaintiffs' Claim That the District Failed to Develop Case Plans Is Unenforceable and Belied by Plaintiffs' Other Claims.**

Plaintiffs' claim that the District has violated 42 U.S.C. § 671(a)(16) can be quickly dispensed with. That provision requires a state plan to "provide[ ] for the development of a case plan ... for each child *receiving foster care maintenance payments* under the State plan ...." 42 U.S.C. § 671(a)(16) (emphasis added). "A case plan is a written document that must include the child's records and information about the plans for the child, such as the prospective placement, the services the child will receive, and the steps taken toward stability and eventual permanency." *Connor B.*, 774 F.3d at 61 (citing 42 U.S.C. § 675(1)). As discussed above, plaintiffs do not meet the statutory definition to receive foster care maintenance payments. As such, the requirement of Section 671(a)(16) is not triggered. The Court may dismiss plaintiffs' claim on this basis alone.

Second, and similarly, like many of the other provisions discussed above, the Court should find this provision is not enforceable through Section 1983. The statute imposes an obligation on the state to receive approval from HHS and does not confer a benefit on individuals. *T.F. by Kenner*, 2018 WL 940621, at *6 ("[T]he provision at issue here is phrased as a directive to states regarding what the state must do to be eligible for foster-care and adoption-assistance payments, not as an 'unambiguously

conferred right' … for the children mentioned in the case plan section.").[18] Moreover, "Congress's choice to amend the statute to include a private right of action for a violation of § 671(a)(18) and not of any of § 671(a)'s other requirements is 'strong evidence that Congress did not intend these other various State plan elements in … § 671(a) to confer rights enforceable pursuant to § 1983.'" *Id.* at *6 (citing *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 489 (D.N.J. 2000)).[19] In other words, Section 671(a)(16) "conditions receipt of federal funds on the existence of a state plan that, among other things, provides for 'a case review system which meets the requirements described in section 675(5)(B) … [it] does not go beyond that and explicitly require a plan to meet the requirements described in [Section 675(5)].'" *31 Foster Children v. Bush*, 329 F.3d 1255, 1271 (11th Cir. 2003).[20]

And in any event, even if proven, that three plaintiffs have not received individualized case plans is not enough to find a violation of the statute. *Connor B.,*

---

[18]    To the extent plaintiffs seek to enforce the definition of "case plan" in 42 U.S.C. § 675(1), that provision is, for the reasons discussed above, not enforceable as it appears only in the definitions section of the AACWA. *T.F. by Kenner*, 2018 WL 940621, at *5 (definition section in 675(1) cannot support private action under Section 1983). Similarly, 42 U.S.C § 675(5) simply defines the term "case review system," and does not place a substantive obligation on states or confer a benefit to children or caregivers.

[19]    Here too, some courts have come to the opposition conclusion. *See, e.g., Connor B.*, 774 F.3d at 61; *Henry A. v. Willden*, 678 F.3d 991, 1006 (9th Cir. 2012); *L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir. 1998).

[20]    To the extent plaintiffs' claim for damages, Compl. at 41, is based on their claim under Section 671(a)(16), the "written case plan requirement does not confer rights that can be the subject of an action for damages under § 1983." *Estate of Place*, 398 F. Supp. 3d at 844.

774 F.3d at 61 (finding no statutory violation where "between about 65% and 85% of children have individualized case plans"). Plaintiffs provide no allegations that a failure to develop case plans is widespread or goes beyond the facts of their Complaint, which only relate to three children.

## II.   Plaintiffs Fail to Plead a Violation of the Equal Protection Clause (Count II).

Plaintiffs claim the District has violated the Equal Protection Clause by failing to place them in licensed foster care; as such, the District has allegedly treated them in a discriminatory manner by using kinship diversion to deprive them of their "rights" and "entitlements" under the AACWA and the Abuse and Neglect Act. Compl. ¶¶ 100–106. Specifically, plaintiffs claim that they were not given the same "procedures, services, and support" as provided to other children who "experienced a similar type and severity of mistreatment" but were placed in foster homes. *Id.* ¶ 103. In addition, plaintiffs claim the District has discriminated against certain caregivers by failing to "provide the same procedures, services, and support" as that given to "foster parents caring for children who experienced a similar type and severity of mistreatment." *Id.* ¶ 104. In both instances, plaintiffs claim the District's policies are not rationally related to advancing any legitimate governmental interest. *Id.* ¶¶ 103–104; *see also id.* ¶ 8.

The Equal Protection Clause protects against intentional and arbitrary discrimination, "whether by express terms of a statute or by its improper execution through a duly constituted agent." *Sunday Lake Iron Co. v. Township of Wakefield*,

247 U.S. 350, 353 (1918).[21] "To advance an equal protection claim, a plaintiff must assert facts that support the allegation that the government intentionally treated [him or her] differently from others who were similarly situated …." *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 34 (D.D.C. 2015) (quoting *Jones v. Nat'l Council on Disability*, 66 F. Supp. 3d 94 (D.D.C. 2014), *affirmed*, 2015 WL 653308 (D.C. Cir. Feb. 5, 2015)). The Supreme Court has "made clear that proof of [ ] discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003). Moreover, discriminatory intent or purpose "implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

As to plaintiffs' first argument—differential treatment of those in foster care as opposed to kinship diversion—plaintiffs do not allege facts supporting their claim that they were intentionally treated differently than others. Instead, plaintiffs allege facts regarding their own interactions with CFSA and placement in kinship diversion, and then aver that CFSA acted with discriminatory intent. But plaintiffs do not

---

[21]     The District of Columbia is subject to the requirements of the Fifth Amendment Due Process Clause, which contains an equal protection component that is considered substantially the same as the Fourteenth Amendment's Equal Protection Clause, and thus the standards developed under the Equal Protection Clause are applicable to the District. *See Fraternal Order of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998) ("Equal protection analysis is substantially identical under the Fifth Amendment and the Fourteenth") (subsequent history omitted).

actually plead *facts* that would support an inference of *intent* to treat them differently than those children placed into formal foster care who were in similar circumstances, or allegations regarding CFSA's basis for doing so. So too, plaintiffs do not include any facts regarding "children who have experienced a similar type and severity of mistreatment" but were treated differently. As a result, "[s]ince [p]laintiffs do not even allege intentional discrimination, their equal-protection claim must be dismissed." *Porter v. U.S. Capitol Police Bd.*, 816 F. Supp. 2d 1, 6 (D.D.C. 2011); *see also Williamson*, 348 U.S. at 489 ("The prohibition of the Equal Protection Clause goes not further than the invidious discrimination").[22]

And as for not allowing plaintiffs to apply to become licensed foster parents, their own allegations undercut the claim; two plaintiffs *did* apply, Compl. ¶¶ 55, 69, 86, but were not approved. *See* below at 33–37. Plaintiffs do not allege they were treated differently than other individuals as to their applications for licensure or benefits, or that those who are treated differently, if any exist, are similarly-situated. Plaintiffs' allegations are therefore insufficient, and they cannot state an equal protection claim. *See Women Prisoners of the D.C. Dep't of Corr. v. Dist. of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996) ("The dissimilar treatment of dissimilarly situated persons does not violate equal protection."); *see also Atherton v. Dist. of Columbia*

---

[22]    Plaintiffs do not allege they "received differential treatment by the government due to membership in a protected class, such as one based on race, national origin, or gender." *Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 122 (D.D.C. 2012). As such, plaintiffs can maintain their claim only if they meet the standard of a "class of one." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

*Office of the Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009) (affirming dismissal of equal protection claims where plaintiff's "spare facts and allegations" did "not permit the court to infer more than the mere possibility of misconduct").[23]

### III.   Plaintiffs' Fifth Amendment Procedural Due Process Claim Should Be Dismissed Because They Have Not Been Deprived of Any Protected Liberty or Property Interest (Count III).

Plaintiffs fail to state a procedural due process claim. Plaintiffs allege that the District, through the kinship diversion practice, has "intentionally deprived" them of their rights under the AACWA and District law, and a liberty interest—the "right to familial integrity"—"without providing an adequate or meaningful opportunity to be heard." Compl. ¶¶ 104–109. Plaintiffs also allege that the District has deprived them of "the right to receive foster care payments." *Id.* ¶ 110. Plaintiffs are incorrect.

Procedural due process protections attach only when a plaintiff has alleged a cognizable liberty or property interest. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Liberty interests arise from two sources—the Constitution or state law. *Atherton v. District of Columbia*, 567 F.3d 672, 689 (D.C. Cir. 2009) (citing *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). "State regulations may give rise to a constitutionally protected liberty interest if they contain substantive limitations on official discretion, embodied in mandatory statutory or regulatory language." *Id.*

---

[23]    To the extent that plaintiffs base their equal protection claim on violations of the AACWA or the Abuse and Neglect Act, the Court should consider those arguments as relating to Count I and IV. Compl. ¶¶ 101—102. In other words, plaintiffs cannot bootstrap their statutory claims into their equal protection allegation.

(quoting *Price v. Barry*, 53 F.3d 369, 370 (D.C. Cir. 1995) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989)).

In other words, for a liberty interest to be created by a state statute or regulation, the statute or regulation must place "substantive limits on official discretion," *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983), such that the language of the statute or regulation is of "an unmistakable mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed[.]" *Hewitt v. Helms*, 459 U.S. 460, 471–72 (1983). Plaintiffs have failed to identify any explicitly mandatory language that gives rise to a liberty or property interest.

### A.  District Law Does Not Create a Protected Liberty Interest.

As discussed briefly above, the Abuse and Neglect Act authorizes CFSA to exercise broad discretion in addressing instances of child abuse and neglect. The numerous strategies and options available to the agency undercut plaintiffs' claims.

The discretion afforded to CFSA is clear throughout the law. The agency is authorized to determine, in the first instance, if an abused or neglected child should be removed from the home or, alternatively, whether the child can be protected in-home by the provision of certain services. D.C. Code § 4-1301.06(3)(E). If the allegations are substantiated, the agency must "prepare a plan for each child and family" and "shall forthwith take such steps to ensure the protection of the child and the preservation, rehabilitation and, *when safe and appropriate*, reunification of the family *as may be necessary* to achieve the purposes of this subchapter." *Id.* § 4-

1301.09(b) (emphasis added).[24] Those steps "*may* include" "arranging for necessary protective, rehabilitative and financial services" for the child and the child's family, *id.* § (1) (emphasis added), and "securing services aimed at reuniting" the child with his or her family, "including but not limited to parenting classes and family counseling." *Id.* § 3.

Moreover, District law similarly provides broad discretion to the agency to determine who to license as a foster parent. *See, e.g.*, 29 DCMR § 6001.1 ("[C]haracteristics" of foster parents include "[k]nowledge of, interest in, and regard for the principles of good child care[;] [t]he willingness to work with CFSA and agency personnel in the best interest of the foster child; [m]aturity and personality characteristics[;] [t]he capacity to value, respect, appreciate, and educate a foster child[; and a]wareness of the way in which a child needs family life to grow and learn[.]").

This "built-in flexibility" militates against finding a liberty interest. *Chamber of Commerce of U. S. v. NLRB*, 118 F. Supp. 3d 171, 206 (D.D.C. 2015); *id.* at 219 (no identifiable liberty interest where statute gives government officials "considerable discretion to adapt to specific circumstances"); *Cf. Sykes v. New York State Off. of Children & Fam. Servs.*, Civil Action No. 18-8309, 2019 WL 4688608, *12 (S.D.N.Y.

---

[24]    "Case plan" is defined at D.C. Code § 4-1301.02(3), and that provision contains numerous indications of the broad discretion enjoyed by CFSA. *See id.* §§ 4-1301.02(3)(A) (plan should include "a discussion of the safety and appropriateness of the placement"), 4-1301.02(3)(B) (plan should assure "that the child receives safe and proper care and that services are available to the parents, child, and foster parents [and] address the child's needs").

Sept. 25, 2019) ("The Court has found no precedent that concludes that the Due Process Clause creates an affirmative right for a biological relative to obtain the benefit of a state-created foster parent relationship.") (footnote omitted).

### B.  Plaintiffs Have Not Been Deprived of Any Property Interest.

Plaintiffs have not been deprived of any property interest, because they have no constitutionally protected property interest in foster care benefits. The relevant provisions of federal law only require States to "make foster care maintenance payments on behalf of [a] child ... if ... [t]he child's placement and care are the responsibility of—(i) the State agency ... [or] (ii) any other public agency with which the State agency ... has made an agreement which is in effect." 42 U.S.C. § 672(a)(1), (2)(B). Because the plaintiff children are not in foster care or the custody of CFSA, *see* Compl. ¶¶ 55, 70, 88, they are ineligible to receive federal foster care maintenance payments. *Id.*; *see also Johnson v. New York State Off. of Child & Fam. Servs.*, 2017 WL 6459516, *7 (N.D.N.Y. Dec. 18, 2017) (plaintiffs "have no legitimate claim of entitlement to, and no constitutionally protected interest in, foster care benefits"). *See also Rust v. Sullivan*, 500 U.S. 173, 201 (1991) ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.") (quoting *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 507 (1989)).

Again, as argued above, even assuming plaintiffs were eligible for benefits and had properly applied for them, they would still fail to state a procedural due process

claim. *See Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 219 (D.C. Cir. 2013) ("We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause[.]") (quoting *Lyng v. Payne*, 476 U.S. 926, 942 (1986)); *see also Raoof v. Sullivan*, 315 F. Supp. 3d 34, 45 (D.D.C. 2018) (procedural due process "is a safeguard of the security of interests that a person has *already acquired* in specific benefits") (emphasis added) (quoting *Roth*, 408 U.S. at 576).

### C.   <u>Plaintiffs Have Not Been Deprived of the Right to Familial Integrity.</u>

"The Supreme Court has made clear that *parents* have a fundamental liberty interest in family integrity, and in the care, custody, and control of their children." *Jacinto-Castanon de Nolasco v. United States Immigration & Customs Enforcement*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) (emphasis added) (citing, among others, *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000)). Nevertheless, the Supreme Court "has never found that interest to be absolute or unqualified." *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993) (citations omitted).

That interest, whatever its scope, is "balanced against the state's right to investigate allegations of abuse or neglect and take appropriate remedial action." *Connor B.*, 774 F.3d at 58 (citations omitted). The need to protect children from abuse and neglect is a well-recognized, compelling reason to disrupt family integrity. *E.g., Quilloin v. Walcott*, 434 U.S. 246, 255 (1978).

And while the interest in family integrity "has many avatars," *Franz v. United States*, 707 F.2d 582, 595 (D.C. Cir. 1983), it is unclear whether that right extends—

and in what form—to relative caregivers. In any event, plaintiffs have failed to make any specific allegations about how the *defendants* have deprived them of "family integrity" here. Plaintiffs' conclusory procedural due process claims are therefore "devoid of 'factual enhancement'" and should be dismissed. *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557).

> ### D. Plaintiffs Have Failed to Pursue All the "Process" That Is Available to Them.

Plaintiffs also attempt to use their due process allegations to challenge the outcomes of processes they disagree with, rather than the processes themselves; for example, they seem to contend they *were not* licensed as foster parents, not that they *could not* apply to do so. As the Supreme Court stated in a different context in *District Attorney's Off. for Third Judicial Dist. v. Osborne*:

> It is difficult to criticize the State's procedures when [plaintiff] has not invoked them. This is not to say that [plaintiff] must exhaust state-law remedies. But it is [plaintiff's] burden to demonstrate the inadequacy of the state-law procedures available to him …. These procedures are adequate on their face, and without trying them, [plaintiff] can hardly complain that they do not work in practice.

557 U.S. 52, 71 (2009) (citations omitted). So too here: plaintiffs allege that CFSA denied them the ability "to apply" to become foster parents. Compl. ¶ 117. But this is plainly false, as plaintiffs' own allegations reveal. *See id.* ¶ 4 ( "[K].H. has submitted numerous requests to CFSA to license her as a foster parent"); ¶ 5 ("[M].M. submitted a request to CFSA to license her as a foster parent"); ¶ 6 ("[L].C. submitted a request to CFSA to license her as a foster parent"). Plaintiffs, then, challenge not the *process*, but the *results* of the process. And the Complaint is silent as to whether any of the

adult plaintiffs were eligible for foster care licensure, submitted a complete application, or attempted to apply for other available subsidies. *See Osborne*, 557 U.S. at 71 ("His attempt to sidestep state process through a new federal lawsuit puts [plaintiff] in a very awkward position. If he simply seeks [licensure] through the State's [ ] procedures, he might well get it. If he does not, it may be for a perfectly adequate reason, just as the federal statute and all state statutes impose conditions and limits on [eligibility]."); *see also English v. District of Columbia*, 815 F. Supp. 2d 254, 267 (D.D.C. 2011) ("If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.") (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

In addition, and although there is no exhaustion requirement under Section 1983, plaintiffs fail to mention that one or more of the adult plaintiffs may be eligible to receive (or is receiving) financial subsidies under the District's Grandparent Caregivers Program, *see* D.C. Code §§ 4-251.01, *et seq.*, or the Close Relative Caregivers Program, *see* D.C. Law 23-32 (eff. Nov. 26, 2019). These programs provide: "[A] monthly subsidy to assist low-income District residents who have taken the responsibility of caring for a family member that is under the age of 18. The goal of this intervention is that it will enable children, who may otherwise enter into foster care, to find permanence and stability in the home of a caring relative." Council of the District of Columbia, Committee on Human Services, Report on Bill 23-0203, "Close

Relative Caregivers Subsidies Amendment Act of 2019," (July 1, 2019) at 1.[25] For each child served by the Grandparent Caregiver Program in calendar year 2018, the average monthly subsidy was $594.90. *Id.*; *cf.* 29 DCMR § 6801.4 ("Nothing in this chapter shall be construed as creating an entitlement to a subsidy.").

As such, because the plaintiff caregivers do not have any cognizable property or liberty interest, the District does not have an obligation to provide a process to protect them from a deprivation of such interests. But even if plaintiffs *had* been deprived of a liberty or property interest, the "fundamental" requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Considering plaintiffs' repeated interactions with CFSA as well as their custody hearings in Superior Court, plaintiffs received due process. *See Olim*, 461 U.S. at 250 n.12 (An "expectation of receiving process is not without more, a liberty interest protected by the Due Process Clause.").

Finally, even if plaintiffs could show that CFSA violated its *own* policies, *see* Compl. ¶ 28, that fact alone would not amount to a constitutional violation. *Payne v. District of Columbia*, 808 F. Supp. 2d 164, 174 (D.D.C. 2011) ("a breach of state procedural requirements is not, in and of itself, a violation of the Due Process Clause.") (internal quotes and citations omitted); *see also English*, 815 F. Supp. 2d at 266 ("[C]ourts have found that an agency's mere delay or failure to follow its own

---

[25]    *Available at* http://lims.dccouncil.us/Download/42109/B23-0203-Committee Report1.pdf (Feb. 10, 2020).

procedures does not amount to an automatic violation of constitutional due process.")

(citing, among others, *AFGE, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 353

(D.C. Cir. 2007) ("A mere violation of law does not give rise to a due process claim.")).

## IV.   Plaintiffs' D.C. Human Rights Act Claim Should Be Dismissed Because Plaintiffs Cannot Show Discrimination (Count IV).

Plaintiffs allege that CFSA's kinship diversion practice violates the D.C.

Human Rights Act, D.C. Code §§ 2-1401.01, *et seq.* (HRA), by intentionally

discriminating against them based on familial status by refusing to provide the same

benefits and services" it provides to foster families. Compl. ¶ 118; *see also* D.C. Code

§ 2-1402.73).[26] Plaintiffs' allegations fail to state a claim.

Plaintiffs alleging disparate treatment must first establish that they were

discriminated against on the basis of their membership in a protected class. *Boykin*

*v. Gray*, 895 F. Supp. 2d 199, 208 (D.D.C. 2012). Although the HRA is interpreted

broadly, its protections also have limits. *Siddique v. Macy's*, 923 F. Supp. 2d 97, 104–

105 (D.D.C. 2013). To state a claim, plaintiffs must allege facts that "establish a nexus

between the defendants' allegedly discriminatory motive and the adverse action."

---

[26]   "Familial status" is defined as:

> [O]ne or more individuals under 18 years of age being domiciled with: (1) a parent or other person having legal custody of the individual; or (2) the designee, with written authorization of the parent, or other persons having legal custody of individuals under 18 years of age. The protection afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or in the process of securing legal custody of any individual under 18 years of age.

D.C. Code § 2-1401.02(11A).

*Easaw v. Newport*, 253 F. Supp. 3d 22, 30 (D.D.C. 2017); *see also Poola v. Howard Univ.*, 147 A.3d 267, 276 (D.C. 2016) (dismissing discrimination claim because the complaint did not sufficiently allege a causal nexus); *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 87 (D.D.C. 2016) (holding that plaintiff failed to support an inference of gender discrimination where her allegations "suggest[ed] that, at best, she was treated differently from all other employees—which presumably includes both men and women"). So too here. Plaintiffs' allegations do not support an inference that they were discriminated against *because of* familial status.

In discrimination case law, courts assume that "familial status" refers to the presence of minor children in the household. *Borum v. Brentwood Village, LLC*, 218 F. Supp. 3d 1, 22 (D.D.C. 2016) (citing cases).[27] But here, plaintiffs claim the District impermissibly treats them differently than "foster families." Compl. ¶¶ 116, 118. At bottom, plaintiffs complain that the District treats them (households with newly resident minor children) differently than licensed foster families (households with newly resident minor children). This fails to state a disparate treatment claim. *See, e.g., Easaw*, 253 F. Supp. 3d at 26 (plaintiff claiming disparate treatment must allege sufficient facts to create a reasonable inference that the protected characteristic was a factor in the decision at issue) (quoting *Krodel v. Young*, 748 F.2d 701, 705 (D.C.

---

[27]     Typically, plaintiffs in familial status cases state claims when they allege that families with children are treated differently or less favorably than adults-only households. *See, e.g., Belcher v. Grand Reserve MGM, LLC*, 269 F. Supp. 3d 1219, 1234 (M.D. Ala. 2017) (residents stated *prima facie* Fair Housing Act claim by alleging that apartment complex's facially discriminatory "adult supervision rule," "curfew rule," and "pool rule" raised inference of discrimination against families with children).

Cir. 1984)); *Cf. De La Fuente v. DNC Servs. Corp.*, 2019 WL 1778948, *8 (D.D.C. Apr. 23, 2019) ("Mr. De La Fuente's allegations 'are consistent with an arbitrary, *but not racially discriminatory*, decision-making process.'") (emphasis in original) (citation omitted).

The Complaint does not connect plaintiffs' alleged failure to receive "benefits and services" with their familial status. In *McNair*, the plaintiff was allowed to proceed on her HRA claim that the denial of her telecommuting request was racially discriminatory because she alleged that coworkers of a different race were allowed to work from home. *McNair*, 213 F. Supp. 3d at 87–88. But plaintiff's sex discrimination claims were dismissed because she alleged only that she was treated differently from all employees, not that she was treated differently from male employees specifically. *Id.*

Similarly here, plaintiffs' allegations are insufficient to connect their treatment to their familial status, because plaintiffs have not alleged that similarly-situated individuals of a different familial status were treated differently.[28] In other words, "[t]he plaintiffs have made no allegations that, accepted as true, could serve as 'direct evidence of discriminatory intent,' nor that could 'permit an inference of discrimination.' Without any supporting factual allegations, the plaintiffs' assertions reduce to mere legal conclusions that are not entitled to the assumption of truth."

---

[28]    "[T]he plaintiff does not allege with sufficient specificity why the [adverse action] amounted to disparate treatment, or how that purportedly disparate treatment was based on [familial status]." *Schmidt v. United States Capitol Police Bd.*, 826 F. Supp. 2d 59, 62 (D.D.C. 2011) (motion to dismiss granted).

*Boykin*, 895 F. Supp. 2d at 208 (citing, among others, *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999)). "The facts alleged … do not satisfy '[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)' intentional [familial status] discrimination on the part of the District." *Id.* at 209 (quoting *Twombly*, 550 U.S. at 557). *See also Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017) (even where discrimination complaint "contains fulsome factual context," the allegations "must be considered collectively in evaluating the reasonableness and plausibility of the inferences urged by the plaintiff") (citing *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016)). The inferences of discrimination plaintiffs want the Court to draw by their bare allegations are not reasonable or even plausible.

## V.   Plaintiffs Fail to State a Claim for Negligence (Count V).

Plaintiffs allege that the District's child abuse and neglect law creates a "special relationship" between them and the District and that the defendants have breached that duty. Compl. ¶ 121. Plaintiffs, again, are incorrect.

The elements of common-law negligence are a duty of care owed by the defendant to the plaintiff, a breach of that duty, and damages to the plaintiff caused by that breach. *E.g.*, *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (citing *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984)). The District of Columbia Court of Appeals held, decades ago, that the Abuse and Neglect Act creates a "special relationship" between the District and those protected by the statute, which prescribes "'mandatory acts clearly for the protection of a particular

class of persons rather than the public as a whole.'" *Turner v. District of Columbia*, 532 A.2d 662, 667 (D.C. 1987) (quoting *Morgan v. District of Columbia*, 468 A.2d 1306, 1314 (D.C. 1983) (*en banc*)). But negligence in this circumstance is established only if plaintiff can demonstrate that the statute prescribes *mandatory* action and that the defendant *failed* to take that action. *Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158, 188 (D.D.C. 2014) (citing *Turner*, 532 A.2d at 672).

Plaintiffs fail on both requirements—as demonstrated above, the District has complied fully with the Constitution, federal and local law. The provisions plaintiffs argue are mandatory are not and, in any event, the District complies with its federal and local law obligations. Moreover, plaintiffs cannot demonstrate "a proximate causal nexus between the defendant's negligence and a present injury of the kind that the standard of care was designed to prevent." *In re C.W.*, 916 A.2d 158, 167 (D.C. 2007); *cf. Hunter*, 64 F. Supp. 3d at 190 (statute must be "enacted to ... prevent the type of [injury] that occurred") (quoting *Sibert–Dean v. WMATA*, 721 F.3d 699, 702–03 (D.C. Cir. 2013)).

The Abuse and Neglect Act was enacted to protect children. It authorizes CFSA to take numerous actions, in emergencies and in the long-term, to remove children and youth from dangerous situations and provide stable, healthy environments. *See In re D.K.*, 26 A.3d 731, 735 (D.C. 2011) (purposes of act were to "marshall [*sic*] all existing facilities for addressing the problem of child abuse and neglect in the District[,]" to "insur[e] that [neglected] children and, where appropriate, their families receive effective social services") (citations omitted).

Plaintiffs' alleged financial injuries are not the type of injuries the Act was designed to prevent. *Cf. District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001) ("[W]hen abused and neglected children have been individually identified to the government agency charged with their protection, then a duty, although *narrow and specific*, is created by statute to benefit the individually identified persons.") (emphasis added) (citing *Turner*, 532 A.2d at 673). The District did not breach its narrow and specific duty here.

## VI.   Plaintiffs Fail to Meet the Pleading Requirements to Bring a Claim of Fraudulent Misrepresentation (Count VI).

To state a claim of fraudulent misrepresentation, a plaintiff must allege "(1) a false representation or willful omission of a material fact; (2) knowledge of the falsity; (3) an intention to induce reliance; and (4) action taken in reliance on the representation." *Carter v. Bank of America, N.A.*, 888 F. Supp. 2d 1, 19 (D.D.C. 2012) (citation omitted); *see also Falconi-Sachs v. LPF Senate Square*, 142 A.3d 550, 555 (D.C. 2016) (citation omitted); *Econ. Research Servs., Inc. v. Resolution Econ., LLC*, 2016 WL 5335666, (D.D.C. Sept. 21, 2016) (same).

Under Fed. R. Civ. P. 9(b), each of the elements of fraud must be pled "with particularity." *United States ex rel. Williams v. Martin-Baker Aircraft Co., Inc.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004). The Court is to "harmonize" the pleading requirements of Rule 9(b) with those of Rule 8(a) and (e). *Id.* "Combining Rules 8 and 9(b), … the pleader [must] … state the time, place and content of the false misrepresentations, the fact misrepresented … [,] what was retained or given up as a consequence of the fraud," and "identify individuals allegedly involved in the fraud."

*Id.* (citations omitted). In other words, Rule 9(b), requires that a "complaint must ... provide a defendant with notice of the who, what, when, where, and how with respect to the circumstances of the fraud." *United States ex rel. Conteh v. IKON Office Solutions, Inc.*, 103 F. Supp. 3d 59, 64 (D.D.C. 2015); *see also De La Fuente*, 2019 WL 1778948 at *10 (noting plaintiff must "state the time, place and content of the false representations, the fact misrepresented and what was retained or given up as a consequence of the fraud") (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994). Plaintiffs' three vague paragraphs fail to meet this threshold.

At base, plaintiffs again rest their arguments on a misreading of the AACWA, claiming that CFSA made false representations about plaintiffs' "rights and responsibilities" under the statutory scheme. Compl. ¶ 126. As discussed above, however, the AACWA (and specifically 42. U.S.C. § 671(a)(29)) does not confer enforceable rights on plaintiffs or require the actions by CFSA that plaintiffs believe it does. *Id.* In particular, § 671(a)(29)) requires a state to develop a plan to provide notice to a child's family members and relatives regarding the placement of the child and the options for the family members or relatives to become a licensed foster home. It does not, by its terms, require specific disclosures, and therefore cannot support plaintiffs' claim. *See Saucier v. Countrywide Home Loans,* 64 A.3d 428, 438 (D.C. 2013) ("A false representation may be either an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen.").[29] And

---

[29] The bulk of plaintiffs' allegations here are not details about specific misrepresentations, but about things District employees allegedly did *not* say. *Cf.* Compl. ¶¶ 127–129. Plaintiffs assert that 42 U.S.C. § 671(a)(29) imposes a "statutory

plaintiffs do not allege that CFSA provided misrepresentations to plaintiffs about the content of the District's plan under the AACWA. As such, the Court may dismiss this claim by finding that plaintiffs have failed to allege a false or misleading representation.

And even if plaintiffs are correct that CFSA's actions contradict Section 671(a)(29)), plaintiffs' allegations simply assume that CFSA's employees had knowledge of the falsity. Specifically, plaintiffs' Complaint includes the buzzwords "knew she was falsely representing," "made these misrepresentations to deceive," "made affirmative misrepresentations," and "concealed this material fact," but fails to include *facts* supporting those conclusory assertions, or any factual allegations that the Court may use to infer the outcomes plaintiffs state. *See* Compl. ¶¶ 127–129. In other words, besides assuming the falsity of the communications they challenge, plaintiffs do not meet the pleading requirements to bring a claim of fraudulent misrepresentation; instead, plaintiffs only baldly state that the communications they challenge meet the requirements of the claim. *See id.* ¶¶ 50, 52, 66, 84. *Cf. id.*, ¶ 50 (alleging what "K.H. understood [the District employee] to be saying[.]"). Such pleading is insufficient under Rule 9. *See De La Fuente*, 2019 WL 1778948 at *10 (finding plaintiff's "conclusory allegations are simply not adequate under Rule 9(b)"); *Plummer v. Safeway, Inc.*, 934 F. Supp. 2d 191, 199 (D.D.C. 2013) (where plaintiff

---

duty to explain" their legal options to them. Compl. ¶ 126. But the District has been unable to find any cases finding that the provision imposes any "duty to disclose" as plaintiffs contend.

"asserts mere legal conclusions, rather than facts, he fails to state a claim for fraudulent misrepresentation").

## VII.   Plaintiffs Fail to State a Claim of Negligent Misrepresentation (Count VII).

The elements of a claim of negligent misrepresentation are the same as that for fraudulent misrepresentation, except that a plaintiff need not allege that the defendant had knowledge of the falsity of the statement or an intent to deceive. *Falconi-Sachs*, 142 A.3d at 555 (citing *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015)). However, a plaintiff must still allege that the defendant falsely stated (or omitted) a material fact. *Id.* Here, plaintiffs fail to state a claim for negligent misrepresentation because their allegations only amount to a claim that the District's employees "misrepresented the law—not that they misrepresented the facts." *Id.*

Indeed, a careful review of plaintiffs' sparse allegations, *see* Compl. ¶¶ 124–126, 132, reveals that plaintiffs repeatedly take issue with the District's alleged failure to explain the available *legal* options available to relative caregivers, but plaintiffs do not detail any specific *facts* that were misrepresented. Plaintiffs thus fail to state a claim for negligent misrepresentation.

## VIII.   The Court Should Not Exercise Supplemental Jurisdiction.

Although plaintiffs invoke 28 U.S.C. § 1367, Compl. ¶ 12, the Court should not exercise supplemental jurisdiction over plaintiffs' common-law claims, even if properly stated, because dismissal of plaintiffs' constitutional and federal law causes of action is warranted. While the decision to exercise supplemental jurisdiction over

local law claims is discretionary, *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), "in the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine— judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) (quotation omitted).

## CONCLUSION

For the foregoing reasons, the Court should grant defendants' motion and dismiss the Amended Complaint with prejudice.

Dated:  February 21, 2020.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Gregory M. Cumming*
GREGORY M. CUMMING [1018173]
Assistant Attorney General
ANDREW SAINDON [456987]
Senior Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C.  20001
(202) 724-6627
(202) 715-7769 (fax)
gregory.cumming@dc.gov

*Counsel for Defendants*

43