**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **K.H.,** *et al.,* | **Civil Action Nos. 1:19-03124-ACR** |
| | **1:20-00753-ACR** |
| **Plaintiffs,** | **1:21-00512-ACR** |
| | **1:21-00663-ACR** |
| **v.** | **1:21-00670-ACR** |
| | **1:21-00671-ACR** |
| **DISTRICT OF COLUMBIA,** *et al.,* | **1:24-02206-ACR** |
| | **1:24-02207-ACR** |
| **Defendants.** | |

**<u>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ v

BACKGROUND ................................................................................................................. 2

   I.   Legal Requirements Governing Entry into Foster Care. ......................................... 2

   II.   Procedural History ................................................................................................. 5

   III.   Plaintiffs' Requests for Relief................................................................................ 8

   IV.   The Alleged Diversions ......................................................................................... 9

LEGAL STANDARD ....................................................................................................... 15

ARGUMENT ..................................................................................................................... 15

   I.   Plaintiffs Lack Standing..................................................................................... 15

     A.   All Plaintiffs Lack Standing To Obtain Injunctive or Declaratory Relief Because They Face No Future Harm from Defendants' Conduct. ................................. 16

     B.   Plaintiffs Lack Standing To Seek Damages............................................. 18

       1.   All Plaintiffs Lack Standing To Seek Damages as Relief for Any Claim Because Their Injuries Are Not Fairly Traceable to Defendants' Conduct. ................................... 18

         a.   K.H., L.C., S.K., N.G., and M.S. Cannot Show They Were Otherwise Eligible for Foster Care Licensure................................................................................ 20

         b.   S.S., M.S., N.G., D.B., and Y.A.L. Cannot Show They Would Have Applied for Licensure If That Had Been an Option. ......................................................... 24

         c.   None of the Plaintiffs Can Show a Substantial Probability That OAG Would Have Prosecuted the Childrens' Neglect Cases and the Family Court Would Have Placed Them with the Caregivers. ......................................................................... 27

         d.   Plaintiffs' Other Damages Claims Are Not Fairly Traceable to the District's Allegedly Illegal Conduct for the Same Reasons......................................... 30

       2.   Alternatively, Plaintiffs T.J., S.S., K.H., J.R., Y.A.L., M.M., and D.B. Lack Standing To Seek Damages for Their Notice Claims Because They Were Aware of Their "Options" and Suffered No Injury. ..................................................................... 31

3.    Plaintiff Children Lack Standing To Seek Payments Allegedly Denied to Their Caregivers. .......................................................................................... 34

II.    The District Is Entitled to Judgment on All Plaintiffs' Claims for Violations of 42 U.S.C. §§ 672(1) and 671(a)(16) Because Plaintiffs Fail To State A Claim. ....................................... 35

A.    Plaintiffs Are Not Eligible for the Benefits Claimed. .................................... 35

B.    The District Cannot Be Estopped from Arguing Plaintiffs Are Ineligible. .................... 36

III.    The District Is Entitled to Judgment on All Plaintiffs' Claims for Violation of 42 U.S.C. § 671(a)(29). ..................................................................................................... 40

A.    Section 671(a)(29) Applies Only to Removal Into State Care. ....................................... 42

B.    Plaintiffs S.S. and T.J. Received All Notice Required. .................................................. 47

C.    The Remaining Caregiver Plaintiffs Fail to State A Claim Under § 671(a)(29) Because the Relevant Children Were Not "Removed." ...................................................... 47

D.    Alternatively, Plaintiffs K.H, S.K., M.M., J.R., M.S., N.G., and Y.A.L. Received Accurate Notice of Their "Options." ....................................................................... 48

E.    Alternatively, The Alleged Violations Caused No Harm to Plaintiffs. ........................ 48

F.    Alternatively, § 671(a)(29) Is Not Privately Enforceable. ............................................ 49

IV.    The District Is Entitled to Judgment on All Plaintiffs' Claims for Negligence. ............ 51

A.    Sovereign Immunity Forecloses Plaintiffs' Claims. ...................................................... 52

B.    Alternatively, Plaintiffs Cannot State a Claim for Negligence Per Se. .......................... 58

C.    Alternatively, Plaintiffs Cannot Possibly Prove Traditional Negligence. ..................... 61

D.    Alternatively, the District's Conduct Did Not Cause Plaintiffs To Suffer Damages. ... 63

V.    The District Is Entitled to Summary Judgment on All Plaintiffs' Claims for Fraudulent and Negligent Misrepresentation. ................................................................................. 66

A.    Plaintiffs Cannot Show Any CFSA Employee Made A False Misrepresentation Or Willfully Omitted a Material Fact. ....................................................................... 67

B.    Plaintiffs T.J., S.S., K.H., J.R., Y.A.L., M.M., And D.B. Cannot Show They Reasonably Relied Upon CFSA Social Workers' Misrepresentations. ................................ 68

iii

C.    No Plaintiffs Can Show They Suffered Damages............................................................ 69

D.    Plaintiffs Cannot Show Any CFSA Employee Intended to Mislead Them.................. 69

CONCLUSION................................................................................................................................ 70

# TABLE OF AUTHORITIES

Cases

*Coal. for Resp. Regul., Inc.* v. EPA,
  684 F.3d 212 (D.C. Cir. 2012)................................................................. 71

*GAO v. Accounting Office Pers. Appeals Bd.*,
  698 F.2d 516 (D.C. Cir. 1983)................................................................. 45

*Aguehounde v. District of Columbia*,
  666 A.2d 443 (D.C. 1995)........................................................... 59, 60, 61

*Am. Marietta Co. v. Griffin*,
  203 A.2d 710 (D.C. 1964)........................................................................ 71

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
  659 F.3d 13 (D.C. Cir. 2011)................................................................... 37

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................... 21, 22

*Art Metal-U.S.A., Inc. v. United States*,
  753 F.2d 1151 (D.C. Cir. 1985)............................................................... 74

*ATC Petroleum, Inc. v. Sanders*,
  860 F.2d 1104 (D.C. Cir. 1988).......................................................... 45, 46

*Athridge v. Aetna Cas. & Sur. Co.*,
  604 F.3d 625 (D.C. Cir. 2010).................................................................. 56

*Atlas Life Ins. Co. v. W. I. S., Inc.*,
  306 U.S. 563 (1939) ................................................................................ 15

*Banks v. Sec'y, Dep' of Health & Hum. Servs.*,
  38 F.4th 86 (11th Cir. 2022).................................................................... 37

*Baylor v. United States*,
  407 A.2d 664 ........................................................................................... 69

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................ 26

*Berkovitz v. United States*,
  486 U.S. 531 (1988)................................................................................. 59

*Black Lives Matter D.C. v. Trump*,
  2021 WL 2530722 (D.D.C. June 21, 2021).............................................. 24

*Blessing v. Freestone*,
  520 U.S. 329 (1997) ................................................................................ 56

*Boff v. Inter-Cont'l Hotels Corp.*,
  2018 WL 6329451 (D.D.C. Dec. 4, 2018) ............................................... 68

*Briggs v. WMATA*,
  481 F.3d 839 (D.C. Cir. 2007).................................................................. 68

*Brown v. Gardner*,
  513 U.S. 115 (1994) ................................................................................ 50

*Calif. State Foster Parent Ass'n v. Wagner*,
  624 F.3d 974 (9th Cir. 2010) ................................................................... 41

v

*Carey v. Piphus,*
  435 U.S. 247 (1978) ...................................................................... 37

*Cato Inst. v. SEC,*
  4 F.4th 91 (D.C. Cir. 2021).......................................................... 25

*\*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................ 22, 24

*Chadbourne v. Kappaz,*
  779 A.2d 293 (D.C. 2001) ............................................................ 66

*City of Canton v. Harris,*
  489 U.S. 378 (1989) ...................................................................... 55

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) .............................................................. 23, 24

*\*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .......................................................... Passim

*Coalition for Mercury-Free Drugs v. Sebelius,*
  671 F.3d 1275 (D.C. Cir. 2012).......................................... 38, 39, 40

*Convit v. Wilson,*
  980 A.2d 1104 (D.C. 2009) ............................................................ 71

*Ctr. for Law and Educ. v. Dep't of Ed.,*
  396 F.3d 1152 (D.C. Cir. 2005).................................................... 39

*Dalton v. United States,*
  816 F.2d 971 (4th Cir. 1987) ........................................................ 63

*D.C. Housing Authority v. Pinkney,*
  970 A.2d 854 (D.C. 2009) .................................................... 59, 61

*Deaf Smith Cnty Grain Processors, Inc. v. Glickman,*
  162 F.3d 1206 (D.C. Cir. 1998)...................................................... 44

*Dearth v. Holder,*
  641 F.3d 499 (D.C. Cir. 2011)................................................ 23, 24

*Delta Constr. Co. v. EPA,*
  783 F.3d 1291 (D.C. Cir. 2015).............................................. 26, 33

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019) ...................................................................... 30

*Dickerson v. Colgrove,*
  100 U.S. 578 (1879) ...................................................................... 45

*District of Columbia v. Am. Univ.,*
  2 A.3d 175 (D.C. 2010) ................................................................ 65

*District of Columbia v. Arnold & Porter,*
  756 A.2d 427 (D.C. 2000) .................................................... 67, 69

*District of Columbia v. ExxonMobil Oil Corporation,*
  172 A.3d 412 (D.C. 2017) .................................................... 10, 34

*District of Columbia v. Pace,*
  498 A.2d 226 (D.C. 1985) .................................................... 58, 59

*District of Columbia v. Sierra Club,*
  670 A.2d 354 (D.C. 1996) .................................................... 61, 63

*District of Columbia v. Zukerberg,*
  880 A.2d 276 (D.C. 2005) ............................................................ 70

vi

*D.O. v. Glisson,
    847 F.3d 374 (6th Cir. 2017) .................................................................. 41, 43
Doe 1 v. Apple Inc.,
    96 F.4th 403 (D.C. Cir. 2024).................................................................... 25
Dominguez v. UAL Corp.,
    66 F.3d 1359 (D.C. Cir. 2012).................................................................. 22
*DuBerry v. District of Columbia,
    824 F.3d 1046 (D.C. Cir. 2016)........................................................... 56, 57
eBay Inc. v. MercExchange, LLC,
    547 U.S. 388 (2006) ................................................................................ 15
Elk Grove Unified Sch. Dist. v. Newdow,
    542 U.S. 1 (2004) .................................................................................... 57
Endres v. Air Canada,
    2025 WL 752605 (D.D.C. Mar. 10, 2025) ................................................ 22
*Falconi-Sachs v. LPF Senate Square, LLC,
    142 A.3d 550 (D.C. 2016) ................................................................... 73, 74
Florida Audubon Soc. v. Bentsen,
    94 F.3d 658 (D.C. Cir. 1996).................................................................... 25
Washington Gas v. FERC,
    758 F.2d 669 (D.C. Cir. 1985)................................................................... 15
Godfrey v. Iverson,
    559 F.3d 569 (D.C. Cir. 2009)................................................................... 68
Gonzaga Univ. v. Doe,
    536 U.S. 273 (2002) ................................................................................. 56
Grand Marina Invs., LLC v. IRS,
    2024 WL 4253095,n.1 (D.D.C. Sept. 20, 2024)........................................ 45
Greene v. Dalton,
    164 F.3d 671 (D.C. Cir. 1999)................................................................... 22
Haaland v. Brackeen,
    599 U.S. 255 (2023) ........................................................................... 26, 33
*Hailu v. Morris-Hughes, Civil Action No.,
    2022 WL 1124796 (D.D.C. Apr. 14, 2022).................................... 23, 27, 30
Heckler v. Chaney,
    470 U.S. 821 (1985) ................................................................................ 63
Heckler v. Cmmty Health Servs.,
    467 U.S. 51 (1984) .................................................................................. 44
*Hedgepeth v. Whitman Walker Clinic,
    22 A.3d 789 (D.C. 2011) ...................................................... 57, 58, 72, 74
Hercules & Co. v. Shama Rest. Corp.,
    613 A.2d 916 (D.C. 1992)......................................................................... 73
Hill v. Metro. African Methodist Episcopal Church,
    779 A.2d 906 (D.C. 2001) .................................................................. 67, 68
Hood v. United States,
    28 A.3d 553 (D.C. 2011) .................................................................... 63, 65
Hoodbhoy v. District of Columbia,
    282 A.3d 1092 (D.C. 2022) ..................................................................... 58

*Iacangelo v. Georgetown Univ.*,
  595 F. Supp. 2d 87 (D.D.C. 2009) ............................................................ 66
*In re A.S.*,
  2003 WL 22430392 (D.C. Super. Ct. Sept. 17, 2003) ............................... 51
*In re D.K.*,
  26 A.3d 731 (D.C. 2011) ...................................................................... 63, 67
*In re J.J.Z.*,
  630 A.2d 186 (D.C. 1993) ............................................................ 10, 34, 63
*In re T.J.*,
  666 A.2d 1 (D.C. 1995) ....................................................................... 35, 36
*In re Ta. L.*,
  149 A.3d 1060 (D.C. 2016) ........................................................... 35, 36, 67
*INS v. Pangilinan*,
  486 U.S. 875 (1988) ..................................................................................... 44
*J.B-K. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*,
  48 F.4th 721 (6th Cir. 2022) ......................................................................... 43
*Johnson v. District of Columbia*,
  728 A.2d 70 (D.C. 1999) .............................................................................. 66
*Johnson v. Interstate Mgmt. Co., LLC*,
  849 F.3d 1093 (D.C. Cir. 2017) .................................................................... 56
*Johnson v. N.Y. State Office of Child and Family Servs.*,
  2017 WL 6459516 (N.D.N.Y. Dec. 18, 2017) ............................................ 43
*Jones v. District of Columbia*,
  241 F. Supp. 3d 81 (D.D.C. 2017) ............................................................... 74
*Kurtz v. Baker*,
  829 F.2d 1133 (D.C. Cir. 1987) ....................................................... 25, 26, 34
*Lacy v. District of Columbia*,
  424 A.2d 317 (D.C. 1980) ...................................................................... 70, 72
*Lewis v. WMATA*,
  463 A.2d 666 (D.C. 1983) .............................................................. 65, 66, 67
*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................................... 22, 24, 38
*Maher v. White*,
  1992 WL 122912 (E.D. Pa. June 2, 1992) .................................................... 43
*Masters Pharm., Inc. v. DEA.*,
  861 F.3d 206 (D.C. Cir. 2017) ............................................................... 45, 47
*May v. Riber E. at Grandview*,
  322 A.3d 557 (D.C. 2024) ............................................................................ 64
*McKethean v. Washington Metro. Area Transit Auth.*,
  588 A.2d 708 (D.C. 1991) ............................................................................ 70
*McNeil Pharm. v. Hawkins*,
  686 A.2d 567 (D.C. 1996) ...................................................................... 65, 66
*Mohamad v. Palestinian Auth.*,
  566 U.S. 449 (2012) ..................................................................................... 50
*Monell v. Dep't of Soc. Servs*,
  426 U.S. 658 (1978) ..................................................................................... 55

*Morrison v. MacNamara*,
    407 A.2d 555 (D.C. 1979) ...................................................... 58, 68, 69
*Murphy v. Baker*,
    2017 WL 2350246 (D. Mass. May 4, 2017) .................................. 57
*Murthy v. Missouri*,
    603 U.S. 43 (2024) .............................................................. 22, 23, 24
*N.Y. State Citizens' Coal. for Child. v. Poole*,
    922 F.3d 69 (2d Cir. 2019) ........................................................ 41
*Nader v. Allegheny Airlines, Inc.*,
    626 F.2d 1031 (D.C. Cir. 1980) ................................................. 75
*Nat'l Treasury Emps. Union v. Vought*, -- F.,
    2025 WL 942772 (D.D.C. Mar. 28, 2025) .................................. 25
*Neal v. Clark*,
    95 U.S. 704 (1877) ................................................................... 50
*Nealon v. District of Columbia*,
    669 A.2d 685 (D.C. 1995) ................................................. 59, 60, 61
*Night & Day Mgmt., LLC v. Butler*,
    101 A.3d 1033 (D.C. 2014) ..................................................... 65, 66
*Office of Personnel Mgmt v. Richmond*,
    496 U.S. 414 (1990) .......................................................... 44, 45, 46
*O'Neil v. Bergan*,
    452 A.2d 337 (D.C. 1982) ........................................................ 69
*Osbourne v. Cap. City Mortg. Corp.*,
    727 A.2d 322 (D.C. 1999) ........................................................ 76
*Osbourne v. Cap. City Mortg. Corp.*,
    667 A.2d 1321 (D.C. 1995) ...................................................... 76
*Republic of Sudan v. Harrison*,
    587 U.S. 1 (2019) ..................................................................... 52
*Romer v. District of Columbia*,
    449 A.2d 1097 (D.C. 1982) ..................................................... 71, 72
*Rose v. Wells Fargo Bank, N.A.*,
    73 A.3d 1047 (D.C. 2013) ........................................................ 76
*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ................................................................. 50
*Santosky v. Kramer*,
    455 U.S. 745 (1982) ........................................................ 9, 35, 36, 64
*Saucier v. Countrywide Home Loans*,
    64 A.3d 428 (D.C. 2013) .......................................................... 73
*Scenic Am., Inc. v. United States Dep't of Transportation*,
    836 F.3d 42 (D.C. Cir. 2016) .................................................... 36
*Sibley v. St. Albans Sch.*,
    134 A.3d 789 ....................................................................... 75, 76
*Smith v. District of Columbia*,
    413 F.3d 86 (D.C. Cir. 2005) .................................................... 55
*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .............................................................. 38, 40

*Steinberg v. District of Columbia,*
  952 F. Supp. 2d 22 (D.D.C. 2013)..................................................................55
*Stokeling v. United States,*
  139 S. Ct. 544 (2019)......................................................................................51
*Sundberg v. TTR Realty, LLC,*
  109 A.3d 1123 (D.C. 2015)............................................................................73
*T.M. v. DeWine,*
  49 F.4th 1082 (6th Cir. 2022).........................................................................42
*Texas v. California,*
  593 U.S. 659 (2021)..................................................................................30, 34
*Thoma v. Kettler,*
  632 A.2d 725 (D.C. 1993)..............................................................................66
*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021)........................................................................................22
*\*Tucci v. District of Columbia,*
  956 A.2d 684 (D.C. 2008)....................................................................61, 62, 63
*Turner v. District of Columbia,*
  532 A.2d 662 (D.C. 1987)........................................................................58, 69
*Union of Concerned Scientists v. DOE,*
  998 F.3d 926 (D.C. Cir. 2021)........................................................................30
*Util. Air Regulatory Grp. v. EPA,*
  573 U.S 302 (2014) ........................................................................................50
*W.D v. C.S.M.,*
  906 A.2d 317 (D.C. 2006) ..............................................................................11
*Warth v. Seldin,*
  422 U.S. 490 (1975) ..........................................................................25, 40, 41
*Whitmore v. Arkansas,*
  495 U.S. 149 (1990)..................................................................................22, 36
*Wilson v. Johns-Manville Sales Corp.,*
  684 F.2d 111 (D.C. Cir. 1982).........................................................................71
*Wood v. Day,*
  859 F.2d 1490 (D.C. Cir. 1988).................................................................15, 71

Statutes

21 U.S.C. § 333.................................................................................................63
21 U.S.C. § 372.................................................................................................63
42 U.S.C. § 671............................................................................................Passim
42 U.S.C. § 672............................................................................................Passim
42 U.S.C. § 1983...............................................................................12, 55, 56
42 U.S.C. § 670.................................................................................................12
D.C. Code § 4-217.01 ......................................................................................11
D.C. Code § 4-1303.04 ............................................................62, 63, 64, 66
D.C. Code § 4-1301.04 ......................................................................................9
D.C. Code § 4-1301.05 ......................................................................................9
D.C. Code § 16-831.01 .....................................................................................11

D.C. Code § 16-2309 ............................................................................................. 9, 36
D.C. Code § 16-2310 ................................................................................................. 36
D.C. Code § 16-305 ..................................................................................... 10, 34, 63
D.C. Code § 16-2323 ................................................................................................. 10
D.C. Code § 16-2309 ................................................................................................. 64
D.C. Code § 47–310(a) .............................................................................................. 61
D.C. Code § 16-2317 ................................................................................................. 10
P.L. 96-272, 94 Stat. 500 .......................................................................................... 49
P.L. 110-351, 122 Stat. 3949 ............................................................................... 48, 50
P.L. 115-123, 132 Stat. 64 ........................................................................................ 52
U.S. Const. amend IV ............................................................................................... 36

Rules

Fed. R. Civ. P. 56 ........................................................................................ 21, 22, 24, 27

Regulations

29 DCMR § 6000 ...................................................................................................... 28
29 DCMR § 6007.30 ................................................................................................. 28
45 C.F.R. § 1355.20 ...................................................................................... 27, 28, 29
45 C.F.R. § 1356.30 .................................................................................................. 27
C.O.M.A.R. 07.05.02.00 ........................................................................................... 29
C.O.M.A.R. 07.05.02.10 ........................................................................................... 29
Separate Licensing or Approval Standards for Relative or Kinship Foster Family Homes,
    88 Fed. Reg. 66700 (Sept. 28, 2023) .................................................................. 27

Other Authorities

13A Charles Alan Wright et al., *Fed. Prac. & Proc.* § 3531.5 (May 2025 update) .................... 26
Restatement (Second) of Torts § 286 (Oct. 2024 update) ............................................ 65
Restatement (Second) of Torts § 288 (Oct. 2024 update) ............................................ 65
Restatement (Second) of Torts § 440 (Oct. 2024 update) ............................................ 70
Restatement (Second) of Torts § 537 ................................................................... 75, 76

# INTRODUCTION

This is a consolidated action brought by ten families—eleven Plaintiffs who are or were Caregivers and fourteen who are, or were, Children in a Caregiver's custody. Plaintiffs allege that the D.C. Child and Family Services Agency (CFSA) should have informed the Caregivers that they could be licensed to care for the Children as foster parents, and that CFSA should have then removed the Children from their biological parents and placed them into foster care with the Caregivers. They further allege that CFSA failed to provide the Caregivers with information about this "option," and declined to place the Children into foster care, pursuant to a policy they call "kinship diversion." Allegedly as a result of CFSA's illegal actions, the Caregivers independently obtained custody of the Children, through a local court action, and were thereby deprived of the benefits of foster care. They do not allege that CFSA's actions ever endangered the Children—to the contrary, they allege, and discovery has shown, that the Children have been safe and well. They seek injunctive and declaratory relief, and damages.

Defendants District of Columbia and CFSA (collectively, "the District") are entitled to summary judgment on Plaintiffs' surviving claims under the Social Security Act, and their claims for common law negligence and misrepresentation, because their case is deeply speculative and legally mistaken. To start, none of the Plaintiffs have standing to seek injunctive or declaratory relief because none of them face any future harm. And none of them have standing to seek damages—either in the form of money they would have received if the Children were in foster care or for alleged emotional distress—because they cannot possibly prove that they *would have* obtained these benefits, or avoided this distress, but for the District's conduct. Accordingly, this Court should not even reach the merits of Plaintiffs' claims.

That said, a ruling on the merits, ideally in the alternative, could settle this years' long fight with relative ease.  Plaintiffs have no claims under the Social Security Act to foster care maintenance payments, or case plans, because they are not eligible for those things under the plain terms of the law, and the District cannot be estopped from pointing that out because Plaintiffs allegedly received bad advice, even if that were true.  And there is no evidence of any grand or individual plan to mislead them.  Plaintiffs have no claims under the Social Security Act to notice of their "options" because the relevant law only applied in the case of two families in this action, and CFSA complied with it in those two cases.  The other families have no claim because their Children were never "removed" within the meaning of the Act.  Plaintiffs have no negligence claims for a handful of alternate reasons, but most importantly, the District is immune from such claims for its discretionary acts, including its decisions about whether or when to take a child into District custody and care.  And Plaintiffs have no claims for misrepresentation because, again to cite just one of many reasons, the alleged misrepresentations were of law only, not fact, which is insufficient to state a claim under District law.

## BACKGROUND

### I.    <u>Legal Requirements Governing Entry into Foster Care.</u>

The law governing CFSA, the federal foster care program, and neglect cases in the District has already been extensively briefed in this matter.  *See*, *e.g.*, Def.'s Mot. to Dismiss, [42] at 12–16; Defs.' Supp. Briefing in Supp. of Mot. to Dismiss (Defs.' Supp. Mem.) [54-1] (memorandum) at 2–15; Ex. A, [54-2] (outline of relevant D.C. Code provisions) at 2–14; Ex. B,

[54-2] (charts showing laws applicable to CFSA's response to allegations of abuse or neglect, services available, and neglect case procedures).[1]

Summarizing briefly, under District law, a child cannot be placed into foster care without CFSA *first* having that child in its physical or legal custody. CFSA's decision to seek custody in any case is constrained by parents' constitutional rights to care for their children. *E.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). CFSA becomes involved in a family life's upon report of an allegation of abuse or neglect. D.C. Code § 4-1301.04, 4-1301.05. CFSA cannot take a child into its physical custody unless the child is in "immediate danger" or "is suffering from illness or injury or otherwise is endangered" by his or her "surroundings." D.C. Code § 16-2309(a). CFSA takes a child into legal custody only by court order, *see id*. § 16-2320(a)(3)(A), generally through a "neglect case." *Infra*. When CFSA takes a child into custody, it must place the child into a licensed foster care home or facility. *Id*. § 2313.

After CFSA takes a child into physical custody, for the child to *remain* in foster care, the Office of the Attorney General for the District of Columbia (OAG) must choose to prosecute a neglect case. *See* D.C. Code § 16-305(c)(1); *In re J.J.Z.*, 630 A.2d 186, 191 (D.C. 1993) (discussing absolute discretion). OAG is legally independent from the Mayor and Council for the District of Columbia (Council). *District of Columbia v. ExxonMobil Oil Corporation*, 172 A.3d 412, 428–31 (D.C. 2017). OAG initiates prosecution with a neglect petition. *In re J.J.Z*, 630 A.2d at 190–91. OAG can also initiate a neglect case *before* CFSA takes the child into physical custody—CFSA staff refer to this procedure as "community papering." Defs.' Statement of Undisputed Material Facts (SUMF) ¶ 8.

---

[1]    All citations to the docket are to ECF pagination. Citations to deposition transcripts are to the native page numbers. Citations to all other exhibits are to the page of the .pdf file.

After a child is taken into physical custody, within 72 hours, OAG must justify the need to keep the child in foster care, or "shelter care," before a judge of the Family Court of the Superior Court of the District of Columbia (Family Court). *Id*. §§ 16-2312(a)(1), 11-1101. The Family Court must find "probable cause to believe" the allegations of neglect or abuse are true, D.C. Code § 2312(e) and that foster care is warranted, *see id*. § 16-2310(c), Super. Ct. Neglect Rule 13 ("Criteria for Shelter Care"). Judges consider, *e.g.*, "Alternatives to shelter care," including that no "relative or other third-party custodian is available who can protect the child and provide for his or her welfare." Negl. Rule 13(d).

After that, in order for the child to remain in foster care, the Family Court must find, after a factfinding hearing, that the allegations are true and that foster care is still the best placement (or would be best now, if the child was not initially taken into physical custody). D.C. Code §§ 16-2317, 16-230. This placement decision must be affirmed again approximately six months from that disposition, *id* § 16-2323(a)(1), (b), (d), (f), Negl. Rules 28–30, and reconsidered after one year at a hearing intended to determine "the permanency plan" for the child, D.C. Code § 16-2323(a)(4), (c), (d), Negl. Rules 30–34. Foster care is not *supposed* to last for years. *Id*.

If a child is placed into foster care this way—which, again, is the only way it can happen in the District—usually that child's foster family receives monthly "foster care maintenance payments" while that child is in foster care with that family. *See* 42 U.S.C. § 672; D.C. Code § 4-217.01. The District will refer to this benefit by its full name or as "Payments" in this brief.

The D.C. Council has also created a legal procedure potential caregivers can use to obtain custody of certain children, without their parents' consent or CFSA involvement, called "Third-Party Custody." *See* D.C. Code § 16-831.01 *et seq*.; [54-2] at 7–9. The Council created this option in response to a decision by the D.C. Court of Appeals (DCCA)

that interested relatives could *not* bring such actions outside the confines of a neglect case, *W.D v. C.S.M.*, 906 A.2d 317 (D.C. 2006); the Council reasoned that "[s]ometimes[,] enabling [a] third party caregiver to obtain custody promotes a safe and stable home for a child," Council, Report of the Comm. on Human Servs. on Bill No. 17-41 (Mar. 23, 2007) at 1–2, *available at* https://tinyurl.com/bdubwtww. *See also* [54-1] at 10–11 (discussing local subsidies).

## II.    <u>Procedural History</u>

This litigation concerns eight consolidated cases: *K.H. v. District of Columbia*, No. 1:19-cv-03124 (D.D.C., Amended Complaint [13] filed Jan. 27, 2020); *S.K. v. District of Columbia*, No. 1:20-cv-00753 (D.D.C., Complaint [3] filed Mar. 17, 2020); *S.S. v. District of Columbia*, No. 1:21-cv-00512 (D.D.C., Complaint [4] filed Mar. 19, 2021), *M.S. v. District of Columbia*, No. 1:21-cv-00671 (D.D.C., Complaint [3] filed Mar. 11, 2021), *D.B. v. District of Columbia*, No. 1:21-cv-00670 (D.D.C., Complaint [3] filed Mar. 11, 2021), and *T.J. v. District of Columbia*, No. 1:21-cv-00663 (D.D.C., Complaint [3] filed Mar. 11, 2021); *Y.A.L. v. District of Columbia*, No. 1:24-cv-02206 (D.D.C., Complaint [1] filed July 26, 2024); and *J.R. v. District of Columbia*, No. 1:24-cv-02207 (D.D.C., Complaint [1] filed July 26, 2024).  The District will refer to the operative complaint in each case (cited above) by the lead Plaintiff's initials (e.g., "S.K. Compl.," "S.S. Compl.," etc.).  The complaints assert the same claims based on the same or similar District conduct and differ only as to the particular facts alleged by each Plaintiff.  *See* Order [88].  Allegations that are materially the same across complaints are referenced by citation to the Amended Complaint in *K.H.* (hereinafter, "K.H. Compl.").

There are 24 total Plaintiffs.  Eleven of them are "Caregivers" for others in the action: K.H., M.M., L.C., N.G., S.K., D.B., S.S., M.S., T.J., Y.A.L., and J.R.  Thirteen are children or

youth ("Children") who live or have lived with the Caregivers: K.J., L.E., T.C., C.G. 1, C.G. 2, C.G. 3, B.B., A.B., N.B., M.A., T.S., J.M.L., and T.A.

Plaintiffs bring federal and local law claims. Under 42 U.S.C. § 1983, Plaintiffs bring claims to enforce various provisions of the Social Security Act, 42 U.S.C. §§ 670 *et seq.* All Plaintiffs assert a claim to Payments under § 672(a)(2). K.H. Compl. ¶¶ 96(f), 97(c). The Children assert a claim under § 671(a)(16) for failure to receive a case plan reviewed under the District's case review system. *Id.* ¶ 96(d)–(i). The Caregivers assert a claim under § 671(a)(29) for failure to receive notice of their options to participate in the care and placement of the Children. *Id.* ¶ 97(a)–(b). Plaintiffs also asserted claims under the Fifth Amendment for violations of the Equal Protection and Due Process Clauses. *Id.* ¶¶ 100–13.

Under District common law, the Children also assert a negligence claim arising from the District's alleged failure to remove them from their homes and place them in a licensed foster family home, and to provide the benefits associated with that status. *Id.* ¶¶ 120–24. The Caregivers assert claims of fraudulent and negligent misrepresentation, claiming that the District failed to explain their options to participate in the care and placement of the Children in the event the Children were removed and placed in foster care. *Id.* ¶¶ 125–32. Plaintiffs also asserted a claim under the District of Columbia Human Rights Act. *Id.* ¶¶ 114–19.

The first six cases were transferred from Judge Hogan to this Court on February 24, 2023. The District filed a (renewed) motion to dismiss on May 19, 2023. *See* Defs.' Mot. to Dismiss Pls.' Compl. [42]. The Court heard arguments on the motion on September 6, 2023 and October 24, 2023. The Court also posed written questions concerning the District's motion to which the Parties responded in October 2023. Defs.' Supp. Mem., [54-1] and Pls.' Resp. to Defs.' Supp. Briefing [57]. On January 24, 2024, the Court issued an oral ruling granting in part

6

and denying in part the District's motion to dismiss. *See* Order [70]; Ex. 58 (transcript of Jan. 24, 2024 oral reading of opinion on motion to dismiss) (MTD Ruling).

The Court denied the District's motion as to claims brought under three provisions of the Social Security Act. The Court held that: Section 672(a) creates an enforceable right to foster care maintenance payments, MTD Ruling at 10; Section 671(a)(16) creates an enforceable right to receive a case plan reviewed under the District's case review system, *id.* at 11; and § 671(a)(29) creates an enforceable right for relatives of children removed from their parents to receive notice of their options to participate in the care and placement of those children, *id.* at 12. Although most Plaintiffs had not alleged they met all the requirements for foster care maintenance payments or a case plan, the Court found that the District may be equitably estopped from opposing Plaintiffs' claims under §§ 672 and 671(a)(16) on that basis. *Id.* at 19. The Court also declined to dismiss Plaintiffs' claim under § 671(a)(29) on the basis that the Children were not removed from their homes, noting the absence of briefing on the meaning of removal in that provision and finding that Plaintiffs plausibly alleged "that the District effectively removed these children from their parents, even if they did not follow a formal legal process in doing so." *Id.* at 20:16–18.

The Court also allowed Plaintiffs' misrepresentation claims to proceed. *Id.* at 30:16–18. Plaintiffs alleged that the District had failed to disclose their "options to participate in" the Children's "care and placement" in violation of § 671(a)(29) of the Social Security Act. The Court also declined to dismiss Plaintiffs' negligence claim. *Id.* at 34:2–12.

The Court dismissed Plaintiffs' claims under §§ 671(a)(10) and 671(a)(22) of the SSA, the Due Process and Equal Protection Clauses, and the D.C. Human Rights Act. *Id.* at 37:1–6. The Court expressly invited the District to renew its arguments as to the claims that were not

dismissed at summary judgment.  *Id.* at 37:17–23.  The Court's oral ruling was subsequently applied via written order to the consolidated cases, including *Y.A.L.* and *J.R.*, which were filed after the Court's oral ruling.  Order [70]; Order [88].

## III.     Plaintiffs' Requests for Relief

All Plaintiffs seek declaratory and injunctive relief.  *E.g.*, K.H. Compl. at 40–41.  They ask this Court to enter a declaratory judgment that the District's conduct violates various laws and a permanent injunction prohibiting the District from retaliating against the Plaintiff Caregivers and from "continuing the custom and practice of kinship diversion."  *Id*.

All Plaintiffs seek "compensatory damages in an amount equal to the total foster care maintenance payments that Plaintiffs would have received since the kinship diversion was effected, . . . plus interest, and other damages attributable to Defendants' violation of federal and D.C. law."  *Id*. at 41.[2]  In response to a District request that Plaintiffs identify all damages they seek by category and amount, along with the methodology or basis for claiming such amounts, Plaintiffs only reiterated that they seek Payments as well as "damages attributable to Defendants' failure to provide a case plan or case review system," to "the illegal separation of a parent and child," to "negligence, fraudulent misrepresentation, negligent misrepresentation and emotional

---

[2]     Plaintiffs also seek "[i]ssuance of an order that, for so long as" any Children remain in the care of the Caregivers, "Defendants continue to pay to Plaintiffs an amount equal to foster care maintenance payments and other damages attributable to Defendants' violation of federal and D.C. law."  K.H. Compl. at 41.  Although phrased as a request for prospective relief, this is a request for damages.  Plaintiffs must prove their entitlement to future damages now, with reasonable or probable certainty.  *Wood v. Day*, 859 F.2d 1490, 1492–93 (D.C. Cir. 1988).  They cannot, in any event, obtain a permanent injunction to this end because injunctions provide relief only where damages cannot, that is, where otherwise "irreparable harm" would result.  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Washington Gas v.* FERC, 758 F.2d 669, 674 (D.C. Cir. 1985); Atlas *Life Ins. Co. v. W. I. S., Inc.*, 306 U.S. 563, 568 (1939) (describing source of federal courts' equity powers).

distress (including due to the traumatic nature of the kinship diversion when effected and/or due

to the stress of taking on childcare responsibilities) . . . ." Ex. 7, Compilation of Pls.' Resps. to

Interrogs. No. 3, at *4 (same for all).  Other than the Payments, Plaintiffs have not specifically

identified or described damages in discovery by amount or with evidence.  Plaintiffs have not,

for example, identified any experts who could speak to what damages might be caused by the

"illegal separation" or any of the alleged torts, if proven.  When asked what damages they were

seeking in this action, three (maybe four) of the Caregivers stated they wanted compensation for

emotional distress.  SUMF ¶¶ 135, 186, 243, 310.

IV.    **The Alleged Diversions**

Each of the eleven families before the Court is different, but some basic facts are cross-

cutting.  For all of the families, at some point, CFSA conducted one or more investigations into

allegations of abuse or neglect involving the Children in each family.  SUMF ¶¶ 27, 63, 75, 104,

141, 177, 213, 233, 265, 284.  And, as a result of those investigations, CFSA determined, or

"substantiated," that some form of abuse or neglect had occurred.  *Id*.  Further, each family

alleges that, sometime between 2018 and 2024, CFSA "diverted" the Children to live with the

Caregivers, outside of foster care, instead of licensing the Caregivers and placing the Children in

foster care with them.  *E.g.*, K.H. Compl. ¶ 41.  All Caregivers got custody of the Children by

filing actions in the Family Court, mostly Third-Party Custody actions.  *Infra*.

Around the time of the alleged diversions, nine of the families came into contact with

CFSA as part of an investigation of abuse or neglect.  Four Caregivers had physical custody of

the Children when CFSA began its investigation.  K.H. picked up her niece, five-year-old K.J.,

from K.J.'s mother's home when K.J.'s mom called her to say that she was being taken into

temporary custody as a result of her psychiatric condition.  SUMF ¶¶ 21–23.  M.M. continued to

care for infant L.E., as she had every day of L.E.'s life, after L.E.'s teenage mother was arrested in M.M.'s home, for alleged assault.  SUMF ¶¶ 54–57, 68.  D.B. picked up her five-year-old nephew, B.B., when the police called to say that his mother had passed out (from an apparent overdose).  SUMF ¶¶ 140, 143–48.  J.R. picked up her three-year-old former foster child, T.A., after learning that his mother was in a coma following a tragic car accident.  SUMF ¶¶ 284–85.

K.H., M.M., and D.B. all filed emergency motions seeking Third-Party Custody of the Children within days of taking over their care.  SUMF ¶¶ 38, 62, 154.  K.H. testified she was "instructed" to file for custody.  *Id.* ¶ 34.  She told the person she spoke with that she "did not want K.J. to go into foster care."  *Id.* ¶ 36.  She does not recall being told K.J. would go to strangers.  *Id.* ¶ 35.  Days after obtaining custody, K.H. appeared at CFSA with an attorney asking to be licensed as a foster parent for K.J.  *Id.* ¶ 41.  CFSA denied her request.  *Id.* ¶ 43.

M.M. also testified she was told she had to go to court for custody if she wanted to keep L.E. in her home.  *Id.* ¶ 59.  She says she told the social worker she had been licensed before and wanted to serve as a foster parent for L.E., but the social worker said that because of "protocol" she would have to "take" L.E. "out of the home" that day unless M.M. had custody.  *Id.* ¶ 60.  The social worker did not say that M.M. could not be a foster parent for L.E.  *Id*. ¶ 61.

D.B. was already at the courthouse, waiting for a decision on her emergency motion for custody, when she first spoke with a CFSA social worker.  *Id.* ¶ 157.  She was familiar with foster care and its benefits at the time.  *Id.* ¶ 158.  But she believed custody was "the only option to keep [B.B.] with [her], and safe."  *Id.* ¶ 156.  There's no evidence that anyone from CFSA suggested to D.B. that she seek custody or that B.B. would end up with strangers if she did not.  *Id.* ¶ 153. The night before that, D.B.'s *mother* had spoken with someone from CFSA's hotline for about six minutes.  *Id.* ¶ 150.  D.B.'s mother told the hotline worker that the police advised

her to get "emergency custody." *Id.* ¶ 151. The hotline worker told D.B.'s mother that CFSA doesn't "give custody," then D.B.'s mother asked, "okay well how do you get emergency" custody, and the worker explained how D.B.'s mother could file for custody. *Id.* ¶ 152.

J.R. also already had physical custody of T.A. when she first spoke with CFSA about him—she appeared at a CFSA office and asked to serve as T.A.'s foster parent again. *Id.* ¶¶ 285, 291. A CFSA social worker told J.R. that was not possible and advised J.R. to seek custody in Family Court. *Id.* ¶ 292. There is no evidence J.R. was told T.A. would end up with strangers, or in foster care, if she did not seek custody. *Id.* ¶¶ 295–96. CFSA opened an investigation concerning J.R.'s allegations that T.A. was without adequate care, *id.* ¶ 293, and, as a result, T.A. went to live with his paternal grandmother, per a plan made by T.A.'s father, *id.* ¶¶ 294–300. J.R. regained custody through a Third-Party Custody action in Family Court. *Id.* ¶¶ 302, 304.

Two Caregivers were notified by CFSA that they could apply to be licensed foster family homes for their respective Children. S.S. had sole custody of her grandchildren, A.B. and N.B., from the time they were infants until they were eight and ten years old, respectively, at which time their mother regained custody. *Id.* ¶¶ 168–71. Ten months after leaving S.S.'s care, CFSA filed a complaint for neglect on behalf of A.B. and N.B. against their mother. *Id.* ¶ 177. After determining A.B. and N.B. would be removed from their mother's custody and taken into CFSA's care, CFSA contacted S.S. and discussed with her the possibility of serving as a licensed foster family home for the children. *Id.* ¶¶ 172–77. At the time, S.S. did not want the Children "in the system," nor did she want them to be reunified with their mother. *Id.* ¶¶ 179, 185. S.S. declined licensure, choosing instead to get custody of the kids in Family Court. *Id.* ¶¶ 178, 180.

Caregiver T.J. had lived with her mother and Child T.S. for the first ten years of T.S.'s life. *Id.* ¶¶ 219–21. Immediately following an incident between T.S., then 16 years old, and her

11

mother that triggered a CFSA investigation, T.S. went to live with T.J.  *Id*. ¶¶ 222–231.  On August 7, 2020, T.J. obtained a temporary protection order (TPO) against T.S.'s mother, which did not address custody of T.S.  *Id*. ¶ 232.  Because T.S. could not legally be near her mother, and because T.S.'s mother did not agree to let T.S. live with T.J., or make any other plan for T.S.'s care, CFSA filed a neglect complaint on August 13, 2020, and granted T.J. a temporary foster care license that day.  *Id*. ¶¶ 232–35.  T.J.'s TPO was then amended to allow T.S.'s mother to visit T.S., and T.S.'s mother agreed T.S. could live with T.J.  *Id*. ¶ 236.  OAG declined to file a neglect petition (or "no-papered" the case), and T.S. did not enter foster care.  *Id*. ¶ 238.

Two other Caregivers were already in the process of seeking some sort of custody of the Children when CFSA's investigation began.  M.S. came to the District with a specific plan to bring her two-month-old grandson M.D.A. back to Pennsylvania with her while his mother sought substance abuse treatment.  *Id*. ¶¶ 190–93.  M.S. believed she could obtain some legal rights to help care for M.D.A. by having his mother write and sign a notarized letter.  *Id*. ¶ 196. M.D.A.'s mother did write and sign such a letter, but then immediately changed her mind and fled with M.D.A.  *Id*. ¶ 198.  The police and CFSA were called.  *Id*. ¶¶ 202–03.  M.S. testified that a CFSA social worker told her she "needed to petition the court for emergency custody" before taking the baby across state lines and convinced M.D.A.'s mom to let the baby go with M.S., explaining that this way he "wouldn't be placed in the system with a stranger in foster care."  *Id*. ¶ 207.  M.S. obtained Third-Party Custody the next day.  *Id*. ¶ 210.

Y.A.L. was trying to find a family to adopt her former foster daughter's newborn baby, J.M.L., after she had promised her foster daughter she would do so.  *Id*. ¶¶ 249, 258, 260.  By then, Y.A.L. had served as a foster parent to approximately 18 children, including J.M.L.'s mother, J.L.  *Id*. ¶¶ 249–50.  Y.A.L. had recently retired and told J.L. that she would not take the

baby, but she would "find a couple to adopt the baby," and she found multiple candidates. *Id*. ¶¶ 255–61. CFSA got involved when the baby was born because there was evidence of illegal drugs in her system. *Id*. ¶ 265. The social worker "advised" Y.A.L. "to get custody of the baby . . . because [she] asked her about certain documents," "[s]he said I had to have the proper paperwork." *Id*. ¶ 272. Y.A.L. took the baby home from the hospital. *Id*. ¶ 267. There is no evidence Y.A.L. was told she had to file for custody, or that the baby would go to strangers if she did not. *Id*. ¶ 268. Y.A.L. did not want to be a foster parent at the time but fell in love with the baby and soon obtained Third-Party Custody. *Id*. ¶¶ 262, 275, 280.

The alleged diversions in the remaining two families were *not* a part of a neglect investigation, but rather, happened while CFSA had "in-home" cases open with the families. Generally, CFSA opens an "in-home" case after investigating an allegation of abuse or neglect and concluding that the alleged victims do not need to be removed, but that the family needs a fairly intensive level of services or supports. *Id*. ¶ 4. When a family has an open "in-home" case, social workers typically visit the home to check on the safety, supervision, and well-being of the children. *Id*. ¶ 5. They sometimes help support the family by driving kids where they need to go, for example, to school. *Id*. ¶ 6.

In 2019, CFSA had an open "in-home" case with the family of teenage T.C. and his many siblings. *Id*. ¶ 75. On March 6, 2019, T.C.'s oldest sibling reported to his paternal grandmother, L.C., that his mother had put bug repellant in food and poured a sauce on her children's clothes. *Id*. ¶¶ 73, 76. The assigned in-home social worker checked on the family at home that day, and when he arrived, found them in an argument. *Id*. ¶ 78. The social worker drove T.C. and some of his siblings to L.C.'s house because the children wanted to stay there instead. *Id*. ¶¶ 80–81. L.C. wanted the children out of their mother's home and took them in that night. *Id*. ¶¶ 82–83.

The children's father was engaged in a custody battle with their mother at the time. *Id*. ¶ 84.

L.C. told the social worker she would "consult with the father to expedite the ongoing custody

hearing." *Id*. ¶ 85. There is no evidence anyone from CFSA suggested L.C. file for custody or

that the children would be put in foster care with strangers if she did not do so. *Id*. ¶ 86. Days

later, L.C. filed and won an emergency motion for Third-Party Custody of the Children. *Id*. ¶

87–88. T.C.'s siblings returned to their mother's home in June 2019. *Id*. ¶ 89. T.C. went to live

with his father in January 2020. *Id*. ¶ 90.

      In 2019, CFSA also had an open case with the family of C.G.1, 2, and 3. *Id*. ¶¶ 104. On

March 18, 2019, an in-home social worker was visiting their home to discuss their father's

feeling that he might not be able to continue caring for the Children. *Id*. ¶¶ 105–06. The

Children grew upset and were taken to a hospital that night as a result of their psychiatric

condition. *Id*. ¶¶ 107–08. Soon after, the social worker contacted N.G., and the two spoke

"about the Children being in crisis and needing someone to care for them." *Id*. ¶ 110. N.G.

testified she was told that the Children would be placed in foster care if she did not "come get

them." *Id*. ¶ 111. N.G. flew from Texas to D.C. to attend a family team meeting with the

Children's father, the in-home social worker, and others. *Id*. ¶¶ 113–14. Per a plan agreed to by

all at the meeting, N.G. filed and won an emergency motion for Third-Party Custody of the

Children, with their father's consent days later. *Id*. ¶¶ 114–15. Three months later, N.G. brought

the Children back to a CFSA office. *Id*. ¶ 118. N.G. testified she was seeking help, *id*. ¶ 119,

but CFSA records show she was trying to leave the Children in CFSA's care, *id*. ¶ 120. Days

later, members of the family met at CFSA's office. *Id*. ¶ 121. S.K. agreed, and wanted, to care

for the Children at her home in Maryland, and they wanted to live with her. *Id*. ¶¶ 122–25. She

does not recall there being any conversation about foster care or strangers. *Id*. ¶ 126. N.G. then successfully vacated her custody order, and S.K. later obtained power of attorney. *Id*. ¶¶ 128–29.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To prevail, the moving party need only show that the nonmoving party cannot "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c)(1)(B). The nonmoving party, however, must establish more than the "mere existence of a scintilla of [favorable] evidence" to overcome a motion for summary judgment. *Anderson*, 477 U.S. at 252. The nonmoving party must present specific facts that would allow a reasonable jury to find in his favor. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## ARGUMENT

### I.    <u>Plaintiffs Lack Standing.</u>

Plaintiffs have the burden to "clearly and specifically set forth facts" establishing standing. *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990). Standing is a "part of the case-or-controversy requirement of Article III," limits the Court's subject matter jurisdiction, and requires an injury-in-fact traceable to a defendant's conduct that is redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992). Plaintiffs "must support each

15

element of standing 'with the manner and degree of evidence required at the successive stages of

the litigation.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Lujan*, 504 U.S. at 561).

At summary judgment, Plaintiffs must "point to factual evidence," *id*. (quoting *Lujan*, 504 U.S.

at 561), that establishes their standing by a preponderance, *Endres v. Air Canada*, Civil Action

No. 24-00883, 2025 WL 752605, at *2 (D.D.C. Mar. 10, 2025) (citing *Lujan*, 504 U.S. at 561).

Plaintiffs must further "demonstrate standing for each claim that they press . . . and for each form

of relief that they seek." *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S.

413, 431 (2021)).  The Court must determine Plaintiffs' standing "before addressing the merits"

of their dispute.  *Dominguez v. UAL Corp.*, 66 F.3d 1359, 1361–62 (D.C. Cir. 2012).

> **A.    All Plaintiffs Lack Standing To Obtain Injunctive or Declaratory
> Relief Because They Face No Future Harm from Defendants'
> Conduct.**

Plaintiffs ask this Court to enter a declaratory judgment that the District's conduct

violates various laws, and to enjoin the District from retaliating against the Plaintiff Caregivers

"for seeking licensure" and certain payments, and from "continuing the custom and practice of

kinship diversion." *E.g.*, K.H. Compl. at 40–41.  The Court lacks jurisdiction to consider these

requests because no Plaintiff can show standing to seek such relief.

To obtain injunctive or declaratory relief, Plaintiffs must establish that they are

threatened with an "imminent" and "certainly impending" future injury.  *Murthy*, 603 U.S. at 49–

50, 57–59; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *City of Los Angeles v.

Lyons*, 461 U.S. 95, 105 (1983); *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) (applying

to declaratory relief).  "It is blackletter law that plaintiffs cannot rely on speculative future

injuries to establish Article III standing."  *Hailu v. Morris-Hughes*, Civil Action No. 22-00020,

2022 WL 1124796, at *3 (D.D.C. Apr. 14, 2022) (dismissing claims for prospective relief where plaintiffs could only speculate they would apply for unemployment benefits again in the future).

Here, Plaintiffs lack standing to seek an injunction prohibiting "kinship diversion" because they have already admitted—indeed, objected—that they can only "speculate" as to whether they will ever be subject to "kinship diversion" again.  Thus they cannot possibly show any "certainly impending" threat of future harm.  The District asked Plaintiffs to "explain in detail, how, why, and when" any of them are likely to "be subject to the policy or practice described in" their complaints as "'kinship diversion' again in the future."  Ex. 6, Compilation of Pls.' Resps. to Interrogs. No. 1), at *3 (same as to all).  Each of the Plaintiffs objected to the request as "calling for speculation," because Plaintiffs have "no way of knowing how, why, or when Defendants may subject them to kinship diversion again, and ha[ve] no control over such decision."  *Id.*  Plaintiffs further responded that they "could be subject" to the policy again, but without explanation as to how or why that might happen.  *Id.*  This is plainly insufficient under blackletter law.  *E.g.*, *Lyons*, 461 U.S. at 105.

Further, there is no evidence that the Plaintiff Children are in danger of removal from their current homes, or at risk of being subject to "kinship diversion" again, or that the Plaintiff Caregivers may not be informed of their "option" to become foster parents again, or denied licensure for other kin who are at risk of removal, or subject to any kind of "retaliation" by CFSA "for seeking licensure."  To the contrary, the Plaintiff Caregivers uniformly testified that the Children are safe, *Id.* ¶¶ 49, 66, 122, 162, 184, 214, 242, 279, 309, and that they have no concerns about "retaliation," *id.* ¶¶ 50, 71, 97, 137, 164, 187, 217, 244, 282, 311.  In short, there is no evidence even suggesting that the sequence of events alleged in Plaintiffs' complaints will "imminently" recur or that Plaintiffs face any "certainly impending" harms as a result of any

future similar conduct by the District. *Id.* Plaintiffs therefore lack standing to seek any declaratory relief, or injunctions prohibiting retaliation or the future use of what Plaintiffs call "kinship diversion." Fed. R. Civ. P. 56(c)(1)(B); *Celotex Corp.*, 477 U.S. at 322; *Murthy*, 603 U.S. at 49–50, 57–59; *Clapper*, 568 U.S. at 409; *Lyons*, 461 U.S. at 105; *Dearth*, 641 F.3d at 501; *Black Lives Matter D.C. v. Trump*, No. 20-cv-01469, 2021 WL 2530722, *9 (D.D.C. June 21, 2021) (finding four-step dependent causal chain speculative).

### B.     Plaintiffs Lack Standing To Seek Damages.

#### 1.     All Plaintiffs Lack Standing To Seek Damages as Relief for Any Claim Because Their Injuries Are Not Fairly Traceable to Defendants' Conduct.

Plaintiffs' damages claims are similarly speculative, and not fairly traceable to—or caused by—the District. *See Lujan*, 504 U.S. at 560. To show causation for purposes of standing, Plaintiffs must prove that had the conduct not occurred, "there is a *substantial probability*" that they would be receiving the Payments they now seek, and would not have suffered any alleged emotional distress. *See Kurtz v. Baker*, 829 F.2d 1133, 1143–44 (D.C. Cir. 1987) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)) (emphasis in *Kurtz*); *accord*, *e.g.*, *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc); *Nat'l Treasury Emps. Union v. Vought*, -- F. Supp. 3d --, 2025 WL 942772, at *18 (D.D.C. Mar. 28, 2025); *see also*, *e.g.*, *Cato Inst. v. SEC*, 4 F.4th 91, 94–95 (D.C. Cir. 2021) (finding no "substantial probability" that claim is redressable because plaintiff's injury is independently caused by other conduct). "The chain of causation may not be attenuated, nor can it result from the independent action of some third party not before the court." *Doe 1 v. Apple Inc.*, 96 F.4th 403, 408 (D.C. Cir. 2024) (citation modified). Plaintiffs lack standing to seek damages, as relief for any claim, because they cannot make this showing.

18

Plaintiffs' complaints suggest that, but for the District's allegedly illegal conduct, the Children would be in foster care, and the Caregivers would be licensed providers receiving Payments. But their damages claims depend upon a *much longer* chain of what-ifs. Even if the District had initiated neglect proceedings for the Children, and even if the District had then provided notice to the Caregivers of their "option" to become licensed foster parents, the Caregivers could receive Payments only *if* the Caregivers could be licensed as foster parents, *and if* they had chosen to seek licensure, *and if* OAG also elected to prosecute the neglect cases, *and if* the Children were then placed by the Family Court in foster care. *See* Background Sec. I. Plaintiffs must prove, with evidence, a substantial probability that *each* of these *ifs* would have gone in their favor. *Kurtz*, 829 F.2d at 1143–44.

Caselaw is clear that a defendant's conduct does not cause plaintiff's harm if the harm would occur regardless of the defendant's allegedly illegal conduct. *E.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 296 (2023) (finding Texas lacked standing when it "would continue to incur the complained-of costs even if" the challenged rule did not exist); *Clapper*, 568 U.S. at 412–13 (2013) (holding plaintiffs lacked standing to challenge statute authorizing communications interceptions because it was not clear if the government would rely on that statute "or some other authority" to authorize future interceptions); *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (reiterating that alleged injury cannot be "the result of the independent action of some third party not before the court"); *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015) (per curiam) (explaining that when "a separate action . . . independently causes the same alleged harm as the challenged action," plaintiffs are "unable to establish the 'necessary causal connection' between the [challenged action] and their purported injury"); *Kurtz v. Baker*, 829 F.2d 1133, 1145 (D.C. Cir. 1987) (finding defendants' conduct did not cause plaintiff's harm when he

would have been prevented from speaking where he wished by a third party anyway, regardless of defendants' conduct); *cf.* 13A Charles Alan Wright et al., *Fed. Prac. & Proc.* § 3531.5 (May 2025 update) (hereinafter, Wright & Miller) ("The best uses of causation have involved plaintiffs who were ineligible for desired benefits, or failed to satisfy some precondition; plaintiffs whose injury was due to their own fault; or plaintiffs who simply had sued the wrong defendants.").

For some of the Plaintiffs, the record indisputably shows that one or more of the links in the causal chain did not or would not go their way. In other words, the record shows that Plaintiffs would not be receiving the Payments they seek now, anyway, even if the District had done everything they allege it should have. For the others, there is insufficient evidence, or a total lack of evidence, to show that *each* and *every* link in this chain would have gone in their favor. For both groups, this means that Plaintiffs cannot show their alleged damages are fairly traceable to the District, and therefore Plaintiffs lack standing to seek those damages.

> a.   **K.H., L.C., S.K., N.G., and M.S. Cannot Show They Were Otherwise Eligible for Foster Care Licensure.**

For five of the eleven families before the Court, the chain of causation breaks at licensure—the record shows that even if Plaintiffs K.H., L.C. and S.K. had applied to be licensed as foster family homes at the time of the incidents alleged in their complaints, they would not have been granted licenses. There is also a total absence of evidence by which Plaintiffs N.G. or M.S. could establish their eligibility. Since Plaintiffs bear the burden to establish standing, this is fatal to their claims. *See*, *e.g.*, Fed. R. Civ. P. 56(c)(1)(B); *Hailu*, 2022 WL 1124796, at *5 (finding lack of standing for damages where record does not show plaintiff's eligibility for back benefits he seeks).

A "foster family home" is defined by federal law, in relevant part, as "the home of an individual or family . . . that is licensed or approved *by the State in which it is situated* as a foster

family home that meets the standards established for the licensing or approval . . . ."  42 U.S.C. § 672(c)(1) (emphasis added); *see also* 45 C.F.R. § 1355.20 (reiterating that home must be licensed by "a state authority in the state in which the foster family home is located").[3] Licensing standards are set by each State, 42 U.S.C. § 671(a)(10)(A), though federal law sets some minimum requirements, *see id*. §§ 671(a)(10) and (a)(20), 45 C.F.R. § 1356.30.  *See also*, *e.g.*, Separate Licensing or Approval Standards for Relative or Kinship Foster Family Homes, 88 Fed. Reg. 66700 (Sept. 28, 2023).  "Anything less than full licensure or approval is insufficient for meeting title IV–E eligibility requirements," or, in other words, is insufficient to show eligibility for Payments.  45 C.F.R. § 1355.20; 42 U.S.C. § 672(a)(2)(C).

The District licenses District residents as foster family homes according to rules set by CFSA.  *See* 29 DCMR § 6000; *id. et seq*.  Some criteria are absolute, in that every applicant must meet them.  29 DCMR § 6000.5.  Others, which do "not adversely affect child safety," can be waived by the agency "upon written application and for good cause."  *Id*.  29 DCMR § 6000.5.  CFSA policy specifies which criteria can be waived; all waivers are on a case-by-case basis.  SUMF ¶ 9.  Some criteria concern qualifications of the potential foster parent, and some concern the potential living environment.  *Id*.  As explained by Plaintiffs, the District's licensing decision is ultimately "a subjective determination by CFSA."  Ex. 8, Compilation of Pls.' Resps. to Interrog. No. 11, at *4 (same as to all); *see also* SUMF ¶¶ 9–11.[4]

---

[3]    "State" as used in relevant parts of the SSA includes the District of Columbia.  45 C.F.R. § 1355.20.

[4]    Plaintiffs' counsel even went so far as to object that the District's request to Plaintiffs to set forth material facts showing their eligibility for licensure also "call[ed] for speculation," indicating *any* prediction of outcome is speculative.  *E.g.*, Ex. 8 at *4.  This hardly suffices to show a "substantial probability" that Plaintiffs would have been licensed.

Relevant here, District law has many rules around foster families' sleeping arrangements. Foster children are to sleep in bedrooms, not living rooms. *See* 29 DCMR § 6007.30. "No more than three (3) children may share a room regardless of the room's size." *Id*. § 6007.36. Bedrooms must "be sufficient in size to provide for the safety, privacy and comfort" of the child. *Id.* § 6007. 34. Foster children "may not share a bedroom with an adult unless" they are medically fragile or under eighteen months old, and there is a different room for sleeping when the child grows older, which CFSA can assess at the time the home is licensed. *Id*. § 6007.39. CFSA has discretion to waive any of these requirements. SUMF ¶¶ 9–11.

Plaintiffs K.H. and L.C. were District residents at the time of the alleged diversion. *Id*. ¶¶ 44, 92. The record shows that even if CFSA had been seeking to place the relevant Children into foster care, and even if K.H. and L.C. had applied for licensure, the District would not have licensed them because they did not have adequate space in their homes for the Children to live and sleep. *Id*. ¶¶ 44–47, 92–96. For K.H. or L.C. to be licensed, CFSA would have had to waive licensure criteria related to sleeping arrangements, but there is no evidence to support that it would have done so in either case. To the contrary, licensing staff who recently reviewed the cases determined they would not have granted waivers, but would instead most likely have denied licensure. *Id*. K.H. and L.C. therefore cannot show their damages are fairly traceable to the District's.

As of 2019, S.K. was a Maryland resident. *Id*. ¶ 130. Maryland law establishes foster care licensing criteria for Maryland residents. *E.g.*, 42 U.S.C. § 671(a)(10)(A); C.O.M.A.R. 07.05.02.10. Under Maryland law, like the District, foster children cannot share bedrooms with adults. C.O.M.A.R. 07.05.02.10. Unlike in D.C., this requirement cannot be waived. *See generally* C.O.M.A.R. 07.05.02.00 *et seq.*; Ex. 12, Decl. of Ana Burgos ¶ 20 . When C.G. 1, 2,

and 3 moved in with S.K., she was living in a three-bedroom apartment with her adult son. *Id*. ¶ 131. S.K. kept her own room; the two C.G. girls shared a room, and the C.G. boy shared a room with S.K.'s adult son. *Id*. ¶ 132. S.K. also could not be licensed to foster the C.G. children because of insufficient space in her apartment. *Id*. ¶ 133; C.O.M.A.R. 07.05.02.10.

At the relevant time, N.G. was a resident of Texas, and M.S. was a resident of Pennsylvania. *Id*. ¶¶ 112, 191. In order for N.G. or M.S. to ultimately receive Payments, they would have needed to be licensed by Texas and Pennsylvania, respectively. *Id*.; 42 U.S.C. § 672(c)(1); 45 C.F.R. § 1355.20; 42 U.S.C. § 672(a)(2)(C). Under procedures established by the Interstate Compact for the Placement of Children (ICPC), the District would have contacted the relevant jurisdictions to request placement there and help begin the licensing process. *Id*. ¶¶ 13–16. The licensing process typically takes three to six months. *Id*. ¶ 18. The District cannot issue any temporary licenses to family outside the District or Maryland. *Id*. ¶¶ 117, 119.

Plaintiffs bear the burden to show at least a "substantial probability" that they would have been licensed by those States, but they cannot make such showing because there is no evidence as to how officials in either of those states make licensing decisions, or whether they would have favorably exercised their discretion in either case. *See*, *e.g.*, *Clapper*, 568 U.S. at 411–12 & n.4 (explaining courts cannot fill in gaps with "assumptions" and then make it "the Government's burden to disprove standing"); *Texas v. California*, 593 U.S. 659, 675 (2021) (explaining that when standing depends upon action of third-parties, "plaintiff must show at least 'that third parties will likely react in predictable ways'") (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019). Plaintiffs have no experts, nor any witness with experience in those jurisdictions.

For all of the reasons described above, Plaintiffs K.H., L.C., S.K., N.G., and M.S. cannot carry their burden to show their damages are fairly traceable to the District's allegedly illegal conduct. *Hailu*, 2022 WL 1124796, at *5; *cf. Union of Concerned Scientists v. DOE*, 998 F.3d 926, 930 (D.C. Cir. 2021) (affirming "reluctan[c]e to find standing based on predictions of how agencies will exercise discretion in future proceedings").

> **b.    S.S., M.S., N.G., D.B., and Y.A.L. Cannot Show They Would Have Applied for Licensure If That Had Been an Option.**

For another three families, and again for Plaintiffs M.S. and N.G., the chain of causation breaks at the point of *application for* licensure—Plaintiffs S.S., M.S., N.G., D.B., and Y.A.L. cannot show a "substantial probability" that, even if licensure had been an option, they would in fact have applied.  And of course, if they had never applied, they would never have been licensed, or been eligible to receive the Payments they now seek.

The record indisputably shows that CFSA gave S.S. the option to serve as a foster parent, or to independently seek custody of A.B. and N.B., and she affirmatively chose the latter.  *See* Background Sec. V.  S.S. "want[ed] the kids to avoid being put in the system."  SUMF ¶ 179.  She did not want the Children reunified with their mother.  *Id.* ¶ 185.  S.S. declined licensure, choosing instead to seek custody of the kids again in Family Court.  *Id.* ¶¶ 178, 180.

The record also indisputably shows that M.S. came from Pennsylvania to the District with the independent intent to bring baby M.A. home with her.  *Id.* ¶¶ 191–93.  Plaintiff had obtained custody of some of M.A.'s other children years before, also without involving any child welfare authorities, because she "was able to handle the situation" herself and "preferred that to involving the state."  *Id.* ¶ 197.  Indeed, M.S. persuaded M.A.'s mother to draft and sign a statement purporting to grant M.S. temporary custody rights before anyone from CFSA was involved with the family at all.  *Id.* ¶¶ 196, 198–99; Ex. 41 (handwritten statement).  She "did not

24

want [her] grandson in the system." *Id.* ¶ 194. Even more to the point, when the District asked M.S. if she would have chosen licensure instead, had CFSA presented that option, she could not say with any certainty that she would, in fact, have chosen to apply for licensure. *Id.* ¶ 211. Specifically, Counsel for the District stated. that if the District had initiated neglect proceedings when M.S. came to take baby M.A., M.S. would have needed to obtain a foster care license from her home state of Pennsylvania; that this process would likely have taken months to complete; and that baby M.A. could not go back to Pennsylvania with her in the meantime. *Id.*[5] In contrast, the custody proceeding M.S. in fact initiated and successfully completed took just a matter of days and enabled M.S. to bring home baby M.A. almost immediately. *Id.* ¶ 210. Given a proper picture of the path not taken, M.S. understandably could not say that she would, in fact, have chosen to seek licensure. *Id.* ¶ 211.

Plaintiff N.G. had also tried to gain custody of C.G. 1, 2, and 3 before speaking with anyone from CFSA, and also could not say what she would have done if, at the time of the alleged diversion, someone had explained her "option" to be licensed. *Id.* ¶ 117. N.G. had tried unsuccessfully to obtain custody of the Children years before. *Id.* ¶ 101–03. At the time of the alleged "diversion," when N.G. filed for custody of C.G 1, 2, and 3, she *also* filed for, and initially obtained, custody of their fourth sibling as well. *Id.* ¶ 116. That was never discussed with CFSA. As with M.S., in deposition, N.G. could not say what she would have done if, at the relevant time, someone had told her that she "could maybe be licensed as a foster parent, but that it was not certain and could take many months, and in the meantime the kids would have to be

---

[5]    It is also entirely possible that baby M.A. might have been placed with a traditional foster family, who would be strangers to her, while M.S. awaited license approval. Ex. 11, Ann Reilly (3/11/2025) Dep. Tr. at 133–34. The same could be true for the C.G. Children.

25

somewhere else, and they told [her] about all of the financial benefits that come with foster care." *Id.* ¶ 117.

Plaintiff D.B., similarly, was already in the process of independently filing for custody of B.B. before speaking with anyone from CFSA about her "options." Around the time of the alleged "diversion," when D.B. had her first conversation with someone from CFSA about her options to care for B.B., she was *already at* the Family Court, awaiting a decision on her emergency motion for Third-Party Custody. *Id.* ¶ 157. And, at the time, D.B. was aware that family could be licensed as foster parents, because her mother had previously been licensed to care for B.B.. *Id.* ¶ 158. She was also aware of the benefits that could come with licensure for the same reason. *Id.* But she did not wait to speak with anyone at CFSA about that possibility of being licensed before independently seeking custody. In deposition, D.B. also made clear that she did not want B.B. to be reunified with his mother, wanted to keep him "for as long as possible," and was intending to raise him herself. *Id.* ¶¶ 155–56, 163. Given this, it strains credulity that she would have chosen to have B.B. placed into foster care—where the goal would have been reunification with his mother—rather than seek custody. *See* Section I.B.1.c. Further, like M.S., she also could not say what she would have done if CFSA had presented her with the "option" of licensure around the time when B.B. came to live with her. *Id.* ¶ 159. In light of all this, D.B. cannot possibly show a "substantial probability" she would have pursued licensure.

Plaintiff Y.A.L. cannot show a substantial probability that she would have applied for licensure because she testified that, at the time baby J.M.L. first came to live with her, she affirmatively did *not* want to serve as a foster or adoptive parent to J.M.L. *Id.* ¶ 275. To the contrary, Y.A.L. was seeking to independently connect J.M.L. to potential adoptive parents. *Id.* ¶¶ 251–61. Y.A.L. explained that she decided to become J.M.L.'s caregiver indefinitely only

26

after spending weeks with the baby. *Id.* ¶ 262. If CFSA had taken baby J.M.L. into its custody before J.M.L. went to live with Y.A.L., CFSA would have had to find a willing and able foster family home immediately. *See* Background Sec. V. And because Y.A.L. was not willing to so serve at the time, it would not have been Y.A.L. *Id.* ¶¶ 251–62.

For all of these reasons, Plaintiffs S.S., M.S., N.G., D.B., and Y.A.L. cannot show their alleged damages are fairly traceable to the District's allegedly illegal conduct. *E.g.*, *Haaland*, 599 U.S. at 296; *Clapper*, 568 U.S. at 412–13; *Delta Constr. Co.*, 783 F.3d at 1296–97.

<div style="margin-left:2em">

**c.  None of the Plaintiffs Can Show a Substantial Probability That OAG Would Have Prosecuted the Children's Neglect Cases and the Family Court Would Have Placed Them with the Caregivers.**

</div>

For the remaining families, both Caregivers and Children—and for all of the families discussed above—Plaintiffs also cannot show traceability because their ultimate entitlement to Payments depends upon favorable decisions from two different third-parties to the case, and there is no evidence in the record that could be used to show how those entities make decisions, or what they would have done in these cases. Plaintiffs therefore cannot possibly show a "substantial probability" they would have received Payments. *Kurtz*, 829 F.2d at 1143 ("Article III requires a chain of causation less ephemeral than a coin tossed into a wishing well."); *Clapper*, 568 U.S. at 411–12 & n.4; *Texas v. California*, 593 U.S. at 675.

To the contrary, CFSA did initiate or attempt to initiate neglect proceedings for two of the eleven families before the Court (for Children T.S., and siblings A.B. and N.B.), and in each of those cases, the first gatekeeper—OAG—ended the cases, and Plaintiffs' chances for receipt of Payments, by declining to prosecute neglect. *Id.* ¶¶ 181, 238. CFSA can file complaints for neglect in the Family Court, *id.* ¶ 7, but once a complaint is filed, OAG has discretion as to whether or not it will prosecute the case. D.C. Code § 16-305(c)(1); *In re J.J.Z.*, 630 A.2d 186,

191 (D.C. 1993) (discussing "corporation counsel's" discretion); *District of Columbia v. ExxonMobil Oil Corporation*, 172 A.3d 412, 428–31 (explaining transformation of "corporation counsel" to entity independent from the Mayor or Council, charged with upholding the public interest). OAG initiates a prosecution by filing a neglect petition. *In re J.J.Z.,* 630 A.2d at 190–91. In the case of T.S., and the case of siblings A.B. and N.B., CFSA filed complaints, but OAG did not file a petition for neglect. *Id*. ¶¶ 181, 238. Thus, those Plaintiffs' caregivers were never going to be eligible for Payments regardless of the District's allegedly illegal conduct.

As for the remaining families, if CFSA had done what Plaintiffs want for them, by initiating neglect proceedings, Plaintiffs have no evidence to show a substantial probability that OAG would have prosecuted the cases, let alone what would have happened once the cases came up for decision before the Family Court, which would have to find both that the Children were in fact abused and neglected and that shelter care was warranted before the Children could be placed into foster care for anything more than a few days. *See* Background Sec. I. Even assuming Plaintiffs could possibly present evidence to make such a showing, here, there are no witnesses from either entity, nor any experts who could speak to those entities' decision-making processes, or how they would have handled Plaintiffs' individual cases.

Even so, the record also shows that many of the Children would likely *not* have been placed into foster care through the neglect system. As explained below, in Section IV.B, the "underlying purpose of the neglect process" is to prevent abuse and neglect and "to rehabilitate parents and reunite children with their families." *See In re Ta. L.*, 149 A.3d 1060, 1083 (D.C. 2016). And foster care is, accordingly, designed to enable children's reunification with their parents. *See*, *e.g.*, *id*. at 1078; *id*. at 1079 ("[T]he presumption in favor of reunification remains the primary goal of neglect proceedings with adoption as a favored alternative placement for

children when efforts to reunify the family fail."); *In re T.J.*, 666 A.2d 1, 11–12, 14–15 (D.C.

1995); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

T.A. was not a good candidate for, or in need of, foster care.  T.A.'s mother was

deceased, but his father was not.  *Id*. ¶¶ 313, 294.  During CFSA's investigation of J.R.'s

allegations of abuse and neglect, the social worker contacted T.A.'s father, and other members of

his family.  *Id*. ¶ 294.  T.A.'s father made a plan for T.A. to live with his own mother, who was

also a foster parent to two of T.A.'s older half-siblings.  *Id*. ¶¶ 294–98.  Indeed, T.A. was living

with his paternal grandmother when CFSA closed its investigation and was thus already reunited

with his only living parent, through a plan made by that parent.  *Id*. ¶ 300.

There is no reason to believe that OAG would have prosecuted a neglect case—centered

on T.A.'s deceased mother and supposed need for alternative care—under the circumstances, or

what result would have followed if there were a case.  *See In re Ta. L.*, 149 A.3d at 1083; *In re

T.J.*, 666 A.2d at 11–12, 14–15; *Santosky*, 455 U.S. at 753; D.C. Code § 16-2309(a) (limiting

grounds for CFSA to take a child into custody to situations in which the child is in "immediate

danger" or "otherwise is endangered" by "surroundings"); U.S. Const. amend IV (prohibiting

unreasonable seizure); Super. Ct. Neglect Rule 13(d)(2) ("Before a child is placed in shelter care,

the judicial officer must determine . . . [n]o relative or third-party custodian is available who can

protect the child and provide for his or her welfare."); D.C. Code § 16-2310(c).

At the time of the alleged diversion, K.J. also had an involved father, who wished to

care for her.  *Id*. ¶¶ 28–32.  According to a plan CFSA prepared contemporaneously with the

family, K.J.'s dad indicated he "would care for his daughter if the court did not allow" K.H. to

have custody.  *Id*. ¶ 39.  Indeed, he had recently filed for custody of K.J. in Family Court, and

had a second hearing set for November 11, 2018.  *Id*. ¶ 32.  Another maternal aunt, who

previously had power of attorney over K.J., granted from K.J.'s mom, also expressed willingness "to care for the child in the event that" K.J. was "left without a caregiver." *Id.* ¶ 40.

Thus, none of the Plaintiffs can show standing to seek damages, because they cannot show a substantial probability that they would have ever obtained Payments even if CFSA had done everything Plaintiffs allege it should have done at the time. *See Clapper*, 568 U.S. at 413–14 (explaining that plaintiff lacked standing in *Whitmore v. Arkansas* because it "is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case") (quoting *Whitmore*, 495 U.S. at 159–60); *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 50 (D.C. Cir. 2016) ("Mere unadorned speculation as to the existence of a relationship between the challenged government action and the third-party conduct will not suffice to invoke the federal judicial power.") (internal quotations omitted) (citation modified); *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 27–28 (D.C. Cir. 2011) (holding plaintiff lacked standing because it failed to demonstrate key link in causal chain with evidence); *Banks v. Sec'y, Dep' of Health & Hum. Servs.*, 38 F.4th 86, 95 (11th Cir. 2022) (rejecting standing that "requires the coalescence of several decisions by at least three independent actors").

### d.     Plaintiffs' Other Damages Claims Are Not Fairly Traceable to the District's Allegedly Illegal Conduct for the Same Reasons.

In addition to claims for foster care maintenance payments, at least three (maybe four) of the Plaintiff Caregivers—S.S., N.G., T.J, and J.R—testified they believe they suffered emotional distress as a result of the District's conduct, and they believe they are entitled to compensation for that distress. *See* Background Sec. III.  Because, as discussed above, Plaintiffs cannot show a substantial probability that they would have become foster parents and received foster care maintenance payments, regardless of the District's allegedly illegal conduct, they also cannot

show that any other injuries allegedly resulting from that conduct are fairly traceable to the

District.  *Supra*, Section I.B.1.c; *see also*, *e.g.*, *Carey v. Piphus*, 435 U.S. 247, 263 (1978)

(finding plaintiff must have evidence sufficient to convince the trier of fact "that he actually

suffered distress because of the" procedural violations at issue, in part because "the injury caused

by a justified deprivation, including distress, is not properly compensable under § 1983").

As discussed above, Plaintiff S.S.'s injuries are not fairly traceable to the District because

she affirmatively *chose* independent custody over licensure.  N.G. cannot show that she would

have been licensed in Texas, or that, even if she could be, she would have chosen licensure over

custody.  T.J. actually received a temporary license at the time, and CFSA initiated a neglect

case, but a third party, OAG, declined to prosecute.  J.R. cannot show a substantial probability

that things would have gone differently for her than for T.J.—namely, there is no evidence as to

what OAG or the Family Court would have done with a neglect case had it been prosecuted.

*Supra*, Section I.B.a–c.

To be sure, all of these cases caused Plaintiffs emotional distress—but Plaintiffs cannot

show even a substantial probability this distress is fairly traceable to the District's conduct.

> **2.    Alternatively, Plaintiffs T.J., S.S., K.H., J.R., Y.A.L., M.M., and D.B. Lack Standing To Seek Damages for Their Notice Claims Because They Were Aware of Their "Options" and Suffered No Injury.**

Alternatively, even if the Court were to disagree with the causation arguments above,

seven of the Caregivers lack standing to seek damages as relief for the District's alleged failure

to provide them notice of their "options" to care for the Children, including the option to become

foster parents, because at least seven of the Caregivers were already well-aware of this option.

Thus, Plaintiffs cannot show they suffered any actual injury as a result of this alleged failure.

Injury-in-fact is an "irreducible . . . minimum" requirement for standing. *Lujan*, 504 U.S. at 560–61. To be cognizable, a plaintiff's injury must be "'concrete and particularized' and 'actual and imminent,' not abstract, generalized, remote or speculative . . . ." *Coalition for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1280 (D.C. Cir. 2012) (quoting *Lujan*, 504 U.S. at 560–61). A "'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id*. (quoting *Lujan*, 504 U.S. at 560 n.1). "[A] bare procedural violation, divorced from any concrete harm," does not suffice. *Id*. at 341.

Where, as here, a plaintiff's alleged injury is a failure to provide information, a plaintiff suffers no actual injury if she already possessed that same information. *E.g.*, *Spokeo, Inc.*, 578 U.S. at 340 (holding injury "must actually exist," and plaintiff lacked standing to challenge defendant's failure to provide notice required by statute because he could not show that resulted in any actual harm); *Coalition for Mercury-Free Drugs*, 671 F.3d at 1280 (holding members lacked standing to challenge insufficient notice of dangers they already knew); *Ctr. for Law and Educ. v. Dep't of Ed.,* 396 F.3d 1152, 1159 (D.C. Cir. 2005) (explaining that plaintiff must demonstrate "that it is substantially probable that [a] procedural breach will cause the essential injury to the plaintiff's own interest").

As discussed above, Plaintiffs T.J. and S.S. suffered no actual harm as a result of the alleged notice violations because the District did, in fact, provide the required notice. S.S. had multiple conversations with licensing staff at CFSA, including discussion of her option to become a foster parent. *Id*. ¶¶ 174–76. T.J. was even granted a temporary license at the relevant time. *Id*. ¶ 235. She can hardly maintain now that she did not know licensure was an option.

32

Plaintiff K.H. indisputably learned of the "option" to become a licensed foster parent within 30 days of CFSA's purported removal of K.H., which is all Section 671(a)(29) might require.  *See* 42 U.S.C. § 671(a)(29) (requiring notice "[w]ithin 30 days" of "removal").  Indeed, 14 days after K.J.'s purported removal, K.H. appeared at CFSA, with counsel (KinCare Alliance), and demanded to be licensed.  *Id.* ¶¶ 41–42.

Plaintiffs J.R., Y.A.L., M.M., and D.B. also certainly knew of their "option" to be licensed foster parents because they each had personal experience with licensure and the benefits that come with it.  Before the incidents alleged in her complaint, J.R. had served as a foster parent *for T.A.* (who is the Plaintiff-Child in this action J.R. supposedly did not know she could care for as a licensed foster parent).  *Id.* ¶ 285.  J.R.'s interactions with CFSA concerning the incidents alleged in her complaint *begin* with her going to CFSA to request that she serve, *again*, as a licensed foster parent for T.A.  *Id.* ¶ 291.  Y.A.L. had extensive knowledge of licensing and the pros and cons of such service—by the time J.M.L. came to live with her, she had already fostered more than a dozen children.  *Id.* ¶ 250.  M.M., too, had served as a licensed foster parent, and, according to her testimony, she told that to the social worker at the time of the alleged diversion and asked to be licensed for L.E.  *Id.* ¶ 60, 69–70.  And D.B., as stated above, was well aware of the "option," and its potential benefits, because her mother had served as a licensed foster parent for Plaintiff B.B.  *Id.* ¶¶ 142, 158.

None of these Plaintiffs suffered any actual harm as a result of the District's alleged failure to provide them the notice allegedly required by 42 U.S.C. § 671(a)(29) because they all already had the information they claimed they were denied.  Thus, they lack standing to seek relief on these claims.  *E.g.*, *Spokeo, Inc.*, 578 U.S. at 340; *Coalition for Mercury-Free Drugs*, 671 F.3d at 1280.  Because Plaintiffs' common law claims for misrepresentation depend on this

same alleged lack of information, *see infra*, Section V, Plaintiffs also lack standing to seek relief

on those claims.  *Spokeo, Inc.*, 578 U.S. at 340.

> 3.    **Plaintiff Children Lack Standing To Seek Payments Allegedly Denied to Their Caregivers.**

Even if the Court found the Children's non-placement into foster care traceable to the

District, the Children lack standing to seek damages in the form of foster care maintenance

payments because they never had any entitlement to those payments at all—the District's

conduct has thus not caused them any injury.  *Warth v. Seldin*, 422 U.S. 490, 499 (1975)

("[J]udicial power exists only to redress or otherwise to protect against injury to the complaining

party . . . . A federal court's jurisdiction therefore can be invoked only when the plaintiff himself

has suffered 'some threatened or actual injury resulting from the putatively illegal action.'").

Federal law makes clear that it is *foster caregivers*, not foster children themselves, who

are entitled to foster care maintenance payments.  *See N.Y. State Citizens' Coal. for Child. v.

Poole*, 922 F.3d 69, 82 (2d Cir. 2019) (holding the SSA "designates foster parents as the holders

of the right" to foster care maintenance payments); *D.O. v. Glisson*, 847 F.3d 374, 378 (6th Cir.

2017) ("[W]e conclude the Act confers *upon foster parents* an individually enforceable right to

foster care maintenance payments." (emphasis added)); *Calif. State Foster Parent Ass'n v.

Wagner*, 624 F.3d 974, 980 (9th Cir. 2010) (noting payments "are directed to foster parents").

This makes sense: foster care maintenance payments are made *on behalf of* foster children, but

not *to* foster children.  *Calif. State Foster Parent Ass'n*, 624 F.3d at 981; *see also id.* at 980

("Section 672(a) is about payments 'on behalf of each child,' payments which are *directed to

foster parents* pursuant to § 672(b)) (emphasis added).  Their purpose is to "ensure that foster

children's basic needs are provided for[.]"  *N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 82.

Thus, "Congress vest[ed] the right" to these payments "in those who do the providing."  *Id.*

Because foster children have no independent entitlement to such payments, the Plaintiff Children here do not have standing to seek them.  *See*, *e.g.*, *Warth*, 422 at 499.

## II.    The District Is Entitled to Judgment on All Plaintiffs' Claims for Violations of 42 U.S.C. §§ 672(1) and 671(a)(16) Because Plaintiffs Fail To State A Claim.

Even if Plaintiffs have standing to seek some relief, the District is entitled to judgment on their claims for violations of 42 U.S.C. §§ 672(1) and 671(a)(16) because Plaintiffs are not eligible for those benefits, per the plain terms of the law, and the District is not estopped.

### A.    Plaintiffs Are Not Eligible for the Benefits Claimed.

At the motion to dismiss stage, the District argued Plaintiffs failed to state a claim for any violation of 42 U.S.C §§ 672(1) or 671(a)(16) because those provisions concern only the rights of children who are in foster care and their foster caregivers and Plaintiffs did not allege they were in foster care or licensed as foster caregivers.  That argument is equally correct at this stage—Plaintiffs surely cannot prove they were in foster care or acting as foster caregivers at the relevant times and thus fail to state a claim for violation of these provisions.

Section 672(a) describes specific requirements that make a child foster caregiver eligible to receive foster care maintenance payments on behalf of a foster child.  Section 672(a)(1)(A) states that maintenance payments can be made only if the child's removal and foster care placement meet the definitions in Section 672(a)(2)(A).  That provision, in turn, requires the "removal and foster care placement" to be made "in accordance" with "a voluntary placement agreement," or "a judicial determination . . . ."  42 U.S.C. § 672(a)(2)(A).  The child's placement must *also* be the responsibility of the state, *id*. § 672(a)(2)(B), and the child must be placed "in a foster family home," *id*. § 672(a)(2)(C).  "Foster family home" is further defined as a home "that is licensed . . . by the State . . . ."  *Id*. § 672(c)(1)(A)(i)); *see supra*, Section I.B.1.a (licensure required).

Similarly, 42 U.S.C. § 671(a)(16) requires states to "provide[ ] for the development of a case plan . . . for each child *receiving foster care maintenance payments* . . . ." 42 U.S.C. § 671(a)(16) (emphasis added). As just discussed, children cannot receive foster care maintenance payments without first being placed into foster care. *Supra*. By logical extension, children are also not entitled to case plans under Section 671(a)(16) unless they are, at least, in foster care, because they could not possibly be receiving Payments.

Again, Plaintiffs do not even allege that they meet the requirements of Section 672 or 671(a)(16). In fact, Plaintiffs alleged the Children were *not* placed in formal foster care. *E.g.*, K.H. Compl. ¶ 3. As numerous federal courts have made clear, this forecloses their claims. *See T.M. v. DeWine*, 49 F.4th 1082, 1090 (6th Cir. 2022) (affirming trial court's holding that, because the plaintiff-children were not placed in a Title IV-E licensed "foster family home," they were ineligible for foster care maintenance payments) (citing *J.B-K. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 48 F.4th 721, 729–30 (6th Cir. 2022)); *Johnson v. N.Y. State Office of Child and Family Servs.*, Civil Action No. 16-1331, 2017 WL 6459516, at *8 (N.D.N.Y. Dec. 18, 2017) (quoting *Maher v. White*, Civil Action No. 90-4674, 1992 WL 122912, at *3 (E.D. Pa. June 2, 1992)) (an individual who is not a foster parent has no claim to benefits because the benefits "'are only available to maintain [a] child while in foster care'") (alteration added); *D.O. v. Glisson*, 847 F.3d 374, 381 (6th Cir. 2017) ("Section 672(a) restricts the class of children entitled to benefits . . . ."). Thus, Plaintiffs fail to state a claim for any violation of these statutes.

## B.    The District Cannot Be Estopped from Arguing Plaintiffs Are Ineligible.

Nonetheless, in denying the District's motion to dismiss, the Court held the District was estopped from arguing that Plaintiffs fail to state a claim for these benefits. It did so, primarily,

upon reasoning that Plaintiffs alleged the "District had an affirmative policy of misleading kinship caregivers about their options."  MTD Ruling at 19.

The District is not estopped from pointing out Plaintiffs' failure to state a claim under 42 U.S.C. §§ 672(1) and 671(a)(16) because no reasonable juror could find that the alleged affirmative policy of misleading caregivers in fact exists.  Plaintiffs deposed two dozen CFSA social workers in this case about their work over the span of many years and not one of them even suggested that any such policy exists.  Plaintiffs also deposed three high-level administrators, and two former Directors—same result, no evidence of such policy.  At best, or worst, one or more Plaintiffs could try to show only that they received "erroneous and unauthorized advice by a government employee," which cannot "provide a basis for equitable estoppel."  MTD Ruling at 20 (quoting *Office of Personnel Mgmt v. Richmond*, 496 U.S. 414, 416 (1990) (hereinafter, *OPM*).

"[I]t is well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Cmmty Health Servs.*, 467 U.S. 51, 60 (1984).  More to the point, estoppel never succeeds where, as here, "public money is at stake." *OPM*, 496 U.S. at 427.[6] The Supreme Court has squarely held that the judicially created doctrine of estoppel cannot be used to create entitlements to government benefits that would not otherwise exist, for a variety of reasons. *Id*. at 424–34.  There are limitations to what powers exist in equity. *Id*. at 426 (quoting *INS v. Pangilinan*, 486 U.S. 875, 883 (1988) (holding equitable relief cannot conflict with or create rights not existing in federal law).  There are separation of powers problems. *Id*. at 424 (explaining that the Appropriations Clause of the Constitution "means simply that no money can

---

[6]    To be sure, the District believes that *OPM* is dispositive of Plaintiffs' estoppel claim, even *if* they could prove the existence of the affirmative misconduct they alleged.

be paid out of the Treasury unless it has been appropriated by an act of Congress," even by court order).  There is the "obvious practical consideration . . . of preventing fraud and corruption," because "it would be very difficult for the public to protect itself" from "improper collusions" between government employees and prospective beneficiaries.  *Id*. at 427.  There is the burden that "endless litigation over both real and imagined claims of misinformation by disgruntled citizens," and the likelihood that liability for misinformation would actually result in potential beneficiaries receiving *less* information, because the government would "cut back and impose strict controls" on "the provision of information."  *Id*. at 433, 434; *see also Deaf Smith Cnty Grain Processors, Inc. v. Glickman*, 162 F.3d 1206, 1214 (D.C. Cir. 1998) (explaining the Supreme Court has "emphatically dismissed the notion" that erroneous advice gives rise to benefits claims "'not otherwise permitted by law'") (quoting *OPM*, 496 U.S. at 415–16); *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111–13 (D.C. Cir. 1988) ("[A] plaintiff seeking the benefit of equitable estoppel must have some claim, sounding in equity or in law, that *otherwise entitles it* to prevail against the defendant.") (emphasis added).

Here, Plaintiffs are seeking to estop the District from arguing that they are not entitled to certain federal monetary benefits.  This argument is foreclosed by *OPM*.  *Supra*.

Even absent this clear rule, Plaintiffs cannot possibly show the District is estopped. There is "a presumption against equitably estopping the government in any but the most extreme circumstances."  *Grand Marina Invs., LLC v. IRS*, No. 23-cv-01676, 2024 WL 4253095, at *5 n.1 (D.D.C. Sept. 20, 2024) (citation modified).  Plaintiffs "must show that: (1) the government made a definite representation; (2) on which the [plaintiff] relied . . . in such a manner as to change [its] position for the worse; (3) the [Plaintiffs'] reliance was reasonable; and (4) the government engaged in affirmative misconduct."  *Masters Pharm., Inc. v. DEA.*, 861 F.3d 206,

225 (D.C. Cir. 2017) (citation modified); *see also*, *e.g.*, *Dickerson v. Colgrove*, 100 U.S. 578,

580–81 (1879).  The conduct must have "cause[d] an egregiously unfair result."  *Masters*

*Pharm., Inc.*, 861 F.3d at 225 (quoting *GAO v. Accounting Office Pers. Appeals Bd.*, 698 F.2d

516, 526 (D.C. Cir. 1983)).  The evidence must be "compelling."  *ATC Petro., Inc. v. Sanders*,

860 F.2d 1104, 1111 (D.C. Cir. 1988).

> First, Plaintiffs cannot show the District's conduct caused any "egregiously unfair result"
because the District never had any duty to seek to have the Children placed into foster care, *see*
Section IV *infra*, and Plaintiffs were therefore not deprived of anything they were possibly
entitled to.  It is not "egregiously unfair" that CFSA exercised its discretion in a way Plaintiffs
view as unfavorable.

> Second, Plaintiffs cannot show the District engaged in any "affirmative misconduct,"
because the information social workers provided to the Caregivers, under the circumstances, was
*true*.  CFSA only determined it should remove three of the Children (A.B., N.B., and T.S.. *Id.*
¶¶ 181, 238.  Thus, most of the Caregivers (that is, all but S.S. and T.J.) never had an "option" to
serve as licensed foster parents for the Children; and, if, at the time of the allege diversion, the
Caregivers wanted to have custody of the Children, their only "option" appeared to be to seek
Third-Party Custody in the Family Court.  *See* Background Sec. I.  "Wellmeant" advice such as
this is not misconduct, even if it were *incorrect*.  *OPM*, 496 U.S. at 416; *see also Montana v.*
*Kennedy*, 366 U.S. at308, 314–15 (1961) (government employee's "wellmeant advice," even
though incorrect, "falls far short of misconduct" warranting estoppel).  And in the two cases in
which CFSA did initiate a neglect action, CFSA also contacted both Caregivers to discuss
licensing—S.S. opted out and T.J. received a license.  *Id.* ¶¶ 178, 180, 235.  That is not
"affirmative misconduct."

Third, most Plaintiffs cannot show they "relied" on the District's representations "in such a manner as to change" their "position[s] for the worse," or that any such "reliance was reasonable."  As discussed above, Plaintiffs K.H., L.C., S.K., N.G., and M.S. cannot show even a substantial probability that they were eligible for licensure, so they cannot possibly show, by "compelling" evidence," that they relied on the District's alleged misrepresentations to their *detriment.  See ATC Petro., Inc*, 860 F.2d at 1111; *Supra*, Section I.B.1.a.  Plaintiffs S.S., M.S., N.G., D.B., and Y.A.L. also cannot show that, even if licensure had been an option, that they would have taken that path.  *Supra*, Section I.B.1.b.  Therefore, they cannot show they relied on anything the District said to their detriment.  Similarly, there is no evidence that L.C. or S.K. took *any* action in response to alleged misrepresentations, *see infra*, Section V.B, or that T.J. did either:  Again, at the time of the alleged "diversion," CFSA pursued a neglect case for T.S. and approved a license for T.J.  *Supra*, Section I.B.1.c.  Caregivers K.H., J.R., M.M., and again D.B. and Y.A.L., also did not "reasonably" rely on any District representations, if they relied on them at all, because they all already knew that it was possible to be licensed as a foster family home, how to be licensed, and the Payments that come with being licensed,   *Supra*, Section I.B.2.

Finally, the Plaintiff Children have no estoppel arguments because there is no evidence CFSA made any relevant "definite representations" to them at all.  *See Masters Pharm., Inc.*, 861 F.3d at 225.

For all of these reasons, the District is entitled to judgment on Plaintiffs' claims for violations of 42 U.S.C. §§ 672(1) and 671(a)(16).

### III.   The District Is Entitled to Judgment on All Plaintiffs' Claims for Violation of 42 U.S.C. § 671(a)(29).

Section 671(a)(29) states in full:

(a) In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—

(29) provides that, within 30 days after the removal of a child from the custody of the parent or parents of the child, the State shall exercise due diligence to identify and provide notice to the following relatives: all adult grandparents, all parents of a sibling of the child, where such parent has legal custody of such sibling, and other adult relatives of the child (including any other adult relatives suggested by the parents), subject to exceptions due to family or domestic violence, that—

(A) specifies that the child has been or is being removed from the custody of the parent or parents of the child;

(B) explains the options the relative has under Federal, State, and local law to participate in the care and placement of the child, including any options that may be lost by failing to respond to the notice;

(C) describes the requirements under paragraph (10) of this subsection to become a foster family home and the additional services and supports that are available for children placed in such a home; and

(D) if the State has elected the option to make kinship guardianship assistance payments under paragraph (28) of this subsection, describes how the relative guardian of the child may subsequently enter into an agreement with the State under section 673(d) of this title to receive the payments;

42 U.S.C. § 671(a)(29).

As discussed below, the District is entitled to judgment on all Plaintiffs' claims under this statute, for a variety of reasons. First, most Plaintiffs fail to state a claim because this statute only applies after a "removal," and most of the relevant Children were not subject to a "removal" as a result of the incidents alleged in the complaints. Second, in the two cases when the relevant Child was subject to removal, CFSA complied with the law. Third, for nine Caregivers, even though the law did not apply, the District did accurately convey to Plaintiffs their "options" for care at the time. Fourth, in any event, the District's conduct did not cause Plaintiffs the damages they allege resulted from violations of this statute. Finally, the District renews its argument that this statute does not create a privately enforceable right.

## A.     Section 671(a)(29) Applies Only to Removal Into State Care.

The notice requirements in Section 671(a)(29) apply only "within 30 days after the removal of a child from the custody of the parent or parents of the child  . . . ."  Although the word "removal" was not defined in the law creating this section, its usage across other provisions of the Social Security Act (SSA) makes clear that it means an action to take a child from his or her parents' custody, and into the placement and care of the State, by way of a voluntary placement agreement between the parents and State, or through judicial determination.

Section 671(a)(29) was enacted in 2008, as part of the Fostering Connections to Success and Increasing Adoptions Act of 2008, P.L. 110-351, sec. 103, 122 Stat. 3949.  That law amended the SSA.  *Id*. at 3949 (preamble).  The SSA has used the word "removal" since at least 1980, when it was included as part of the Adoption Assistance and Child Welfare Act (Act or 1980 Act) of 1980, P.L. 96-272, sec. 101, 94 Stat. 500.  That Act created the current program for the provision of federal foster care maintenance payments.  *Id.*  Relevantly, it set out the requirements for a "plan" that any *State* must have "[i]n order . . . to be eligible for payments [from the federal government] under this part," at sec. 101, now codified at 42 U.S.C. § 671, and the requirements that any *child* must meet before the State could receive subsidies for payments made to the child's caregivers, *see* sec. 101, 102, now codified at 42 U.S.C. § 672.

The 1980 Act limited the class of children eligible for foster care maintenance payments to those who would be eligible for federal welfare benefits "but for" their "removal from the home of a relative," and further specified that "the removal" must have been "the result of a judicial determination," P.L. 96-272, sec. 101, or of a "voluntary placement agreement," *id*. sec. 102.  Further, a child was eligible only when "such child's placement and care are the responsibility of . . . the State agency administering the State plan" or another qualifying public

entity, *id.* at Sec. 101; and only when the child was placed in a "foster family home," *id.* Today, Section§ 672 continues to limit eligibility to only children whose "removal" was "in accordance with" the same criteria, and whose "placement and care are the responsibility of" the state, and who are placed in a foster family home. 42 U.S.C. § 672(a)(1), (2).

The requirements for the State plan that Congress created in the same 1980 Act were also tailored to benefit the same limited class of children. Subpart (9) of the plan requirements, for example, required states to bring possible neglect or abuse "to the attention of" local courts or law enforcement, but only for those "home[s] or institution[s] in which a child resides whose care is being paid for in whole or in part with funds" provided by the Act. P.L. 96-272, sec. 101. Subpart (10) required certain standards be applied to "any foster family home or child care institution receiving funds" provided by the Act. *Id.* Subpart (16) required the development of case plans "for each child receiving foster care maintenance payments." *Id.* Section 671(a)(29) was added almost thirty years later as just one more requirement on this list of what the State's plan must include. P.L. 110-351, sec. 103. Its use of the term "removal" must be understood in the context of the law it amends. *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context . . . ."). "[I]nterpretation must account for both the specific context in which language is used and the broader context of the statute as a whole." *Util. Air Regulatory Grp. v. EPA*, 573 U.S 302, 321 (2014); *see also Samantar v. Yousuf*, 560 U.S. 305, 319 (2010); *Neal v. Clark*, 95 U.S. 704, 708–09 (1877). And the Court should presume Congress meant the term to "mean the same thing throughout [the] statute." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012).

Applying these principles, it appears Congress intended for the notice requirement in Section 671(a)(29) to be but one more requirement in the State plan, and one more condition in

the agreement between Congress and the States related to the payment of federal funds for certain specified children or their caregivers.  "Removal," then, in Section 671(a)(29) most naturally and plainly means the same "removal" as described in other parts of the statue, which define those specified children (and their caregivers).  *Compare* 42 U.S.C. § 672(a) *with* § 671(a)(29).  And it should be interpreted in a way that ensures its benefits flow to the same children who Congress intended the payments and the plan to benefit, that is, children whose "placement and care are the responsibility of" the State.  *See Id*. § 672(a)(2)(B); § 671(a)(8) (requirement limited to "individuals assisted under the State plan"); *id*. (a)(9) (limited to "maltreatment of a child receiving aid" through program); *id*. (a)(10) (limited to entities "receiving funds" through program); *id*. (a)(16) (limited to children receiving foster care maintenance payments); § 671(a)(30) (creating standards related to education only for "each child . . . with respect to whom there is eligibility for a payment under the State plan"); § 671(a)(33) (creating requirement of notice of tax benefit to persons adopting "a child who is in foster care under the responsibility of the State"); *cf*. U.S. Dep't of Health & Human Servs., Children's Bureau, Child Welfare Policy Manual § 8.3A.12, Question 4, *available at* https://tinyurl.com/pns8kns3 [last accessed June 9, 2025]. [7]

  This interpretation is also consistent with how the same term is used in District law, which again creates consistency.  *See* Defs.' Supp. Mem., [54-1] at 2; *In re A.S.*, No. N-1281-93,

---

[7]  HHS has explained that the "term placement and care means that the title IV-E agency is legally accountable for the day-to-day care and protection of the child who has come into foster care through either a court order or a voluntary placement agreement." *Id*.  It has further explained that this requirement ensures that that "the title IV-E agency," which implements the State plans, can "make placement decisions about the child, such as where the child is placed and the type of placement most appropriate for the child," and "that the title IV-E agency provides the child with the mandated statutory and regulatory protections, including case plans, administrative reviews, permanency hearings, and updated health and education records." *Id*.

2003 WL 22430392, at *2 (D.C. Super. Ct. Sept. 17, 2003) ("Throughout the life of a neglect case, the child who has been removed from the parents' home remains in the legal custody of the District . . . .) (citation modified); *Cf. Stokeling v. United States*, 139 S. Ct. 544, 551 (2019) ("If a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.").

And, in contrast, another subpart of the same list of State plan requirements expressly, and uniquely, includes both children whose caregivers receive payments *and* those who do not. 42 U.S.C. § 671(a)(27) (requiring plan to provide "with respect to any child in foster care under the responsibility of the State under this part or part B and without regard to whether foster care maintenance payments are made under section 672 of this title on behalf of the child, . . . procedures for verifying the citizenship or immigration status of the child"). Other, later-enacted parts of the SSA also expressly state that they apply to children "without regard to" their eligibility for funds. In 2018, Congress enacted the Family First Prevention Services Act "to enable States to use Federal funds . . . to provide enhanced support to children and families and prevent foster care placements . . . ." P.L. 115-123, sec. 50702, 132 Stat. 64. It added new subparts to § 671, outside of the existing foster care program plan requirements, that permitted States to spend funds for a "child who is a candidate for foster care . . . but can remain safely at home or in a kinship placement . . . ." *Id*. sec. 50711, codified at 42 U.S.C.A. § 671(e)(2). It further defined such children as those "at imminent risk of entering foster care []without regard to whether the child would be eligible for foster care maintenance payments under section 672" or funds under § 673. *Id*., codified at § 675(13).[8]

---

[8]    Plainly, this act and program also indicate that Congress does not think "kinship placements," outside of foster care and to prevent entry into that system, are a bad thing. It would thus be very strange to now contort § 671(a)(29) with a broad reading of "removal," in

"Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019). Congress surely knows how to specify which children should benefit from its programs, and, when it has intended it should be a class larger or smaller than those defined by § 672(a), it has said so expressly in § 671—but it did not say so in § 671(a)(29).

Finally, interpreting "removal" of § 671(a)(29) to mean simply any action that results in a child leaving their parents' home to live with someone else—like a dictionary definition might suggest—creates enormous ambiguity and absurd results. For one, nothing clarifies if or how a State should be involved before the notice requirement is triggered. If, for example, a child goes to stay with an uncle while their single mother attends inpatient substance abuse treatment, and a child welfare agency is *aware* of that, is the agency supposed to call every adult relative of that child, explain what happened (maybe to extended relatives' great surprise), then convey a lot of totally irrelevant information concerning foster care? *See* 42 U.S.C. § 671(a)(29). What if a social worker drove the child to the uncle's house? *Id.* What if a social worker suggested this arrangement? *Id.* Application of § 671(a)(29) to these circumstances would be absurd—it would not serve the purposes of the federal foster care program, nor benefit foster children, *unless* the agency had *also* decided that the child should be placed in foster care, meaning it would have to have responsibility for the child's placement and care, via placement agreement or judicial determination.

---

service of some theory that maybe the notice requirement was intended to *prevent* the very thing Congress affirmatively funds as a good thing, to be desired.

For all of these reasons, "removal" in § 671(a)(29) means just that—an action to take a child from its parents' custody, and into the placement and care of the state, by way of a voluntary placement agreement between the parents and state, or through judicial determination.

**B.    Plaintiffs S.S. and T.J. Received All Notice Required.**

In any event, the District is entitled to judgment on the Section 671(a)(29) claims by Plaintiffs S.S. and T.J. because there is no evidence that the District failed to provide them information required by this statute.  As stated above, around the time of the incidents alleged in the complaints, CFSA *did* decide to try to remove the Plaintiff Children A.B., N.B., and T.S. from the legal custody of their parents and to take the Children into its own custody, and it in fact filed complaints of neglect in the Family Court for each of these Children to that end.  *Id.* ¶¶ 181, 238.  At that point, CFSA began the notice procedures described by the statute.  *Id.* ¶ 173.  As part of that process, CFSA licensing staff had multiple conversations with S.S. about licensure. *Id.* ¶¶ 174–76.  There is no evidence that they did not adequately inform her of her rights or options.  T.J. also spoke with licensing staff and received a temporary license at the time.  *Id.* ¶ 235.  There is no evidence she was inadequately informed of her options.  Accordingly, the District is entitled to judgment on Plaintiff S.S. and T.J.'s claims under this statute.

**C.    The Remaining Caregiver Plaintiffs Fail to State A Claim Under § 671(a)(29) Because the Relevant Children Were Not "Removed."**

As discussed above, § 671(a)(29)'s notice requirement is not triggered unless a child experiences a "removal" within the meaning of the law.  *See* Section III.A.  Only three of the Plaintiff Children, discussed just above, were subject to such removal.  *See* Section III.B.  CFSA did not take, or seek to take, placement and care responsibility of any of the other Children, via placement agreement or judicial order.  *See* Background Sec. V.  Thus, the notice requirement

was not triggered in any other cases, and those Caregivers also cannot state a claim for any violation of their rights, and the District is entitled to judgment on those claims.

### D.    Alternatively, Plaintiffs K.H, S.K., M.M., J.R., M.S., N.G., and Y.A.L. Received Accurate Notice of Their "Options."

Even if additional Plaintiff Children were somehow removed within the meaning of § 671(a)(29), Plaintiffs K.H, S.K., M.M., D.B., J.R., M.S., N.G., and Y.A.L. suffered no violation of that law because they received relevant information concerning their "options." For the Caregivers of Children on whose behalf CFSA never sought to initiate a neglect case (that is, everyone but S.S. and T.J.), licensure to serve as a foster family home for the relevant Children was not an "option." *Supra*, Section II.B; Pls.' Opp'n to Dist. Mot. to Dismiss, [45] at 44 ("[A]nyone can apply to be a licensed foster parent . . . but because CFSA did not remove Plaintiff Children to foster care, having Plaintiff Caregivers become licensed as foster parents would not make them foster parents to Plaintiff Children.").

Rather, at the time of the alleged "diversion," if any of those Caregivers wanted to be sure that the Children would remain in their custody, their "option" to make that happen was to seek custody in the Family Court. *See* Background Sec. I. Plaintiffs K.H, M.M., J.R., M.S., N.G., and Y.A.L. all testified that, at the time of the alleged diversions, CFSA employees advised them to file for custody of the Children in the Family Court. *Id*. ¶¶ 34, 59, 301, 207, 114, 272. And they successfully did so, *id*. ¶¶ 38, 62, 304, 210, 115, 280. And, except for N.G., they have maintained custody of the Children they love to this day. *Id*. ¶¶ 48, 68, 308, 215, 246. The District is therefore entitled to judgment on these Plaintiffs' claims under § 671(a)(29) because they were given notice of their relevant "options" for care.

### E.    Alternatively, The Alleged Violations Caused No Harm to Plaintiffs.

48

Alternatively, all of the Caregivers' claims under § 671(a)(29) fail because no reasonable juror could find the District's alleged failures caused Plaintiffs any harm, or damages.  Plaintiffs rely upon 42 U.S.C. § 1983 to provide a cause of action for the alleged violation.  Where, as here, the defendant is a local government, Plaintiffs must prove that some District policy or custom was the "'moving force' behind" the alleged violations.  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell v. Dep't of Soc. Servs*, 426 U.S. 658, 694 (1978)).  The policy or custom must be "closely related to the ultimate injury," and the court should inquire whether "the injury [would] have been avoided" in its absence.  *Smith v. District of Columbia*, 413 F.3d 86, 102 (D.C. Cir. 2005) (quoting *City of Canton*, 489 U.S. at 391).  The D.C. Circuit has "equated moving force with proximate cause" in the tort context.  *Id*. (citation modified); *see* Section IV.D (discussing tort causation).

Here, for the reasons repeatedly stated, no reasonable juror could find that the District's alleged failure to provide certain notice to the Caregivers—even assuming that was pursuant to a custom or policy—*caused* them to be deprived of the foster care maintenance payments they seek as damages, or any other damages allegedly flowing from their inability to serve as licensed foster families for the Children.  *See* Section I.B; II.B; *see also*, *e.g.*, *Steinberg v. District of Columbia*, 952 F. Supp. 2d 22, 27–29 (D.D.C. 2013) (granting summary judgment for defendant when no reasonable juror could find fire chief was aware of decision, based only on evidence showing fire chief "would ordinarily be responsible for" such decisions, and as against chief's denials he was aware in this case); *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 631 (D.C. Cir. 2010) ("The possibility that a jury might speculate in the plaintiff['s] favor . . . is simply insufficient to defeat summary judgment.").

## F.    <u>Alternatively, § 671(a)(29) Is Not Privately Enforceable.</u>

"If the text of a statute does not provide a cause of action, there ordinarily is no cause of action." *Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1097 (D.C. Cir. 2017).  The SSA does not expressly create any private right of action.   "Unambiguously conferred" federal statutory rights —"not the broader or vaguer 'benefits' or 'interests'"— might be enforceable through 42 U.S.C. § 1983.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).  "A statute creates a right enforceable under Section 1983 if (1) 'Congress . . . intended that the provision in question benefit the plaintiff,' (2) 'the plaintiff . . . demonstrate[s] that the right . . . protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence,' and (3) 'the statute . . . unambiguously impose[s] a binding obligation on the States' using 'mandatory, rather than precatory, terms.'"  *DuBerry v. District of Columbia*, 824 F.3d 1046, 1051 (D.C. Cir. 2016) (citing *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)).

This Court has already held that § 671(a)(29) is privately enforceable but permitted re-argument.  Some of the Section's terms render it too "vague and amorphous" to find it creates a federal right.  The term "options" creates an open-ended cause of action for plaintiffs, like those here, to dispute whether or not a child welfare agency gave them good or accurate legal advice. It also, as here, requires federal courts, in order to enforce this right, to determine what good or accurate advice as to "Federal, State, and local law" would be.  This in turn would require federal courts to regularly opine on the meaning of state and local family law—a domain the Supreme Court has repeatedly said "belongs to the laws of the States," so much so that in rare cases involving "a determination of the status of the parties" under State family law, federal courts might abstain altogether.  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13 (2004). Enforcement of this benefit would therefore "strain" federal "judicial competence" by requiring it to wade deeply and regularly into family law matters.  *See DuBerry*, 824 F.3d at 1051.

Moreover, if Plaintiffs are correct that "removal" means something like moved from one home to another, as discussed above, the application of this provision would be very vague indeed. *Supra*, Section III.A. The phrase "and other adult relatives" would also be difficult to enforce. Does this mean all of them? What if one is already licensed for the child? Shall the agency prompt a custody battle by seeking other relatives? And, perhaps relatedly, at least one court has also found that the phrase "exercise due diligence" does not provide sufficient guidance to create an enforceable right. *Murphy v. Baker*, No. 15-cv-30187 2017 WL 2350246, at *9–10 (D. Mass. May 4, 2017), *report and recommendation adopted*, No. 15-cv-030187, 2017 WL 2363114 (D. Mass. May 30, 2017). Finally, the District is still unaware of any decision, other than this Court's, finding this Section is privately enforceable.

For all of these reasons, the Court should find § 671(a)(29) is not privately enforceable.

**IV.    <u>The District Is Entitled to Judgment on All Plaintiffs' Claims for Negligence.</u>**

To prove negligence, Plaintiffs must show (1) that the District owed them a duty, (2) breach of the duty, and (3) injury proximately caused by the breach. *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (en banc). The "existence of a duty" is "a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." *Id*. (citation modified). To show the existence of a duty, Plaintiffs must both show that the District owed a duty to them, as opposed to the public in general, *and* establish the substance of that duty, that is, the standard of care. *E.g.*, *Hoodbhoy v. District of Columbia*, 282 A.3d 1092, 1096–98 (D.C. 2022) (discussing public duty doctrine); *Turner v. District of Columbia*, 532 A.2d 662, 675 (D.C. 1987) (finding limited exception to the public duty doctrine for abused and neglected children); *Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C. 1979) (reiterating plaintiffs' burden to prove substance of duty). And where, as here,

a plaintiff sues a sovereign government, she must also show—first—that the duty described is "ministerial," that is, non-discretionary. *District of Columbia v. Pace*, 498 A.2d 226, 228 (D.C. 1985).

Here, Plaintiffs fail at every step. First, the District is immune to tort suits for the discretionary decision to take a child into its custody and care. Second, to establish the standard of care, Plaintiffs rely on negligence per se, arguing the D.C. Code requires CFSA to take children into its custody, and to seek to place them into foster care, under certain circumstances. But, by its plain terms, that statute creates neither mandatory duties nor per se negligence. Nor could Plaintiffs establish a traditional standard of care, because they lack experts.

Even if Plaintiffs could show the existence of a duty, and breach, no reasonable juror could find that the District's conduct proximately caused Plaintiffs not to be placed into foster care, or, consequently, that the damages they claim resulted from that non-placement. Nor could they prove any of the categories of damages they are pursuing. The Payments they seek are not funds that would have ever gone to the Plaintiff Children, who are the only Plaintiffs with negligence claims. They have no right to those funds and cannot possibly show that they were deprived of them as a natural and foreseeable consequence of the District's conduct. Further, there is no actual evidence on which they could base a claim for emotional distress damages.

### A.    Sovereign Immunity Forecloses Plaintiffs' Claims.

Plaintiffs' negligence claims are foreclosed by the doctrine of sovereign immunity. "Under this doctrine, the District is immune from suit in tort if the act complained of was committed in the exercise of a discretionary function." *Pace*, 498 A.2d at 228; *accord*, *e.g.*. *DCHA v. Pinkney*, 970 A.2d 854, 859–60 (D.C. 2009). The District is not immune from suit for "ministerial" acts. *Id*. "Generally, discretionary acts involve the formulation of policy, while

ministerial acts involve the execution of policy." *Pace*, 498 A.2d at 228 (qouting *Nealon v. District of Columbia,* 669 A.2d 685, 690 (D.C. 1995)).

"The common-law distinction between ministerial and discretionary functions arose out of a concern for separation of powers." *Id*. at 229. "Immunity is vital in the context of discretionary functions because of the necessity and desirability of freeing policy decisions from jury speculation." *Id*. (citation modified). "In other words, allowing a court or jury to invade the legitimate sphere of a municipality's policymaking processes would infringe upon the powers properly vested in a coequal branch of government." *Id*. (citation modified).

The Court determines the application of sovereign immunity. *Aguehounde v. District of Columbia*, 666 A.2d 443, 447 (D.C. 1995). "To determine whether a given governmental action is discretionary or ministerial," the Court should "first determine whether it is the kind of action 'that the discretionary function exception was designed to shield;' that is, whether the action involves 'the permissible exercise of policy judgment.'" *Id*. at 448 (quoting *Berkovitz v. United States,* 486 U.S. 531, 536–37 (1988)). "If the answer to this first inquiry is yes, then the action is immune from suit, unless the government has adopted a statute, regulation or policy that specifically prescribes a course of action for an employee to follow." *Id*. (quoting *id*.) (citation modified). "If such a specific directive exists which removes the otherwise unfettered discretion of the government employee, the action is ministerial, opening the government to suit . . . ." *Id*.

To start, the acts at issue here are CFSA's alleged decisions not to take certain children into its custody and further seek prosecution of a neglect case. *See* K.H. Compl. ¶ 1–3. These acts indisputably involve "formulation of policy," not just "the execution of policy." *Cf*. MTD Ruling at 28. Plaintiffs *allege* the opposite—they claim that a policy they call "kinship diversion" guides CFSA's decision-making, even in individual cases, and that this policy directly

53

caused their harms. *E.g.*, K.H. Compl. ¶ 3, 37.[9] But Plaintiffs are well aware of a handful of

formal, written policies formulated by CFSA that address how agency personnel should make

these decisions—on a case-by-case basis. *See* Exs. 2–4; *see also Nealon*, 669 A.2d at 690

("Discretionary acts have also been defined as acts that require personal deliberation, decision

and judgment.") (citation modified).

       And they allege that CFSA formulated all of these policies because of *other* underlying

policy decisions concerning costs and allocation of resources: To wit, they allege CFSA has

"adopted the custom and practice of kinship diversion to relative caregivers, and now use[s] it

routinely, *precisely to avoid*" certain "legal and financial responsibilities to support these

children and their relative caregivers" that would otherwise arise. *E.g.* K.H. Compl. ¶ 3 (italics

in original); *see also Nealon*, 669 A.2d at 690 (explaining discretionary acts "generally have a

broad public effect and call for a delicate balancing of competing considerations") (citation

modified). Plaintiffs' statement of the case effectively concedes that the acts at issue here "were

prompted by policy considerations." *Pinkney*, 970 A.2d at 862.

       Even so, these acts also indisputably implicate "core" executive responsibilities and

policy choices, and thus they are "discretionary" acts entitled to immunity, regardless of

Plaintiffs' position. The DCCA has repeatedly said that "decisions about 'whether and when to

institute enforcement proceedings against a specific individual'" are "committed to agency

discretion." *Tucci v. District of Columbia*, 956 A.2d 684, 692 (D.C. 2008) (quoting *District of

Columbia v. Sierra Club*, 670 A.2d 354, 360 (D.C. 1996)). Such decisions are a "core executive

---

[9]     The District disputes Plaintiffs' characterization of this policy in their Complaints, but the
point is that Plaintiffs can hardly dispute that these acts involve policy decisions at this point.
Moreover, the District has always agreed that this case is fundamentally about a policy
disagreement, between District leaders and, essentially, Plaintiffs' counsel. *See*, *e.g.*, Defs.' Mot.
to Dismiss Pls.' Compls., [42] at 11.

responsibility." *Sierra Club*, 670 A.2d at 360 (collecting cases from Supreme Court and federal circuits). "Budgetary decisions" are also "traditionally" infused with discretion and implicate "core" executive policy choices. *Sierra Club*, 670 A.2d at 362. The D.C. Code vests the Mayor with "charge of the administration of the financial affairs of the District," D.C. Code § 47–310(a), and requires her "to apportion all appropriations, funds, and authorizations 'so as to achieve the most effective and economical use thereof.'" *Sierra Club*, 670 A.2d at 365 (quoting § 47–310(a)(9)). "These are core executive functions" and courts "should accede to a request for judicial intrusion only if it is plain that the Council intended to restrict the Mayor's authority in this regard." *Id.* (citation modified). In short, where, as here, "there is room for policy judgment and decision, there is discretion." *Nealon*, 669 A.2d at 690 (citation modified).

Nothing in the text of the D.C. Code restricts that discretion, at least not in the ways Plaintiffs claim. In other words, nothing in the Code "specifically prescribes a course of action" that CFSA should have followed in these cases, *see Aguehounde*, 666 A.2d at 448, or requires "mere obedience to orders . . . in which the [municipal employee or agency] has little or no choice," *Nealon*, 669 A.2d at 690 (internal quotations omitted) (alteration expanded).

Plaintiffs have argued that D.C. Code § 4-1303.04(c) (the "Section") creates a ministerial duty for CFSA "to remove" the Plaintiffs "to foster care" once the agency "determined the Plaintiff Children could not remain in their homes even with services." Pls.' Resp. to Defs.' Notice of Anticipated Mot. for Summ. J., [108] at 5. That Section states as follows:

> (c) When an investigation made pursuant to § 4-1301.04 or § 4-1301.05 indicates that a child is an abused or a neglected child and when it has been determined that the child cannot be adequately protected by any of the services set forth in § 4-1303.03(a)(7) or (b) of this section or by any other services, the Director of the Agency is authorized to:

> (1) Remove the child with the consent of the parent, guardian, or other person acting in loco parentis;

(2) Request the Corporation Counsel of the District of Columbia to petition the Family Division of the Superior Court of the District of Columbia for a finding of abuse or neglect and, where appropriate, the removal of the child; and

(3) Request the police to remove the child when the consent of a parent, guardian or other custodian cannot be obtained and the need to protect the child does not allow sufficient time to obtain a court order.

D.C. Code § 4-1303.04(c).

Per its plain text, this Section does not create *any* mandatory duties; it simply makes clear that CFSA "is authorized to" take certain actions. *Id.* Providing an agency *authority* to take certain actions is not generally read to mean that the agency must take those actions, particularly when they are the kind of actions traditionally considered discretionary. In *Tucci*, for example, the DCCA found that even stronger language indicating that "the Mayor . . . shall enforce" certain regulations did "not strip the Mayor of discretion in undertaking enforcement action." 956 A.2d at 691. It explained, relevantly, "[n]o one would seriously argue that the use of the term 'shall be prosecuted'" in criminal statutes "requires" criminal prosecutors "to prosecute each and every violation of these statutes brought to his or her attention." *Id.* This alone forecloses Plaintiffs' negligence theory. *Id.*; *Hood v. United States*, 28 A.3d 553, 559 (D.C. 2011) (describing plain meaning canon of construction"); *Sierra Club*, 670 A.2d at 363 (same).

Indeed, the Supreme Court has squarely held that the same language used in similar circumstances "commit[s] complete discretion to" the Secretary of the Food and Drug Adminstration (FDA) "to decide how and when" its enumerated powers "should be exercised." *Heckler v. Chaney*, 470 U.S. 821, 835 (1985). The Federal Food, Drug, and Cosmetic Act (Act) states that "[t]he Secretary is *authorized* to conduct examinations and investigations . . . ." *Id.* (emphasis in original) (quoting 21 U.S.C. § 372). Another section of that act "states baldly that any person who violates the Act's substantive provisions 'shall be imprisoned . . . or fined.'" *Id.*

(quoting 21 U.S.C. § 333).  In *Heckler*, the plaintiffs argued this provision "mandates criminal

prosecution of every violator of the Act," but the Court was "unwilling to attribute such a

sweeping meaning to this language, particularly since the Act charges the Secretary only with

recommending prosecution" and "any criminal prosecutions must be instituted by the Attorney

General."  *Id*.

      The same is true here.  The Section Plaintiffs rely upon merely authorizes CFSA to do

certain things.  The Court should not rewrite the statutory text to have the "sweeping meaning"

Plaintiffs urge, "particularly since" the D.C. Code "charges [CFSA] only with recommending

prosecution" and "any [neglect] prosecutions must be instituted by" OAG.  *See* D.C. Code § 4-

1303.04(c)(2) (authorizing CFSA to "request" that OAG prosecute a neglect case); D.C. Code §

16-305(c)(1); *In re J.J.Z.*, 630 A.2d at 191; *see also Dalton v. United States*, 816 F.2d 971, 973

(4th Cir. 1987) (explaining that "'[m]ay' in a statute dealing with agency power normally confers

a discretionary power, not a mandatory power"); *In re D.K.*, 26 A.3d 731, 734 (D.C. 2011)

(explaining that courts defer to reasonable agency interpretations, and placing "great weight on

CFSA's interpretation . . . of the applicable statutory and regulatory scheme").

      Additionally, even if Plaintiffs had a colorable argument around the Section's "plain"

meaning, Plaintiffs' interpretation leads to absurd results, for many reasons.  *Cf. e.g. May v.

Riber E. at Grandview*, 322 A.3d 557 (D.C. 2024) (finding Court "may look beyond plain

meaning where not doing so would produce absurd results") (citation modified).  First, Plaintiffs

insist that the Section establishes a list of *exclusive* options, meaning that, upon finding abuse or

neglect, and that the child cannot safely remain in the home with their legal caregiver, the agency

*must* do one of these three things.  That would seem to *prohibit* CFSA from immediately

removing a child that is in *immediate danger*, without the caregiver's consent or the aid of OAG

or the police—that is absurd, and in direct conflict with other parts of the Code.  *Compare* D.C.

Code § 4-1303.04(c) *with* D.C. Code § 16-2309(a)(3), (4).  It would also seem to prevent the

agency from simply permitting another parent to step in—if, for example, the custodial parent

experienced a crisis and left his or her children without care or supervision, CFSA *could not*

simply call the other parent and permit that person to pick up the kids.  *See* D.C. Code § 4-

1303.04(c) (specifying only ways for CFSA to take a child into its custody); Ex. 10, Elizabeth

Muffoletto 2/25 Dep. Tr. at 101–02.  Again, that is absurd—and appears to conflict with the

other parent's constitutional right to family integrity.  *Cf. Santosky*, 455 U.S. at 753.  Plaintiffs'

interpretation also conflicts with District laws that were enacted specifically to enable families to

*prevent* children from being taken into state custody or subject to neglect cases, including the

laws creating the Third-Party Custody actions that most of the Plaintiff Caregivers used in these

cases to obtain custody.  *See* Background Sec. I.

The Court should avoid these absurd results and favor a reading that harmonizes the

Section with other parts of the D.C. Code.  *Hood*, 28 A.3d at 559; *May*, 322 at 568; *District of*

*Columbia v. Am. Univ.*, 2 A.3d 175, 187 (D.C. 2010) ("[W]e attempt to harmonize statutes, not

read them in a way that makes them run headlong into one another.").

The District is entitled to judgment on Plaintiffs' negligence claims because it is immune.

## B.    Alternatively, Plaintiffs Cannot State a Claim for Negligence Per Se.

"To prevail on a negligence *per se* theory," Plaintiffs "may rely on a statute or regulation

as proof of the applicable standard of care."  *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033,

1039 (D.C. 2014) (citation modified).  "Violation of a statute or regulation may constitute

negligence *per se* only if the statute is meant to promote safety, if the plaintiff is a member of the

class to be protected by the statute, and if the defendant is a person upon whom the statute

imposes specific duties." *Id.* (citation modified); *see also* Restatement (Second) of Torts § 286 (Oct. 2024 update). "Proof of an unexplained violation of that standard renders the defendant negligent as a matter of law, so long as the violation was the proximate cause of the injuries, and the alleged injuries were of the type which the statute was designed to prevent." *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. 1996) (citation modified); *see also* Restatement (Second) of Torts § 288 (Oct. 2024 update). Thus, the claimant "must, at the outset, establish [the standard's] applicability by showing that he is within the class of persons intended to be protected by it, and that the injury incurred resulted from the type of risk against which the statute was designed to protect." *Lewis v. WMATA*, 463 A.2d 666, 674 (D.C. 1983).

"Moreover, the statute or regulation must not merely repeat the common law duty of reasonable care, but must set forth specific guidelines to govern behavior." *Night & Day Mgmt., LLC* at 1040 (citation modified). The DCCA has created a very high bar for specificity—the law creating the alleged duty must be *very* specific. Thus, a regulation that "requires that a security plan be submitted with a nightclub's liquor-license application," but which leaves "the specifics . . . to the discretion of the applicant and the review board" is not specific enough. *Night & Day Mgmt., LLC*, 101 A.3d at 1040. Regulations requiring that "[d]ebris and other loose material[ ] shall not be allowed on or under stairways" or that "slippery conditions on stairways shall be eliminated as soon as possible" were not specific enough, but more like common law standards of reasonable care. *McNeil*, 686 A.2d at 579 (quoting *Thoma v. Kettler*, 632 A.2d 725, 728–29 n.8 (D.C. 1993)). A law plainly stating that no "owner of an animal shall allow the animal to go at large," too, was not specific enough to create liability for negligence *per se* when a defendant's unleashed dog attacked the plaintiff. *Chadbourne v. Kappaz*, 779 A.2d 293, 296–97 (D.C. 2001). *See also*, *e.g.*, *Iacangelo v. Georgetown Univ.*, 595 F. Supp. 2d

87, 91–93 (D.D.C. 2009) (finding cited rules did not "embody a *substantive standard of care*, but rather an *administrative requirement*"). The Court decides whether a law creates a standard of care. *McNeil*, 686 A.2d at 579; *Johnson v. District of Columbia*, 728 A.2d 70, 75–76 (D.C. 1999).

Here, for essentially the same reasons discussed above in Section I.A., D.C. Code § 4-1303.04(c) does not create a *per se* duty because it does not "set forth specific guidelines to govern behavior." *See Night & Day Mgmt., LLC*, 101 A.3d at 1040 (citation modified). Rather, it "authorizes" CFSA to do certain things, under circumstances in its discretion. *Supra*, Section I.A. District law has never found that such language creates *per se* liability.

Moreover, the "injury" Plaintiffs claim they "incurred" here—the non-payment of foster care maintenance payments—did not "resul[t] from the type of risk against which the statute was designed to protect." *Lewis*, 463 A.2d at 674 (D.C. 1983). The language at issue, in largely the same form, was first added to the D.C. Code as part of the Prevention of Child Abuse and Neglect Act of 1977, D.C. Law 2-22, sec. 304 (Oct. 4, 1977), *available at* https://tinyurl.com/yw767mhd. The Council explained that the "purpose" of the language was:

> to require a report of a suspected neglected child in order to identify neglected children; to assure that protective services will be made available to a neglected child to protect the child and his or her siblings and to prevent further abuse or neglect; and to preserve the family life of the parents and children, to the maximum extent possible, by enhancing the parental capacity for adequate child care.

*Id*. sec. 103. In other words, the Council aimed to prevent abuse and neglect, and to enable children and parents to stay together whenever possible. *Id*.; *see also In re Ta. L.*, 149 A.3d at 1076–79, 1083; *In re D.K.*, 26 A.3d 731, 734–36 (D.C. 2011) (discussing purpose). Nothing indicates that this act, or language, was intended to protect potential kin caregivers, or the children in their care, from the harm of not receiving foster care maintenance payments. To the

contrary, when faced with a similar claim that CFSA should pay certain "emancipation funds" to a child who was "no longer under CFSA's supervision," the DCCA held such a claim "would be inconsistent with the purpose and design of the Neglect Statute." 26 A.3d at 735.

For all of these reasons, Plaintiffs cannot prove negligence *per se*.

### C.    Alternatively, Plaintiffs Cannot Possibly Prove Traditional Negligence.

Nor can Plaintiffs succeed on a traditional theory of negligence. "A plaintiff in a negligence case must establish the applicable standard of care through expert testimony" when, as here, "the subject is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) (citation modified). "No expert testimony is needed if the subject matter is within the realm of common knowledge and everyday experience." *Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001).

"This fact-sensitive standard is best illustrated by example." *Boff v. Inter-Cont'l Hotels Corp.*, No. 17-cv-01523, 2018 WL 6329451, at *3 (D.D.C. Dec. 4, 2018). "The D.C. Court of Appeals has required expert testimony in cases involving:

> maintenance of leaning trees; application of hair relaxer; tightness of handcuffs; cushioning for the ground underneath playground monkey bars; maintenance of street lights to prevent falling light globes; time frame for ordering building materials on a construction project; response when an arrestee is found hanging in his cell; and installation of a crosswalk, instead of a stop sign, light, or crossing guard.

*Id.* (quoting *Briggs*, 481 F.3d at 845). It has not required such testimony "where the defendant left a vent in the floor of a parking garage uncovered, . . . placed plywood boards covering a construction trench with gaps big enough to step into, . . . built a playground slide with a sharp hole in the metal handrails, . . . abandoned a tank of gasoline in violation of the D.C. Fire Code, .

61

. . or built a slightly raised bathroom step that was hard to spot and easy to trip over." *Boff*, 2018 WL 6329451, at *3 (citation modified).

In short, "expert testimony is routinely required in negligence cases which involve issues of safety, security and crime prevention.'" *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009) (citation modified). But it is not required when the "claim involves a straightforward hazard," such as holes in floors, sharp metal on playgrounds, and abandoned explosives. *Boff*, 2018 WL 6329451, at *3.

Here, the question of when a reasonable social worker, or child welfare agency, should seek to take a child into legal custody and further seek prosecution of a neglect case is not *at all* like the "straightforward hazards," *Boff*, 2018 WL 6329451, that the DCCA has found to be "within the realm of common knowledge and everyday experience," *Hill*, 779 A.2d at 908. Indeed, if Plaintiffs' claim has an analogy at all, it is to a professional malpractice claim, very much like the cases that initially led to the general requirement of expert testimony. In *Morrison v. MacNamara*, for example, the DCCA explained that in "actions for professional negligence," the defendants are charged with "reasonable care" given the "special knowledge or skills which a defendant possesses." 407 A.2d at 561. Thus, to prove professional negligence, the plaintiff must be able to articulate what other persons with the same special knowledge or skills would consider reasonable care under similar circumstances. *Id*. Precisely because this is specialized—not common—knowledge, the testimony of other persons who have the same specialized knowledge (*i.e.*, experts) is usually necessary to establish the standard of care. *E.g.*, *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982); *Arnold & Porter*, 756 A.2d at 433; *Baylor v. United States*, 407 A.2d 664, 670 (D.C. 1979 (finding "absence of expert testimony . . . precluded submission of the issue to the jury").

62

Finally, Plaintiffs have suggested that *Turner v. District of Columbia*, 532 A.2d 662, 675 (D.C. 1987) creates an actionable claim of negligence and means they do not need to proffer experts. [108] at 4. It is true that *Turner* held that parts of the Abuse and Neglect Act create a special duty on the part of District officials to act when they receive a report of suspected abuse or neglect. *Id.* at 666–675. After considering the text of parts of the act *not* at issue here, the court concluded that, upon receipt of a report of suspected abuse, the District had a duty to inform the police, gather certain data, determine whether the children should be removed from home, and enlist the aid of the police to physically remove the children if necessary. 532 A.2d at 674–75. Neither that case, nor any other to the District's knowledge, has ever held that the Abuse and Neglect Act requires the District to formally remove and place into foster care every child in the District who appears to have been subject to abuse or neglect, as urged by Plaintiffs.

In sum, Plaintiffs have not identified any experts in this action, so the District is entitled to judgment on their claims for negligence because they cannot possibly prove their case.

## D.    Alternatively, the District's Conduct Did Not Cause Plaintiffs To Suffer Any Damages.

Even if the Court finds an actionable duty exists, no reasonable juror could find that the District's tortious conduct has caused them to suffer damages. Nor could they find that the Plaintiffs suffered damages at all.

Proximate cause is "that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury without which the result would not have occurred." *District of Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005) (citation modified). "Intervening cause" is the same as "superseding cause" as defined in the Restatement (Second) of Torts § 440 (Oct. 2024 update). *McKethean v. Washington Metro. Area Transit Auth.*, 588 A.2d 708, 716 n.9 (D.C. 1991). A "superseding cause is an act of a third person or

other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement, § 440.

"Proximate cause may be divided into a cause-in-fact (causation) element and a policy element." *Lacy v. District of Columbia*, 424 A.2d 317, 320 (D.C. 1980). "The cause-in-fact requirement assures that no defendant will be liable unless he has in fact caused the plaintiff's harm." *Id*. "The policy element includes various liability-limiting considerations which relieve the defendant of liability for harm he actually caused where the chain of events appears highly extraordinary in retrospect." *Id*. at 321 (citing Reporter's Notes to § 433, Restatement (Second) of Torts). According to the Restatement (Second) of Torts, "considerations" that are individually "or in combination . . . important in determining" proximate cause of a plaintiff's harm include:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has a created a situation harmless unless acted upon by other forces for which the actor is not responsible; (c) . . . time.

Restatement, § 433. Proximate cause is a question of law when "it is clear that reasonable [people] could draw but one conclusion from the facts alleged . . . ." *Convit v. Wilson*, 980 A.2d 1104, 1126 (D.C. 2009) (citation modified).

Additionally, even where causation can be found, damages cannot be speculative. *Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C. 1982). There must always be "some reasonable [evidentiary] basis on which to estimate damages," *id*. and to show that the "damages are reasonably or probably certain" to actually occur after a defendant's conduct, *Am. Marietta Co. v. Griffin*, 203 A.2d 710, 712 (D.C. 1964); *accord Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 119 (D.C. Cir. 1982); *Wood v. Day*, 859 F.2d 1490, 1492–93 (D.C. Cir. 1988). Plaintiffs must show that it is "more likely than not (a greater than 50% chance) that the

64

projected consequence will occur." *Wood*, 859 F.2d at 1493 (quoting 684 F.3d at 119).  "Unless there is nonspeculative evidence demonstrating that" the damages "will occur, the question should not be submitted to the jury." *Wood*, 859 F.2d at 1493 (citation modified).

No reasonable juror could find that Plaintiffs can prove they suffered damages as a result of the District's tortious conduct, because they cannot show with reasonable or probable certainty that they would have been placed into foster care absent that tortious conduct.  Jurors would have to simply speculate about how, for example, OAG and the Family Court would have handled Plaintiffs' neglect, if they had in fact been filed.  *See* Section I.B.1.c.  And of course OAG affirmatively declined to prosecute neglect in three of these cases.  *Id.*  And most of the Plaintiffs cannot even get that far in the chain of necessary causation.  *See* Section I.B.1.a–b (arguing most Caregivers cannot show eligibility for licensure or that they would have applied). Any jury award would be impermissible speculation.  *See Romer*, 449 A.2d at 1100 (overturning award of future damages because of insufficient evidence).

Finally, even if a juror could be convinced that the Children were not placed into foster care because of the District's tortious conduct, Plaintiffs cannot prove their entitlement to the damages they are actually seeking.  The Children are the only Plaintiffs making negligence claims, but the foster care maintenance payments they seek are not *their* damages.  *See* I.B.3. They would never have received those payments anyway, regardless of the District's conduct, and the District is not liable to Plaintiffs for them now.  *Eg.*, *Lacy*, 424 A.2d at 320 (stating cause in fact requirement).

Additionally, Plaintiffs appear to seek damages for emotional distress.  *See* Background Sec. V.  Plaintiffs thus must also show that a duty to avoid such distress *exists* in this context— they do not flow automatically from proof of a breach of some general standard.  *See Hedgepeth*,

22 A.3d at 793–811.  Even assuming (without conceding) such a duty existed, they must also

show that they "actually suffered serious and verifiable emotional distress."  *Id*. (citations

modified).  To meet that test, they must prove, again with experts, that the District's conduct

"would cause reasonable persons to suffer serious emotional disturbance."  *Id*. at 816 (quoting

Restatement (Third) of Torts § 46 (Tentative Draft No. 5, 2007)).  They must also show that each

Plaintiff Child suffered distress that is "acute, enduring, or life-altering."  *Id*. at 817.  Plaintiffs

cannot possibly convince a juror of all this because there is no evidence concerning the standard

of care or Plaintiffs' actual suffering in the record.  It is also quite clear that Plaintiffs face an

uphill battle to prove that a child welfare agency's decision *not* to take a child into care "would

cause reasonable persons to suffer serious emotional disturbance."  Again, to the contrary, there

is ample testimony the opposite is true— that removal into the neglect and foster care system is

traumatic for children. Ex. 9, Robert Matthews Dep. Tr. at 184–85.

## V.       The District Is Entitled to Summary Judgment on All Plaintiffs' Claims for Fraudulent and Negligent Misrepresentation.

To "allege fraudulent misrepresentations or omissions, a plaintiff must allege facts

showing that a person or entity (1) made a false representation of or willfully omitted a material

*fact*; (2) had knowledge of the misrepresentation or willful omission; (3) intended to induce

another to rely on the misrepresentation or willful omission; (4) the other person acted in reliance

on that misrepresentation or willful omission; and (5) suffered damages as a result of that

reliance."  *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1130 (D.C. 2015) (citation modified)

(emphasis added).  The reliance must be "reasonable."  *Hercules & Co. v. Shama Rest. Corp.*,

613 A.2d 916, 923 (D.C. 1992).  "In contrast to a complaint that alleges fraudulent

misrepresentations, a complaint alleging negligent misrepresentations need not allege that the

defendant had knowledge of the falsity of the representation or the intent to deceive."  *Id*. at

66

1131.  "A false representation may be either an affirmative misrepresentation or a failure to

disclose a material fact when a duty to disclose that fact has arisen."  *Saucier v. Countrywide*

*Home Loans,* 64 A.3d 428, 438 (D.C. 2013).

### A.  Plaintiffs Cannot Show Any CFSA Employee Made A False Misrepresentation Or Willfully Omitted a Material Fact.

Plaintiffs' claims fail at step one because each Caregiver's "alleged misrepresentation is

in essence an alleged misrepresentation of *law*, not a misrepresentation of fact."  *Falconi-Sachs*

*v. LPF Senate Square, LLC*, 142 A.3d 550, 555 (D.C. 2016).  The claim is similar to one made in

*Falconi-Sachs*.  Falconi-Sachs signed a lease that included a late fee equal to ten percent of one

month's rent each time a rent payment was late.  *Id*. at 553.  She later came to believe that this

late fee was an "invalid penalty provision," "not a valid liquidated damages clause."  *Id*. at 556.

She alleged that her landlord "committed fraud by falsely representing that [she] had the

obligation to pay late fees and attorney's fees."  *Id*. at 555 (citation modified).  The court held

that "the alleged misrepresentation is in essence" a "misrepresentation of *law* . . . ."  *Id*. at 555.

The Caregivers' claims here too concern "in essence" alleged misrepresentations of law,

not fact.  Like Falconi-Sach's claims, Plaintiffs' claims are built upon a *disputed legal premise*:

Plaintiffs argue that, at the time of the alleged misrepresentations, the District had a legal duty to

take the Plaintiff Children into its care, and to seek their placement into foster care.  Further,

because the District should have taken the Children into foster care, the Caregivers should have

been eligible for licensure as foster parents for the Children, and CFSA social workers should

have informed them of this option.  But in Plaintiffs' view, CFSA social workers' failure to

provide this information, and/or their provision of any information suggesting it was not option,

or explanation of other options or possible outcomes, was therefore a tortious misrepresentation

or willful omission.  In essence, this is just a claim that CFSA social workers provided bad legal

advice.  The District is entitled to judgment on these claims because Plaintiffs fail to state a

claim.  *Id.*; *Jones v. District of Columbia*, 241 F. Supp. 3d 81, 89–90 (D.D.C. 2017), *aff'd*, 715 F.

App'x 1 (D.C. Cir. 2018).[10]

> **B.**    **Plaintiffs T.J., S.S., K.H., J.R., Y.A.L., M.M., D.B. Cannot Show They Reasonably Relied Upon CFSA Social Workers' Misrepresentations.**

Plaintiffs cannot show that they reasonably relied on the alleged misrepresentations to

their detriment.  First, a claimant who "knew the facts" cannot show they relied, or reasonably

relied, on the alleged misrepresentation.  *Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1037–

38 (D.C. Cir. 1980).  Plaintiffs T.J., S.S., K.H., J.R., Y.A.L., M.M. and D.B. were all aware of

the "option" to serve as licensed foster parents, generally, before the alleged misrepresentations,

and thus no reasonable juror could find they relied, or reasonably relied, on the District's

statements.  *See* I.B.2.  Nor can there be a showing of "reliance" without the plaintiff actually

doing something different as a result of the alleged misrepresentation.  *See* Restatement (Second)

of Torts § 537 (Oct. 24 Update); *Sibley v. St. Albans Sch.*, 134 A.3d 789, 811 (citing same).

Plaintiffs S.S., M.S., N.G., D.B. and Y.A.L. also cannot show that they would have applied to be

---

[10]    The Court has so far assumed that 42 U.S.C. § 671(a)(29) creates a duty to speak that is actionable in tort under District law.  *See* MTD Ruling at 32.  But Plaintiffs have yet to establish the existence of this duty under District law.  In the context of Federal Tort Claims Act claims, federal courts have explained that the existence of a duty under *federal* law does not automatically somehow create tort liability under state law.  *See, e.g.*, *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1158 (D.C. Cir. 1985) ("Duties set forth in *federal law* do not, therefore, automatically create duties cognizable under *local tort law*.").  And the existence of any duty in tort, under District law, is a "policy" question to be answered, not something to be presumed.  *Hedgepeth*, 22 A.3d at 793.  Plaintiffs would need to show, perhaps, that § 671(a)(29) creates liability for negligence *per se*.  That seems unlikely.  *See* Section IV.B.  For purposes of this Motion, the District will also assume the duty exists in District law but requests the right to contest that at a later stage if the District is denied summary judgment on Plaintiffs' misrepresentation claims.

licensed foster family homes for the Children, instead of seeking Third-Party Custody anyway; thus no reasonable juror could find they actually "relied" on any misrepresentations.  *See* I.B.1.b.

Similarly, there is no evidence that L.C. or S.K. did anything they would not have done anyway because they "relied" on any conversations with CFSA staff.  There is no evidence anyone from CFSA suggested L.C. file for custody or that the children would be put in foster care with strangers if she did not do so.  *Id*. ¶ 86.  And S.K. testified that, during a meeting, social workers asked if she could "take" C.G. 1, 2, and 3 "that day" and she said yes.  *Id*. ¶ 123.  She told them that she "wanted the children to come live" with her and that the kids had previously told her that they wanted to live with her too.  *Id*. ¶¶ 124–25.  When asked, she said she did not think the kids should have been put in foster care in 2019.  *Id*. ¶ 127.  Again, nothing indicates she "relied" on any misstatements by CFSA.  *See* Restatement, § 537.

### C.    No Plaintiffs Can Show They Suffered Damages.

For the same reasons discussed above in Section IV.D, discussing negligence, Plaintiffs cannot show they suffered any damages as a result of the District's misrepresentations.  Additionally, "emotional distress damages are not permissible on a claim for negligent misrepresentation" at all.  *Osbourne*, 667 A.2d at 1328–29.

### D.    Plaintiffs Cannot Show Any CFSA Employee Intended to Mislead Them.

Even if Plaintiffs' claims for negligent misrepresentation survive summary judgment, they cannot make the further showings necessary to prove fraudulent misrepresentation.  In addition to proving that CFSA social workers had knowledge of the falsity of their statements or the need to state some fact, as well as showing the social workers intended to induce some conduct by the Caregivers, Plaintiffs must meet a higher evidentiary standard to succeed on these claims, namely with "clear and convincing" evidence instead of just a preponderance.  *Osbourne*

*v. Cap. City Mortg. Corp.*, 727 A.2d 322, 325 (D.C. 1999), *superseded in part by statute on other grounds*, *see Rose v. Wells Fargo Bank, N.A.*, 73 A.3d 1047, 1054 n.10 (D.C. 2013); *Sibley*, 134 A.3d at 809 (affirming summary judgment).  This they cannot do.

No reasonable juror could find that any of the CFSA social workers involved in this action knew, or should have known, that they were somehow misleading the Caregivers about their options for care.  At bottom, Plaintiffs believe that CFSA, and its staff, have been mistaken, or misleading, about what the law requires all along.  *Supra*.  There is no evidence anyone at CFSA has ever believed that to be true.  Thus no reasonable juror could find social workers were, in essence, intentionally lying to the Caregivers, and the District is entitled to judgment.

## CONCLUSION

For the foregoing reasons, the District is entitled to summary judgment on all of Plaintiffs' Claims.

Date: June 12, 2025.                                    Respectfully Submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Mateya B. Kelley*
MATEYA B. KELLEY [888219451]
GREGORY KETCHAM-COLWILL [1632660]
AMANDA C. PESCOVITZ [1735780]
Assistant Attorneys General

Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 724-5824
Email: mateya.kelley@dc.gov

*Counsel for Defendants*